**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT S. GARNER a/k/a SCOTT GARNER, *individually and on behalf of all others similarly situated* | § § § § | |
| Plaintiff, | § § | Civil Action No. 4:24-cv-3300 |
| v. | § § | |
| AXIP ENERGY SERVICES, LP, | § § | |
| Defendant. | § § | |

**APPENDIX IN SUPPORT OF AXIP ENERGY SERVICES, LP'S
MOTION TO DISMISS CLASS ACTION COMPLAINT**

| Evidence | Appendix pages |
|---|---|
| *Barber v. Nationwide Commc'ns, Inc.*, No. 3:95-CV-0656, 1995 WL 940517 (N.D. Tex. May 30, 1995) | App. 1-4 |
| *Barclay v. Richey*, No. 09-17-00026-CV, 2019 WL 302661 (Tex. App. Jan. 24, 2019) | App. 5-13 |
| *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 3:16-cv-00014, 2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) | App. 14-26 |
| *Green v. eBay Inc.*, No. CIV.A. 14-1688, 2015 WL 2066531(E.D. La. May 4, 2015) | App. 27-35 |
| *Hays v. Frost & Sullivan, Inc.*, No. SA-23-CV-01490, 2024 WL 4052741 (W.D. Tex. Aug. 16, 2024) | App. 36-48 |
| *In re ESO, Sols., Inc. Breach Litig.*, No. 1:23-CV-1557, 2024 U.S. Dist. LEXIS 134337 (W.D. Tex. July 30, 2024) | App. 49-61 |
| *Legg v. Leaders Life Ins. Co.*, No. 21-655, 2021 WL 5772496 (W.D. Okla. Dec. 6, 2021) | App. 62-71 |
| *Logan v. Marker Grp., Inc.*, No. 4:22-CV-00174, 2024 WL 3489208 (S.D. Tex. July 18, 2024) | App. 72-82 |
| *Smith v. Am. Pain & Wellness, PLLC*, No. 4:23-CV-295, 2024 WL 4028050 (E.D. Tex. Sept. 3, 2024) | App. 83-91 |
| *Williams v. Bienville Orthopaedic Specialists, LLC*, No. 1:23CV232, 2024 WL 3387169 (S.D. Miss. June 18, 2024) | App. 92-105 |

DATED: October 29, 2024

Respectfully submitted,

By: */s/ Peter L. Loh*
Peter L. Loh (TX 24036982)
Ana Sofia Batista (TX 24137543)
Joe Swanson (*pro hac vice forthcoming*)
**Foley & Lardner, LLP**
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
ploh@foley.com
abatista@foley.com
joe.swanson@foley.com

**ATTORNEYS FOR AXIP ENERGY
SERVICES, LP**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been duly served upon all known counsel of record in accordance with the Federal Rules of Civil Procedure on October 29, 2024.

*/s/ Peter L. Loh*
Peter L. Loh

1995 WL 940517

1995 WL 940517
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas.

Karen BARBER, Plaintiff

v.

NATIONWIDE COMMUNICATIONS,
INC. d/b/a KDMX–FM 102.9, Chris
McMurray, and Pat McMahon, Defendants

No. CIV. 3:95–CV–0656–H.
|
May 30, 1995.

MEMORANDUM OPINION AND ORDER

SANDERS, District J.

**\*1** Before the Court are a Motion to Dismiss and
Memorandum in Support, filed April 26, 1995 by Defendant
Nationwide Communications, Inc.; Plaintiff's Response, filed
May 15, 1995; and Defendant's Reply, filed May 17, 1995.

I. Background [1]
This case arises from disputes between Plaintiff Karen
Barber and her former employer, Defendant Nationwide
Communications, Inc. ("Nationwide"). From May 1991 until
her termination in September 1993, Plaintiff worked as a radio
personality and announcer on KDMX—FM 102.9, a radio
station owned by Defendant Nationwide. Along with Bobby
Mercer, she broadcast the "Karen and Bobby" morning show,
which aired weekdays from 6 a.m. to 10 a.m. in the Dallas–
Fort Worth area.

Plaintiff's employment contract initially provided that she
would be paid an annual salary of $40,000 and would receive
performance bonuses. Plaintiff's salary increased gradually
until May 1993, when she learned that Mercer earned a
substantially higher salary than her own. Plaintiff discussed
the pay disparity with Defendant Chris McMurray, KDMX's
general manager, and Defendant Pat McMahon, KDMX's
program director; she also began the process of renegotiating
her employment contract, which was to expire in October
1993. Plaintiff contends that although several months of
salary negotiations ensued, Defendants never explained the

pay disparity. Instead, at a September 17, 1993 negotiating
meeting, they informed Plaintiff that she was being fired.

Plaintiff filed a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC") on May
6, 1994 and received a right-to-sue letter on March 22,
1995. She filed her Original Complaint and Jury Demand
("Complaint") on April 4, 1995, alleging causes of action for
(1) violations of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e et seq.; (2) violations of the Equal Pay
Act of 1963, 29 U.S.C. §§ 206(d)(1) and 215(a)(3); (3)
negligent supervision, training, and retention; (4) defamation;
(5) breach of contract; and (6) breach of the implied covenant
of good faith and fair dealing. Defendant subsequently filed
its Motion to Dismiss, contending that certain of Plaintiff's
causes of action fail to state a claim upon which relief can be
granted.

II. Nationwide's Motion to Dismiss

A. Legal standard
In considering a motion to dismiss a complaint for failure to
state a claim, the Court must accept as true the well-pleaded
factual allegations and any reasonable inferences to be drawn
from them. See Tuchman v. DSC Communications Corp.,
14 F.3d 1061, 1067 (5th Cir.1994). To avoid dismissal for
failure to state a claim, however, a plaintiff "must plead
specific facts, not mere conclusory allegations." Guidry
v. Bank of LaPlace, 954 F.2d 278, 281 (5th Cir.1992)
(citation omitted). Thus, the Court will not accept as true any
conclusory allegations or unwarranted deductions of fact. The
Court may not look beyond the pleadings. See Mahone
v. Addicks Util. Dist., 836 F.2d 921, 936 (5th Cir.1988).

**\*2** Dismissal for failure to state a claim is not favored by the
law. Mahone, 836 F.2d at 926. A Plaintiff's complaint
"should not be dismissed for failure to state a claim unless
it appears beyond doubt that the plaintiff can prove no set
of facts in support of his claim which would entitle him to
relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957); see Scheuer v. Rhodes, 416 U.S.
232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("The issue
is not whether a plaintiff will ultimately prevail but whether
the claimant is entitled to offer evidence to support the claims.").
However, "there are times when a court *should* exercise its

1995 WL 940517

power to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Mahone,* 836 F.2d at 927 (emphasis in original).

### B. Analysis

Defendant Nationwide contends that Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing, for defamation, and for negligent supervision, training, and retention. The Court addresses Defendant's arguments in turn.

#### 1. Good faith and fair dealing

Plaintiff alleges that in terminating her employment contract, Defendants breached an implied covenant of good faith and fair dealing. Complaint ¶ 26. Defendant counters by noting that Texas courts have refused to incorporate a duty of good faith and fair dealing into the employment relationship; accordingly, it contends, Plaintiff has failed to state a claim. [2] Defendant's Motion at 3.

Texas courts have uniformly refused to insert an implied covenant of good faith and fair dealing into employment contracts, and federal courts have acknowledged these holdings. *See, e.g.,* *McClendon v. Ingersoll–Rand Co.,* 757 S.W.2d 816, 819–20 (Tex.App.—Houston [14th Dist.] 1988, *rev'd on other grounds,* 779 S.W.2d 69 (Tex.1989), *rev'd,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Caton v. Leach Corp.,* 896 F.2d 939, 948–49 (5th Cir.1990) ("Texas courts do not recognize the employment relationship as warranting the tort duty of good faith."); *Rayburn v. Equitable Life Assurance Soc.,* 805 F.Supp. 1401, 1409 (S.D.Tex.1992). Plaintiff offers no argument and presents no set of facts that would warrant departure from established law in this area. Accordingly, Defendant's Motion to Dismiss Plaintiff's claim for breach of the duty of good faith and fair dealing is GRANTED.

#### 2. Defamation

Plaintiff contends that Defendants have defamed her by intentionally publishing to third parties a false reason for her departure from the station. Complaint ¶ 25. Plaintiff further contends that by stating that she was "terminated," Defendants have forced her to commit self-compelled defamation. *Id.* Defendant argues that because Plaintiff's

Complaint fails to identify any allegedly false publication, Plaintiff has failed to state a claim for defamation.

In support of its contention, Defendant cites Texas cases that require defamation plaintiffs to set out, verbatim, each allegedly defamatory statement. *See* Defendant's Motion to Dismiss at 2–3. Plaintiff does not dispute Defendant's characterization of the law; instead she contends that she should be allowed to conduct discovery regarding the allegedly defamatory statements, after which she proposes to amend her complaint. Response at 4.

**\*3** Defendant correctly notes that Texas courts have long required defamation plaintiffs to set forth in their pleadings "the particular defamatory words, or at least their substance and meaning ." *Murray v. Harris,* 112 S.W.2d 1091, 1094 (Tex.Civ.App.—Amarillo 1938, writ dism'd). In federal court, however, the adequacy of a plaintiff's pleadings is judged according to the Federal Rules of Civil Procedure. *See Ritzmann v. Weekly World News, Inc.,* 614 F.Supp. 1336, 1339 (N.D.Tex.1985); *see also* Fed.R.Civ.P. 8(a) (requiring a short and plain statement of the claim). Federal courts have, accordingly, consistently refused to require plaintiffs to set forth allegedly defamatory statements *en haec verbis.* *See Stabler v. New York Times Co.,* 569 F.Supp. 1131, 1138 (S.D.Tex.1983); *Ritzmann,* 614 F.Supp. at 1339.

Determining that Plaintiff need not set forth the allegedly defamatory statements verbatim does not end the Court's inquiry, however. Under federal law, defamation allegations must afford the defendant sufficient notice of the communications complained of to enable him to defend himself. *Liguori v. Alexander,* 495 F.Supp. 641, 647 (S.D.N.Y.1980). Where the allegedly defamatory statements are contained in a published article, a plaintiff can satisfy Rule 8 merely by attaching a copy of the article to his complaint and alleging that the entire article is false. *See Stabler,* 569 F.Supp. at 1139; *Ritzmann,* 614 F.Supp. at 1339.

In the case at bar, however, Plaintiff's pleadings reveal only her belief that Defendants have "intentionally published to third parties a false reason for her separation." Complaint ¶ 25. The pleadings do not indicate what the "false reason" was or when and to whom it was published. Upon consideration, the Court finds that Plaintiff's Complaint does not provide sufficient notice to allow Defendants to defend themselves. Treating Defendant's motion as a motion for more definite statement, the Court directs Plaintiff to file by *noon, June*

1995 WL 940517

*28, 1995* an amended complaint setting forth her defamation allegations in sufficient detail to satisfy Rule 8.

3. Negligent supervision, training, and retention

Plaintiff contends, without elaborating, that Defendant Nationwide "breached its duty of reasonable care by failing to take corrective measures to eliminate sexually discriminatory conduct in the work place and by failing to supervise or train its supervisors, managers, and employees properly as to their obligation to comply with Title VII and the EPA." Complaint ¶ 22. Defendant argues that Plaintiff's negligence claims are barred by the exclusive remedy provisions of the Texas Workers' Compensation Act and that there exists no federal or state cause of action for negligent supervision or training. Defendant's Motion at 1–2.

The Texas Workers' Compensation Act provides a statutory alternative to common law damages claims and defenses arising from personal injuries in employer-employee relationships. *See Reed Tool Co. v. Copelin,* 610 S.W.2d 736, 739 (Tex.1980). Several courts have held that the Act bars suits based on emotional as well as physical injuries.

*See, e.g., McAlister v. Medina Elec. Co-op., Inc.,* 830 S.W.2d 659, 663 (Tex.App.—San Antonio 1992, no writ) (holding that the Act barred an employee's suit for negligent infliction of emotional distress). No court, however, appears to have considered whether the Act's exclusivity provision bars claims based on negligent supervision, training, and retention. Nonetheless, the Court need not reach Defendant's exclusivity argument. As Plaintiff points out, the Texas workers' compensation system is optional, and employers may elect to forego coverage. *See* Tex. Labor Code Ann. § 406.002(a). Only employers that elect coverage are subject to the exclusivity provisions of the system. *Id.* § 406.002(b). Because Defendant Nationwide has not demonstrated that it is a workers' compensation subscriber, the Court cannot at this stage determine whether Plaintiff's negligence claims against it are barred by the exclusivity of the workers' compensation system.

**\*4** Defendant also argues that there exists no federal or state cause of action for negligent supervision or training. In response, Plaintiff cites Texas cases holding that an employer can be liable for its negligence in *hiring* an employee it knows, or should have known, was incompetent or unfit. *See* Plaintiff's Response at 3; *see also Dieter v. Baker Serv. Tools,* 739 S.W.2d 405, 408 (Tex.App.—Corpus Christi 1987, writ denied). The Court acknowledges that Texas courts have

recognized an employer's duty to make inquiry as to the competence and qualifications of applicants for employment, "especially where engaged in an occupation which could be hazardous to life and limb and [which] requires skilled or experienced servants." *See Estate of Arrington v. Fields,* 578 S.W.2d 173, 178 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). The existence of a cause of action for negligent hiring does not, however, mandate the existence of a similar cause of action for negligent supervision or training. Plaintiff has not cited, and the Court has been unable to locate, any Texas cases recognizing a cause of action for negligent failure to supervise or train supervisors regarding their obligation to treat employees in a non-discriminatory manner. Accordingly, Plaintiff's claims for negligent supervision and training must be DISMISSED.

Plaintiff's claim for negligent retention fares little better. The cases on negligent hiring indicate that suit also may be maintained for an employer's negligent retention of an employee. *See Estate of Arrington,* 578 S.W.2d at 178. To recover on a negligence claim, Plaintiff must prove (1) a duty, (2) a breach of that duty, (3) an injury to Plaintiff, and (4) that the breach of the duty was the proximate cause of the injury. *Johnson v. Sawyer,* 4 F.3d 369, 376 (5th Cir.1993). In a negligent hiring or retention case, breach of duty is shown by demonstrating that the employee is incompetent or unfit and that the employer knew or should have known of such incompetence or unfitness. *Estate of Arrington,* 578 S.W.2d at 178; *Deerings West Nursing Center v. Scott,* 787 S.W.2d 494, 496 (Tex.App.—El Paso 1990, writ denied) (analogizing to elements of negligent entrustment). Plaintiff's Complaint fails to allege that any of Defendant's employees was incompetent or unfit; similarly, there is no allegation that Defendant knew or should have known of such incompetence or unfitness. Accordingly, the Court finds that Plaintiff's Complaint fails to state a claim for negligent retention.

III. Conclusion

For the reasons set forth above, Plaintiff's claims for negligent supervision, negligent training, negligent retention, and breach of the duty of good faith and fair dealing are DISMISSED with prejudice. Plaintiff has until *noon, June 28, 1995* to amend her complaint to provide a more definite statement of her defamation claim.

SO ORDERED.

1995 WL 940517

**All Citations**

Not Reported in F.Supp., 1995 WL 940517

---

## Footnotes

1       Background information is taken from Plaintiff's Original Complaint and Jury Demand.

2       Plaintiff's Response does not address Defendant's argument regarding her good faith claim.

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 7 of 107

Barclay v. Richey, Not Reported in S.W. Rptr. (2019)
2019 WL 302661

2019 WL 302661
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Beaumont.

Melissa BARCLAY, Appellant
v.
Aury Gene RICHEY, Appellee

NO. 09-17-00026-CV
|
Submitted on May 2, 2018
|
Opinion Delivered January 24, 2019

**On Appeal from the 136th District Court, Jefferson County, Texas, Trial Cause No. D-194,462. Baylor Wortham, Judge**

**Attorneys and Law Firms**

Daniel E. Mabry, Strong Pipkin Bissell and Ledyard, LLP, Beaumont, TX, for Appellant.

David L. Tolin, Tolin Law Firm, Beaumont, TX, for Appellee.

Before Kreger, Horton, and Johnson, JJ.

**MEMORANDUM OPINION**

CHARLES KREGER, Justice

*1 In a dispute over ownership of a house, Melissa Barclay appeals the trial court's final amended judgment claiming the trial court erred by (1) denying her motion for instructed verdict on Aury Gene Richey's counterclaim for reformation of deed, (2) awarding excessive damages for unjust enrichment to Richey, and (3) failing to award Barclay reasonable and necessary attorney's fees on her declaratory judgment cause of action.

We conclude the trial court properly denied Barclay's directed verdict on Richey's counterclaim for reformation of deed. We also determine the damages awarded to Richey for unjust enrichment were properly supported by the evidence with respect to the sums awarded for Richey's payment of property

taxes, for payoff of Barclay's mortgage, and for remodeling of the residence. However, the evidence is legally insufficient to support the award of unjust enrichment damages for premiums Richey paid to insure the property. We modify the amended final judgment to strike that portion of the damages awarded to Richey for payment of insurance premiums. With respect to Barclay's claim for attorney's fees, we conclude the trial court properly denied Barclay's claim for attorney's fees on her declaratory judgment claim. We affirm the trial court's amended final judgment as modified.

**Background**

Barclay purchased the property at issue in 2000, obtaining a mortgage secured by a purchase money security interest. Barclay admittedly fell behind on payments, and foreclosure was imminent. According to Barclay, in order to avoid foreclosure in February 2007, Richey, her stepfather, loaned her approximately $78,000.00 to pay off the outstanding note and obtain a release of lien on the home. In February 2009, a dispute arose over what Barclay agreed to in return for Richey's payment of the balance of her mortgage. It is undisputed Richey paid the balance owed to Barclay's lender for the purchase money mortgage on the home. Barclay asserted that in exchange for the money, she signed a promissory note and deed of trust to repay Richey in the amount he paid to extinguish her mortgage, $78,733.15, plus 12% interest. Richey contended that Barclay agreed to sell him her home and execute a lease with the option to buy back the home in two years.

According to Barclay, for the next twenty-seven months—March 2007 until March or April 2009—she paid $1,000.00 a month either by check or in cash to satisfy the note Richey held. In 2009, when Barclay sought to obtain a loan to repay Richey, she was informed she no longer owned the home because Richey recorded a warranty deed in February 2009 transferring ownership of the property to himself. Barclay confronted Richey, and he told her he owned the home and she could repurchase the home for $106,000.00, rather than the balance of the promissory note between them. Shortly thereafter, Barclay moved from the home to another house where she resided at the time of trial and ceased making payments to Richey.

Richey testified that in exchange for paying off Barclay's mortgage, Barclay agreed to sell her house to him, lease the home from him for a $1,000.00 per month, and receive

Barclay v. Richey, Not Reported in S.W. Rptr. (2019)

2019 WL 302661

an option to repurchase the home within two years. Richey explained his agreement with Barclay was similar to an agreement she was going to make with another financial institution to avoid foreclosure, but his terms were more financially favorable to Barclay. Richey also stated that Kae Richey, his wife and Barclay's mother, filled out the documents, but no documents were signed until the following day when Richey and Barclay went to his bank where he wired the money to pay off her mortgage. Richey claimed Barclay signed the warranty deed, a lease, and a repurchase agreement at the bank in the presence of a notary.

 **\*2**  Barclay denied ever signing a warranty deed, residential lease agreement, or an option to purchase the home, maintaining she never agreed to sell her house to Richey. Barclay testified to the terms of the note, stating the interest rate was twelve percent, with payments of $1,000.00 per month. However, she did not have a copy of the documents she claimed she signed. Barclay's mother, Kae, testified Richey offered or gave Barclay signed copies of the deed, lease agreement, and option to repurchase after they were executed at the bank.

Barclay admitted at trial she did not read any of the documents she signed because the agreement was with her parents. Barclay stated, however, that what she signed was handwritten, had a lot of scratch outs, and was done very quickly at her parents' house. When shown pages from a notary book she allegedly signed, Barclay questioned whether her signature was forged. [1] Nonetheless, Barclay stated she knew whatever she signed at the bank was not a warranty deed requiring her signature to be notarized; rather, it was something for the wire transfer to pay off her outstanding mortgage.

The parties also disagreed about the amount of money Barclay paid Richey from February 2007 through early 2009. Barclay testified she paid Richey twenty-seven payments of $1,000.00 before she moved out and ceased paying. However, Barclay did not produce written evidence of every payment. To support her claim of partial payment, she submitted a checkbook registry evidencing only five $1,000.00 payments. Kae kept handwritten records that reflected Barclay paid, at most, $9,000.00, but Kae could not completely decipher her notes at trial. Nevertheless, while Richey claimed Barclay rented the house from him after he paid the mortgage off, Richey did not report any rental income on his 2007 tax return. On his 2008 tax return, Richey reported $6,000.00 in rental

income from the property and in 2009, he reported $3,000.00 in rental income.

Richey explained that because Barclay failed to pay in accordance with their agreement, he filed the original executed warranty deed for record on February 17, 2009. Later, after seeking legal counsel, Richey added a more detailed property description and other changes to the original executed warranty deed and re-recorded the "corrected" deed on July 22, 2009. [2] Richey testified, and Barclay acknowledged, he paid property taxes for the property from 2007 through 2014 in the total amount of $23,672.32. Richey also testified he purchased homeowner's insurance for the property after Barclay moved out in 2009. Richey testified he paid insurance premiums on multiple properties he owned, including the house at issue, from 2009 until 2012, which totaled $12,852.00. Richey further testified that from May 2013 until the time of trial, he paid property insurance premiums solely for the property in question in the total amount of $7,388.97. Barclay explained that Richey began insuring the property because after he recorded the warranty deed in 2009, the tax receipts and all other notices pertaining to the property were sent to Richey instead of her, and she could no longer insure the house.

 **\*3**  Richey further testified that in May 2011, he began remodeling the house. Richey explained the remodeling was extensive, to both the interior and exterior. He stated that Kae performed much of the labor on the house. Barclay admitted she saw people working in the house and acknowledged the exterior of the home was painted. However, she testified that when she observed the Richeys working on the home, she told them to stop but they continued.

Kae also testified about remodeling the house and explained she kept handwritten notes regarding the expenses incurred. She estimated a total of $50,000.00 was incurred for materials and labor remodeling the house. An expense report for materials was admitted into evidence showing a total of $20,230.60.

In pretrial proceedings, the trial court granted summary judgment in favor of Barclay on her declaratory judgment claim rendering the warranty deed filed for record on February 17, 2009, void for vagueness because of an insufficient property description. Additionally, the correction deed filed for record on July 22, 2009, was held to be void because it lacked Barclay's original signature. Thereafter, on May 1, 2015, the trial court granted a severance of those

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 9 of 107

Barclay v. Richey, Not Reported in S.W. Rptr. (2019)

2019 WL 302661

claims for which he granted partial summary judgment into a separate action, Cause No. D-194,462-A, and signed a final judgment in the severed cause. The trial court included a recitation that the final judgment was to be "a final appealable judgment as it disposes of all claims of plaintiff and defendant under Cause No. D-194,462-A."

After a jury trial and post-judgment hearings in the original cause, the trial court rendered its final amended judgment that Barclay take nothing from Richey on her claims of fraud, statutory fraud, and conversion. The judgment ordered Richey take nothing on his reformation of deed claim, thereby rendering ownership of the property to Barclay. The final amended judgment awarded Richey unjust enrichment damages against Barclay in the following amounts: (1) $78,733.15 for paying off Barclay's mortgage; (2) $18,500.00 for expenses incurred in remodeling of the residence; (3) $23,672.32 for payment of property taxes; and (4) $7,800.00 for payment of insurance premiums. The trial court denied any award of attorney's fees asserting it no longer retained jurisdiction to award attorney's fees on the declaratory judgment claims.

Barclay raises three issues complaining of the trial court's denial of her motion for directed verdict on Richey's counterclaim for reformation of deed, the award of certain damages to Richey on the grounds of unjust enrichment, and the denial of her attorney's fees for her successful declaratory judgment.

**Motion for Directed Verdict**

In her first issue, Barclay argues the trial court erred in denying her motion for directed verdict on Richey's counterclaim for reformation of deed. On appeal, Barclay contends Richey's claim for reformation of deed should not have been submitted to the jury, because it was barred by the statute of limitations and by the statute of frauds. However, when Barclay moved for directed verdict at trial, she only asserted Richey failed to prove the elements of his reformation of deed claim by failing to provide evidence of a prior written agreement complying with the statute of frauds. The trial court denied Barclay's motion and referred to its reasoning being the same as when it denied Barclay's motion for summary judgment, which included assertions of both affirmative defenses of statute of limitations and statute of frauds.

*4 The jury rejected Richey's reformation of deed claim. Barclay, however, contends if the trial court had properly granted her directed verdict and the reformation of deed question had not been presented to the jury, the jury may have found differently on her own fraud claims against Richey. While her assertion of harm is considerably speculative, we need not address whether there was a conflict in the jury's answers to the questions if we determine the trial court properly denied her motion for directed verdict. Moreover, because Barclay limited her argument at trial to the statute of frauds, we limit our review to determining whether her directed verdict should have been granted only on statute of frauds grounds. *See* Knapp v. Wilson N. Jones Mem'l Hosp., 281 S.W.3d 163, 170 (Tex. App.—Dallas 2009, no pet.) (explaining "a party's argument on appeal must comport with its argument in the trial court"); *see also* Tex. R. App. P. 33.1(a)(1).

In his live pleadings, Richey counterclaimed against Barclay seeking reformation of the February 1, 2007 deed he filed for record on February 17, 2009, based on mutual mistake. Richey and Kae testified Barclay agreed to sell Richey her house in exchange for his payment of the outstanding mortgage to a third-party lender to avoid foreclosure. Both Richey and Kae explained the agreement took place at their home and Barclay provided the deed form to be filled out. They also stated Kae completed the deed form using other documents from another proposed buyout transaction Barclay rejected as a guide. Richey then testified he and Barclay executed the deed at the bank in the presence of the notary on February 1, 2007, the day Richey transferred the funds to pay off Barclay's mortgage. Following the recording of the original warranty deed in February 2009, Richey explained he sought legal advice concerning the deed, which resulted in refiling the deed with a proper legal description as a correction deed. However, Richey failed to have Barclay execute a new corrected warranty deed. Instead, he re-recorded the same deed with the added property description and other changes. Following the trial court's findings that the original deed was void for vagueness because it lacked a proper legal description and the correction deed void because Barclay did not sign after it was amended, Richey sought reformation of the original deed based on his alleged agreement with Barclay that she sell her house to him in exchange for paying off her mortgage.

We review a trial court's decision on a motion for directed verdict under the same standard of review as a legal

2019 WL 302661

sufficiency or no evidence challenge. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Haynes & Boone, L.L.P. v. Chason*, 81 S.W.3d 307, 309 (Tex. App.—Tyler 2001, pet. denied) (citing *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 187 (Tex. App.—Dallas 1996, no writ) ) ("An appeal from the denial of a motion for directed verdict is ... a challenge to the legal sufficiency of the evidence."). "[A] directed verdict is proper only if the evidence conclusively establishes the movant's right to judgment, negates the opponent's right to judgment, or is insufficient to raise a fact issue on a vital fact." *In re Estate of Longron*, 211 S.W.3d 434, 438 (Tex. App.—Beaumont 2006, pet. denied) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 768 (Tex. App.—Fort Worth 1994, writ denied) ).

At the close of Richey's evidence, Barclay moved for directed verdict arguing the statute of frauds barred Richey's reformation claim. *See* Tex. Bus. & Comm. Code Ann. § 26.01 (West 2015). Specifically, Barclay claims Richey's reformation claim is barred as a matter of law because there is no written document evidencing an agreement to sell her home to Richey, and the statute requires an agreement for the sale of real estate to be in writing. *Id.* § 26.01(a), (b)(4).

**\*5** The Texas Supreme Court has stated "[t]he statue of frauds, [under section 26.01 of the Business and Commerce Code], is no bar to the reformation of a contract for the sale of land where the parties had an agreement and by their mutual mistake failed to state the agreement in the writing." *Nat'l Resort Communities, Inc. v. Cain*, 526 S.W.2d 510, 513 (Tex. 1975). A court may reform a contract to correct a mutual mistake in preparing a written instrument. *See Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987); *see also BH Contractors, LLC v. Helix Energy Sols.Grp., Inc.*, No. 14-15-01035-CV, 2017 WL 3611887, at \*3 (Tex. App.—Houston [14th Dist.] Aug. 22, 2017, pet. denied) (mem. op.). "[R]eformation requires two elements: (1) an original agreement[;] and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing." *Cherokee Water*, 741 S.W.2d at 379 (citing *Sun Oil Co. v. Bennett*, 84 S.W.2d 447, 451 (Tex. 1935) ). "It is not enough that the writing differed from the oral agreement." *Cain*, 526 S.W.2d at 514 (citing *Estes v. Republic Nat'l Bank of Dall.*, 462 S.W.2d 273 (Tex. 1970) ); *Sun Oil Co.*, 84 S.W.2d

at 451. The parties must have had a "definite and explicit" agreement, and the agreement must have been reached before the contract, which the party seeks to reform, was drafted.

*Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 382 (Tex. 1965); *see Cherokee Water*, 741 S.W.2d at 379. "A scrivener's failure to embody the true agreement of the parties in a written instrument is a ground for reformation on the basis of mutual mistake." *Gail v. Berry*, 343 S.W.3d 520, 524 (Tex. App.—Eastland 2011, pet. denied) (citing *Cornish v. Yarbrough*, 558 S.W.2d 28, 32 (Tex. Civ. App.—Waco 1977, no writ) ).

"Parol evidence is admissible to show that the writing, because of a mutual mistake, incorrectly reflects the true agreement, and that the equitable remedy of reformation is available to correct such a mutual mistake in the written instrument." *Hardy v. Bennefield*, 368 S.W.3d 643, 650 (Tex. App.—Tyler 2012, no pet.) (citing *Estes*, 462 S.W.2d at 275). The underlying objective of reformation is to make the written instrument, i.e., the deed, express the original bargain the parties desired to put in writing. *Cherokee Water*, 741 S.W.2d at 379; *Cain*, 526 S.W.2d at 514. The Supreme Court explained in *Cain* that the requirements for reformation can be satisfied when, for example, the parol evidence indicates the mistake in the writing reflected a mutual mistake in the description in the written contract, not the identity of the property itself. *Cain*, 526 S.W.2d at 514 (referring to the retrial of *Shotwell v. Morrow*, 498 S.W.2d 432, 434 (Tex. Civ. App.—Eastland 1973, writ ref'd n.r.e.) ). The *Cain* Court relied on its reasoning from a prior decision, *Morrow v. Shotwell*, wherein the Court reversed and remanded a case, stating:

> [t]here is in the record strong evidence that the parties intended to describe a particular and identified tract of 12.375 in their contract, and that they were mutually mistaken in the belief that the description used was legally sufficient for that purpose. If that be a fact, Morrow would have been entitled to reformation of the contract had he sought it.

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 11 of 107

Barclay v. Richey, Not Reported in S.W. Rptr. (2019)

2019 WL 302661

*Id.* (quoting 🔖 *Morrow v. Shotwell,* 477 S.W.2d 538, 541 (Tex. 1972) ).

Because parol evidence is admissible to determine a fact issue as to whether the parties reached a mutual oral agreement for Barclay to sell her house to Richey in exchange for him paying off her mortgage, but the attempt to reduce the agreement to a writing—the February 1, 2007 original deed—contained an overly vague property description to be effective, the statute of frauds did not bar Richey's reformation of deed counterclaim. *Id.* at 513. We conclude the trial court did not err in denying Barclay's motion for directed verdict. *See Estate of Longron,* 211 S.W.3d at 438. We overrule her first issue.

## Unjust Enrichment

While acknowledging she benefited from her agreement with Richey, regardless of its terms, Barclay asserts in her second issue that the evidence is legally and factually insufficient to support certain damages awarded to Richey for unjust enrichment. Specifically, Barclay concedes Richey is entitled to receive the full amount of property taxes he paid on the property. Barclay also acknowledges that Richey should receive the amount he paid to pay off her mortgage, but that the amount should be offset by the sum of the $1,000.00 monthly payments she paid to him. With respect to the damages awarded to Richey for expenses incurred in the remodeling of the residence, Barclay contends she did not request repairs or remodeling to the home, and she received no benefit from Richey's work on the house. Thus, no damages should have been awarded for this portion of Richey's unjust enrichment claim. Finally, as Barclay was not the named insured with respect to the homeowner's insurance, she received no benefit and argues Richey should receive no damages for the premiums he paid.

*\*6* In a jury trial, a legal sufficiency issue must be preserved by one of the following in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *See* 🔖 *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 220–21 (Tex. 1992) (citing 🔖 *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 822 (Tex. 1985) ); 🔖 *Cecil v. Smith,* 804

S.W.2d 509, 510–11 (Tex. 1991). To complain on appeal that a jury finding is not supported by factually sufficient evidence or that the damages found by the jury are excessive, a party must have first raised the matter in a motion for new trial. *See* Tex. R. Civ. P. 324(b)(2), (4); *see also* 🔖 *Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 281 (Tex. 1994); 🔖 *Cecil,* 804 S.W.2d at 510.

During the jury charge conference, Barclay objected to parts of jury questions twelve and thirteen, which asked whether Barclay was unjustly enriched and, if so by how much, regarding Richey's unjust enrichment claims for amounts he expended for remodeling the house and paid toward property insurance premiums. The trial court overruled her objections to the charge. Then, post-verdict, Barclay filed a "Motion for Judgment" requesting the trial court enter judgment awarding only those damages for unjust enrichment allowable under Texas law. Within the proposed judgment filed by Barclay, she contended the evidence was legally insufficient to support a finding she was unjustly enriched by any amounts Richey claimed to have paid for remodeling or insuring the house. While acknowledging Richey was entitled to damages based on the amount he paid to extinguish her mortgage, for the first time, Barclay asserted in her motion that she was entitled to an offset against the amounts awarded by what she allegedly repaid to Richey.

After a hearing, the trial court awarded Richey the following for unjust enrichment in its amended final judgment: (1) $78,733.15 for payoff of Barclay's mortgage; (2) $18,500.00 for remodeling the residence; (3) $23,672.32 for payment of property taxes; and (4) $7,800.00 for payment of insurance premiums.

Unjust enrichment is an equitable theory that provides for the person receiving benefits unjustly to make restitution for those benefits. 🔖 *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." 🔖 *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992). A key element of unjust enrichment is showing the person sought to be charged wrongfully secured or passively received a benefit it would be unconscionable to maintain. 🔖 *Villarreal v. Grant Geophysical, Inc.,* 136 S.W.3d 265, 270 (Tex. App.—San

2019 WL 302661

Antonio 2004, pet. denied) (quoting *City of Corpus v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App.—Corpus Christi 1987, writ denied) ). It is not enough that the person sought to be charged received some incidental benefit.

*See Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985).

### A. Property Taxes

Barclay does not contest the damages awarded to Richey for payment of property taxes. Therefore, we affirm the unjust enrichment damages awarded to Richey in the amount of $23,672.32.

### B. Payoff of Mortgage

Barclay acknowledges that Richey is entitled to damages for paying off her mortgage. However, she contends the amount of damages should be reduced or offset by the amount she paid to him. As we stated above, to preserve a factual sufficiency complaint following a jury trial, Barclay was required to file a motion for new trial, which she failed to file. *See* Tex. R. Civ. P. 324(b)(2), (4). While Barclay set forth her calculations and reasoning supporting what she contended was the proper damage amount Richey should be awarded for the mortgage payoff in her proposed judgment, we conclude the substance of that pleading does not contain the necessary arguments to preserve her complaint for review. *See id.*; *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing Tex. R. Civ. P. 71; *Ryland Enter., Inc. v. Witherspoon*, 355 S.W.3d 664, 666 (Tex. 2011) ).

**\*7** Nevertheless, even if we considered her issue preserved, the right to an offset or reduction in an amount owed is an affirmative defense. *Brown v Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980); *Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 704 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Rauscher Pierce Refsnes, Inc. v. Great Sw. Sav., F.A.*, 923 S.W.2d 112, 117 (Tex. App.—Houston [14th Dist.] 1996, no writ). Therefore, Barclay bore the burden of proof to plead and prove an offset or reduction to the amount of damages owed Richey for his payment of Barclay's mortgage. *See* Tex. R. Civ. P. 94; *Brown*, 601 S.W.2d at 936; *Rauscher Pierce Refsnes*, 923 S.W.2d at 117. Barclay failed to plead offset and Barclay does not argue the parties tried the defense by consent other than to state the issue was an evidentiary

issue, and Richey did not object to evidence of her payments to Richey. In any case, Barclay did not request or submit proposed questions or instructions for the jury to make any findings related to the defense of offset as to the damages awarded Richey for paying off Barclay's mortgage. As a result, regardless of whether the issue questioning the factual sufficiency of the evidence supporting the damages awarded to Richey for the payoff of Barclay's mortgage is properly before us, Barclay waived this issue by failing to request findings concerning her alleged offset. *See Lone Starr*, 365 S.W.3d at 704; *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied); *see also* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 272, 274. We affirm the trial court's award of unjust enrichment damages in the amount of $78,733.15 to Richey for paying off Barclay's mortgage.

### C. Remodeling of the Residence

Barclay objected at trial to jury questions twelve and thirteen contending there was no evidence she benefited from Richey's remodeling or repairing the residence. Barclay argued at trial and on appeal there was "no evidence of the increase in the market value" of the home. Accordingly, she contended the remodeling subpart of the unjust enrichment claim should be eliminated as there was no evidence she was unjustly enriched.

"When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding." *O'Brien v. Daboval*, 388 S.W.3d 826, 837–38 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 385 (Tex. App.—Dallas 2003, pet. denied) ). In conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d 802 at 827. We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822. We will sustain a no-evidence point only if (1) the record reveals a complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 13 of 107

**Barclay v. Richey, Not Reported in S.W. Rptr. (2019)**

2019 WL 302661

conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If more than a scintilla of evidence exists to support a finding, the legal sufficiency challenge fails. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ).

The factfinder is the sole judge of the credibility of witnesses and the weight to be given their testimony; the factfinder is free to choose to believe one witness over another. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *City of Keller*, 168 S.W.3d at 819). It is for the factfinder to resolve conflicting evidence, and we may not impose our own opinion in opposition to the factfinder's implied credibility determinations. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822.

**\*8** Richey and Kae testified to the work performed, amounts they paid to remodel the house, and submitted numerous receipts and pictures supporting their testimonies. Barclay's children acknowledged the improvements to the property. Barclay also conceded the home's exterior had at least been painted. The remodeling labor and materials Richey paid for became an inseparable part of the residence. Because of the jury's favorable ruling that Barclay did not agree to sell her home to Richey and the trial court's pretrial grant of summary judgment relief setting aside the warranty deeds to Richey, Barclay remains the owner of the property. Therefore, Barclay retains the benefits of the remodel work paid for by Richey. *See Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 112–13 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding evidence legally sufficient to support unjust enrichment claims based on evidence of the value of installed pieces of equipment and personal property retained by one being charged with being unjustly enriched); *see also City of Hous. v. Swinerton Builders, Inc.*, 233 S.W.3d 4, 10 n.7 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (explaining under another equitable doctrine, quantum meruit, that the proper measure of damages includes the reasonable value of the work performed and the materials furnished).

Viewing the evidence in the light most favorable to the judgment, we conclude that more than a scintilla of evidence supports the findings and damages awarded as costs paid for remodeling the house under Richey's unjust enrichment claim. We affirm the judgment's award of damages as determined by the jury and trial court in the amount of $18,500.00 for remodeling the residence. [3]

### D. Insurance Premiums

Barclay objected to jury questions twelve and thirteen submitting the unjust enrichment damage issues to the jury, arguing, among other things, there was no evidence she benefited from homeowner's insurance carried by and paid for by Richey on the home. At trial, Richey testified he insured the home from 2009 until the time of trial. No evidence suggested homeowner's insurance was required under the terms of any agreement alleged by Richey, that Barclay was named as an additional insured on any policy obtained, or that a claim was submitted during this time and proceeds used to benefit the residence. We find no evidence or inference that Richey obtained the insurance for Barclay's sake. To the contrary, Richey maintained he owned the home and Barclay was no more than a lessee during the period he provided the insurance. Thus, we conclude there was no evidence that Barclay received any benefit from Richey maintaining insurance on the house. *See Heldenfels Bros.*, 832 S.W.2d at 41; *Tex. Integrated Conveyor Sys.*, 300 S.W.3d at 367; *Villarreal*, 136 S.W.3d at 270. The evidence is legally insufficient to support the damage award for Richey's payment of insurance premiums. *See City of Keller*, 168 S.W.3d at 810. Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. *Villarreal*, 136 S.W.3d at 270. A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros.*, 832 S.W.2d at 41. There is no legal or equitable basis for Richey to prevail on this claim. We sustain this portion of Barclay's second issue and reverse the trial court's judgment awarding Richey $7,800.00 in unjust enrichment damages for the payment of insurance premiums.

In conclusion, after reviewing the unjust enrichment damages awarded to Richey, we affirm the following awards (1) $78,733.15 for payoff of Barclay's mortgage, (2) $18,500.00 for the remodeling the residence, and (3) $23,672.32 for

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 14 of 107

**Barclay v. Richey, Not Reported in S.W. Rptr. (2019)**

2019 WL 302661

payment of property taxes. We reverse the damages award to him for unjust enrichment for payment of insurance premiums and render Richey take nothing for this portion of his claim. The amended final judgment shall be modified to read: "$0.00 for payment of insurance premiums." *See* Tex. R. App. P. 43.2(c). We affirm in part and overrule in part Barclay's second issue.

### Attorney's Fees

**\*9** In her third issue, Barclay contends the trial court should have awarded her reasonable and necessary attorney's fees required to obtain the pretrial declaratory judgment regarding the deeds Richey filed for record. Both the trial court and Richey maintain the lower court no longer maintained plenary power to award attorney's fees, and thus any claim for attorney's fees is barred. We agree.

On June 13, 2014, in addition to numerous rulings in an interlocutory order, the trial court granted Barclay's motion for summary judgment on her declaratory judgment claims. Then, on May 1, 2015, the trial court granted Richey's motion requesting the trial court sever the claims for which it granted motions for partial summary judgment on June 13, 2014, including Barclay's declaratory judgment claim, from the remaining claims into a separate cause. The severance order specifically proclaimed it did not dispose of Barclay's claim for attorney's fees on her declaratory judgment claim, but rather continued the attorney's fees request with the remainder of the case. No further action was taken regarding the severance order. Despite the trial court's notification to Barclay she was not entitled to attorney's fees for her declaratory judgment claim following the jury trial, she presented her evidence regarding the fees to the trial court in a hearing to the bench. After presenting her evidence, the trial court again rejected her claim reiterating it lacked jurisdiction to award Barclay attorney's fees as the prevailing party on her declaratory judgment claim, because the trial court previously severed that portion of the claim.

Rule 41 of the Texas Rules of Civil Procedure states "[a]ny claim against a party may be severed and proceeded with separately." Tex. R. Civ. P. 41. Generally, a trial court has broad discretion in the severance of cases, and its decision will not be disturbed absent an abuse of discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (citations omitted); *In re Henry*, 388 S.W.3d 719, 726 (Tex. App—Houston [1st Dist.] 2012, orig. proceeding).

"The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience." *Guar. Fed. Sav. Bank*, 793 S.W.2d at 658 (citing *St. Paul Ins. Co. v. McPeak*, 641 S.W.2d 284 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.) ). A trial court properly exercises its discretion in severing claims if (1) the controversy involves more than one cause of action, (2) the severed claim is one that could be asserted independently in a separate lawsuit, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *In re Henry*, 388 S.W.3d at 726 (citing *In re Liu*, 290 S.W.3d 515, 520 (Tex. App.—Texarkana 2009, orig. proceeding) ).

Regardless of the broad discretion in severing cases, such discretion should not be exercised contrary to legal rules and principles applicable in the particular case. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (discussing trial court's broad discretion when considering attorney's fees). "Severance of a single cause of action into two parts is never proper and should not be granted for the purpose of enabling the litigants to obtain an early appellate ruling on the trial court's determination of one phase of the case." *Pierce v. Reynolds*, 329 S.W.2d 76, 79 n.1 (Tex. 1959).

**\*10** The trial court's severance necessarily implies a conclusion that Barclay's claim for declaratory relief under section 37.003 of the Declaratory Judgments Act and her claim for attorney's fees under section 37.009 of the Act can be adjudged in independent lawsuits culminating in separate and distinct judgments. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.003, 37.009 (West 2015). As the Austin Court of Appeals explained, and we agree, these two claims are merely different phases of a single cause of action, as even section 37.009 prescribes a single proceeding under Chapter 37 of the Act. *Dalisa, Inc. v. Bradford*, 81 S.W.3d 876, 880 (Tex. App.—Austin 2002, no pet.); *see also Town of Flower Mound v. Upper Trinity Reg'l Water Dist.*, 178 S.W.3d 841, 843 (Tex. App.—Fort Worth 2005, no pet.) (agreeing with the reasoning in *Dalisa* that a severance of a claim for declaratory relief under section 37.003 of the Act from a claim for attorney's fees under section 37.009 is improper "because the two claims are merely different phases of a single cause of action"). Thus, like the *Dalisa* Court, we conclude the trial court erred when it severed Barclay's claim for declaratory relief from her claim for attorney's fees under the Act. *See Dalisa*, 81 S.W.3d at 881.

Barclay v. Richey, Not Reported in S.W. Rptr. (2019)

2019 WL 302661

Barclay did not appeal the final judgment entered by the trial court in the severed cause. Rather, she continued the case prosecuting her attorney's fees claim in this cause. Except in limited circumstances not applicable here, a party must raise its complaint about improper severance at the time of the alleged improper severance, not later. *See* 🏳️ ⚠️ *Nicor Expl. Co. v. Fla. Gas Transmission Co.*, 911 S.W.2d 479, 482–83 (Tex. App.—Corpus Christi 1995, writ denied) (explaining the finality of severance judgments if alleged error is not valid on the face of the severance). As Barclay neither appealed from the severed cause, nor objected to the trial court's ruling severing her claim for attorney's fees from the final judgment in the severed cause, she waived her right to complain in the cause associated with this appeal about the trial court's decision that effectively severed her claim for attorney's fees into the cause in which she did not appeal. Thus, the trial court correctly ruled that it no longer retained jurisdiction of the severed cause because its plenary power expired thirty days after it rendered judgment in the severed cause. *See* Tex. R. Civ. P. 329b.

We conclude the trial court properly denied Barclay's claim for attorney's fees. We overrule her third issue.

**Conclusion**

We overrule Barclay's first issue pertaining to the trial court properly overruling her motion for directed verdict on Richey's reformation of deed counterclaim. With respect to Barclay's second issue concerning Richey's award of damages for unjust enrichment, we affirm in part and reverse and render in part. The amended final judgment should reflect the following unjust enrichment damages awarded to Richey (1) $78,733.15 for paying off Barclay's mortgage, (2) $18,500.00 for remodeling the residence, (3) $23,672.32 for payment of property taxes, and (4) $0.00 for payment of insurance premiums. We affirm the trial court's denial of Barclay's claim for attorney's fees. We affirm the amended final judgment of the trial court, as modified.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

**All Citations**

Not Reported in S.W. Rptr., 2019 WL 302661

---

## Footnotes

1   The Notary Public did not testify at trial.

2   Deposition testimony was provided by Eddie Schroeder, an attorney, concerning the deeds Richey filed in the real property records wherein Barclay allegedly conveyed the house to Richey. Schroeder, who represented Richey regarding the deed, advised him the original deed did not contain a sufficient legal description, and the deed needed to be amended and refiled with a sufficient description to locate the property. Schroeder prepared an amended deed containing the legal description, and the amended deed was filed for record. Schroeder explained he considered the original deed a conveyance of the property to Richey but needed an amendment to identify the proper legal description. However, Schroeder acknowledged he never met Barclay and did not know for certain that she signed the original deed. Schroeder could not explain the reason for changing the date on the first page of the deed from February 1, 2007 to April 25, 2000 on the correction deed.

3   We do not address any potential issue concerning the factual sufficiency of the award. Barclay neither argued the evidence was factually insufficient to support the award nor filed a motion for new trial to preserve a factual sufficiency complaint regarding the sufficiency or adequacy of the evidence supporting the amount awarded. *See* Tex. R. Civ. P. 324(b)(2), (4).

---

App. 013

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 6523428

KeyCite Yellow Flag - Negative Treatment
Distinguished by Stasi v. Inmediata Health Group Corp., S.D.Cal.,
November 19, 2020

2016 WL 6523428
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Paul DUGAS, Plaintiff,
v.
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., HST Lessee San Diego,
LP; HST GP San Diego, LLC, Defendants.

Case No.: 3:16-cv-00014-GPC-BLM
|
Signed 11/03/2016

**Attorneys and Law Firms**

Dennis J. Price, II, Potter Handy LLP, Mark D. Potter, Center
for Disability Access, William A. Lemkul, Morris & Sullivan
LLP, San Diego, CA, for Plaintiff.

Marcus A. Christian, Rajesh De, Richard Ben-Veniste,
Stephen Lilley, Mayer Brown, LLP, Washington, DC, John
Nadolenco, Mayer Brown LLP, Los Angeles, CA, for
Defendants.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

[ECF No. 22]

Hon. Gonzalo P. Curiel, United States District Judge

**\*1** Before the Court is Defendants Starwood Hotels and
Resorts Worldwide, Inc. ("Starwood"), HST Lessee San
Diego, LP, and HST GP San Diego, LLC's (collectively
"Defendants") Motion to Dismiss. ECF No. 22. Upon review
of the moving papers and the applicable law, and for
the reasons set forth below, the Court **GRANTS** in part,
without prejudice, and **DENIES** in part Defendants' Motion
to Dismiss.

**FACTUAL BACKGROUND**

This case arises from a series of attacks by criminal hackers
upon the United States hospitality industry. First Amended
Class Action Complaint ("FACC"), ECF No. 21 ¶ 8. Plaintiff
Paul Dugas ("Plaintiff") alleges that customer systems of
Starwood Hotels and Resorts Worldwide, Inc. ("Starwood")
had malicious software installed on them and that they have
been compromised since "at least November 2014." *Id.* ¶ 22.
Plaintiff alleges that this data breach (the "Starwood breach")
"adversely affected hundreds of thousands of customers of
the Starwood Hotel system." *Id.* ¶ 4. According to Plaintiff,
although Starwood "discovered the first data breach on or
around April 13, 2015," they failed to notify customers or
regulators of the data breach "until November 20, 2015 via
[ ] internet press release." *Id.* ¶¶ 22–23. Within said press
release, Starwood revealed "that hackers had breached its
database containing sensitive records including: names, credit
card numbers, security codes and expiration dates." *Id.* ¶ 2.

Plaintiff alleges that as a "member in the hotel chain's rewards
program," he has frequented the spa at the Sheraton San Diego
Hotel & Marina on a "continuous and ongoing basis." *Id.*
¶ 21. Plaintiff further alleges that during visits to the spa,
"he provided personal identifying information and consumer
information" to the hotel, operating under the "reasonable
belief that [the information] would be held private." *Id.*
Because of the approximately seven-month delay between
discovering the data breach and notifying affected customers,
Plaintiff alleges that hackers were given "months to use the
information without the customers being able to take any
steps to protect themselves." *Id.* ¶ 23.

The Sheraton San Diego Hotel & Marina was named as one
of the hotels affected by the Starwood breach. *See id.* ¶ 24. As
a customer of the hotel, Plaintiff alleges that his records "were
among the records exposed." *Id.* Plaintiff alleges that during
the time period between Starwood's initial discovery of the
data breach and their disclosure that a breach had occurred,
"[Plaintiff's] credit card...used for purchases at the Sheraton
San Diego...was compromised by an unknown third party
and used for unauthorized purchases, exposing him to losses,
frustration and on-going requirements to protect himself from
identity theft." *Id.* ¶ 26.

Plaintiff alleges that although "Starwood was fully aware of
the consequences awaiting their customers if this information
was accessed by third parties," "they failed to take even the
basic precautionary measure of encrypting the data." *Id.* ¶ 28.
As a result, Plaintiff alleges that he and thousands of other
Starwood customers have been "exposed ...to violations of

Case 4:24-cv-03300 Document 17-3 Filed on 10/29/24 in TXSD Page 17 of 107

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

privacy, economic loss and risks of identity theft" for the rest of their lives. *Id.* ¶ 29.

## PROCEDURAL BACKGROUND

**\*2** On January 5, 2016, Plaintiff filed his First Amended Class Action Complaint alleging: (1) violation of the California Customer Records Act ("CRA"), Cal. Civ. Code §§ 1798.81.5, 1798.82; (2) violation of California's Unfair Competition Law ("UCL"), 🏳 Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (3) invasion of privacy; (4) negligence; and (5) negligence per se. FACC ¶¶ 39–84. Plaintiff has named Starwood Hotels & Resorts Worldwide, Inc., HST Lessee San Diego, LP and HST GP San Diego, LLC ("Defendants") as the collective defendants, alleging that Starwood is "the franchisor of the Sheraton brand," *id.* ¶ 14, while HST Lessee San Diego, LP and HST GP San Diego, LLC are concurrent "owner[s] or operator[s] of the Sheraton San Diego Hotel and Marina," *id.* ¶¶ 15–16. Plaintiff further alleges that each of the three defendants "ratified and approved" all the "actions of each defendant." *Id.* ¶ 19.

On February 26, 2016, Defendants moved to dismiss Plaintiff's Class Action Complaint. ECF No. 19. On March 18, 2016, Plaintiff filed his FACC. On April 1, 2016, Defendants filed a Motion to Dismiss Plaintiff's FACC ("Motion to Dismiss") based on (1) Plaintiff's failure to establish Article III standing and (2) Plaintiff's failure to state a claim on which relief can be granted. ECF No. 22. Plaintiff filed an opposition to Defendants' Motion to Dismiss on May 13, 2016. ECF No. 25. On June 3, 2016, Defendants filed a Reply to Plaintiff's Opposition. ECF No. 26.

## DISCUSSION

### I. STANDING TO SUE

#### A. Legal Standard

In order to invoke the subject matter jurisdiction of this Court, Plaintiff is required to establish standing to sue. Under Federal Rule of Civil Procedure ("Rule") 12(b)(1), a defendant may seek dismissal of a complaint for lack of subject matter jurisdiction. *See* F.R.C.P. 12(b)(1). The federal court is one of limited jurisdiction. *See* 🏳 *Gould v. Mut. Life Ins. Co. of N.Y.*, 790 F.2d 769, 774 (9th Cir. 1986). Each federal court has an "affirmative obligation to ensure that it is acting within

the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

Plaintiff, as the party seeking to invoke jurisdiction, bears the burden of establishing jurisdiction. *See* 🏳 *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). To meet this burden, Plaintiff must show:

> (1) that he or she has suffered an 'injury in fact' that is (a) "an invasion of a legally protected interest" that is concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

🏳 *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992) (internal citations omitted). Because these elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," Plaintiff bears the burden of proving — "with the manner and degree of evidence required at the successive stages of litigation" — that he has Article III standing. *See* 🏳 *id.* at 561. At the pleading stage, general factual allegations of injury are sufficient for standing purposes because courts, on a motion to dismiss, will "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *See* 🏳 *Lujan v. Defenders of Wildlife*, 497 U.S. 871, 889 (1990).

With regard to injury in fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." 🏳 *Lujan*, 504 U.S. at 560 (internal citations omitted). A "concrete" injury must be "*de facto*," meaning, it must actually exist. 🏳 *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). The "threatened injury must be *certainly impending* to constitute injury in fact" and "allegations of *possible* future injury are not sufficient." 🏳 *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1147 (emphasis in original) (quoting ⚠ *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). In *Clapper*, the Supreme Court held that respondents' reliance on a "highly attenuated chain of possibilities," involving a "highly speculative fear" that a number of third party actors would take certain actions, did

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 18 of 107

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

not amount to the "certainly impending" injury required for Article III standing. 🔖 *Clapper*, 133 S. Ct. at 1148.

**\*3** To prove "causation," a plaintiff must show that the injury is fairly traceable to the challenged action of the defendant, and that the injury is not the result of the independent action of a third party not before the court. 🔖 *Lujan*, 504 U.S. at 560.

The third and final element of standing, redressability, does not appear in the text of the Constitution. Rather, it is a judicial creation of the past twenty-five years and an interpretation of the "case" requirement of Article III standing. *See* 🔖 *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41–46 (1976). To demonstrate redressability, a plaintiff must show that the injury "is likely to be redressed by a favorable decision." 🔖 *Id.* at 38, 41. Consequently, the Supreme Court has found that "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." 🔖 *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (explaining that because respondent sought "vindication of the rule of law" rather than "remediation of its own injury" it had not established redressability because "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement").

**B. Injury in Fact**

Injury-in-fact analysis is highly case-specific. This is particularly true in the context of data breach. To determine whether or not a plaintiff was, in fact, injured by a defendant's data breach, various courts have found one or more of following factors persuasive: (1) the type and volume of stolen information [1]; (2) the likelihood that the information was stolen for misuse [2]; (3) the degree of attenuation between the theft and the harm [3]; (4) whether the stolen information has been misused [4]; and (5) whether unauthorized purchases were reimbursed [5].

**\*4** Defendant argues that the gravamen of Plaintiff's allegations amounts to nothing more than a "fear[ ] of hypothetical future harm," *see* 🔖 *Clapper*, 133 S. Ct. at 1151, that could be inflicted by future unauthorized expenditures. A plaintiff, however, cannot manufacture standing by causing harm to oneself based on "hypothetical future harm that

is certainly not impending." *Id.*; *see also* 🔖 *In re Adobe Systems, Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1216 (N.D. Cal. 2014). In *Clapper*, the respondents' 'feared" that: "(1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [Section 702] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [Section 702's] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the 🔖 Government intercepts." 133 S. Ct. at 1148. Given the level of attenuation between this feared action and the likelihood of harm, the court concluded that the future harm was too hypothetical to qualify as injury in fact. Meanwhile, the instant case involves more than unrealized or hypothetical actions by third parties. Here, Plaintiff's name and credit card information have been stolen and an unauthorized individual has already made charges on Plaintiff's credit card. Thus, the question before the Court is whether the theft of Plaintiff's personal identifying information ("PII") and the subsequent unauthorized purchases sufficiently establish a "concrete and particularized" harm that is "actual or imminent, not conjectural or hypothetical."

Plaintiff claims various forms of harm individually and on behalf of the class members. They include:

> (1) theft of their names and credit card information; (2) costs associated with the detection and prevention of identity theft or unauthorized use of financial accounts and credit card records; (3) lost opportunity costs and loss of productivity from efforts to mitigate the actual and future consequences of the data theft, including fraudulent charges, cancelling and reissuing credit cards, purchasing credit monitoring and identity theft protection, and the stress of dealing with all issues resulting from the data theft; (4) cost associated

Case 4:24-cv-03300  Document 17-3  Filed on 10/29/24 in TXSD  Page 19 of 107

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

with the inability to use credit; (5) future costs in terms of time, effort, and money that will be expended to prevent and repair the impact of the data breach; (6) damages to and diminution in value of information entrusted to Defendants for the purpose of deriving health care from Defendants [6]; (7) the imminent and certainly impending injury flowing from potential fraud and identity theft posed by the data breach; and (8) the continued risk to their credit card information, which is subject to further breaches so long as Defendants fail to undertake adequate measures to protect data in their possession.

FACC ¶¶ 56, 70, 74.

These claimed injuries can be summarized as (1) past financial costs associated with detecting and preventing identity theft or unauthorized use of credit cards; (2) future costs in terms of time, effort and money to prevent or repair identity theft or future unauthorized use of credit cards; (3) theft of personal identifying information and; (4) past loss of productivity from efforts to mitigate consequences of data theft.

### 1. Past Financial Costs

As to past financial costs, other than conclusory allegations, Plaintiff has not specifically alleged out-of-pocket losses or monetary damages resulting from the data breach due to Defendants' negligence or "failure to maintain reasonable security procedures." *See generally* Cal. Civ. Code § 1798.81.5(b). [7] As to fraudulent charges, Plaintiff does not assert that he suffered any unreimbursed losses from the unauthorized use of his credit card or that he was unable to use credit thereafter. Plaintiff merely alleges that he was "exposed" to economic losses. *Id.* ¶¶ 26, 29. Such indirect allegations do not demonstrate injury in fact. The FACC instead offers only oblique references to "unauthorized purchases" and "damages" suffered by Plaintiff and the putative class. *See, e.g.*, FACC ¶¶ 1, 12, 26. But these "conclusory allegations" and "general averments"

are inadequate to establish standing. *See* Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 184 (2000) (citations omitted).

### 2. Future Harm

**\*5** With respect to future damages and mitigating future loss in data theft cases, the Ninth Circuit has identified the types of data breaches which constitute a "real and immediate harm" as opposed to a merely "conjectural or hypothetical" harm. Krottner v. Starbucks Corp., 628 F.3d 1139, 1143 (9th Cir. 2010). In *Krottner*, Plaintiffs were Starbucks employees whose personal information, including names, addresses, and social security numbers were compromised as a result of the theft of a company laptop. Id. at 1140. The Ninth Circuit found that the *Krottner* plaintiffs satisfied the injury-in-fact requirement because they had "alleged a credible threat [of future identity theft] of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data." Id. at 1143. Thus, where sensitive personal data, such as names, addresses, social security numbers, and credit card numbers are improperly disclosed or disseminated into the public — thereby increasing the risk of future harm to plaintiff — injury in fact has been sufficiently alleged. Id. at 1139; Doe 1 v. AOL, 719 F. Supp. 2d 1102, 1109–11 (N.D. Cal. 2010).

A similar conclusion was reached in In re Adobe, 66 F. Supp. 3d at 1214, where plaintiffs alleged that "hackers deliberately targeted Adobe's servers and spent several weeks collecting names, usernames, passwords, emails addresses, phone numbers, mailing addresses, credit card numbers and expiration dates." The *Adobe* court concluded that the risk that the plaintiffs' personal data would be misused by the hackers was "immediate and very real" because it was clear that the hackers "intend[ed] to misuse the personal information stolen" and that they had the ability to do so. Id. at 1214–15. Accordingly, the court concluded that Article III standing to bring a CRA claim for violations of Section 1798.81.5 did exist because plaintiff had adequately alleged injury in fact, causation, and redressability. Id. at 1217.

Here, the theft of personal information is far more limited than that in *Krottner* and *In re Adobe*, and notably, does not

2016 WL 6523428

involve the theft of social security information or the theft of usernames, passwords, or emails. Plaintiff only alleges that the Starwood breach jeopardized the names, addresses, billing information, and credit card numbers of the members of the hotel's chain rewards program. FACC ¶ 2. This fact is salient with respect to future identity theft because the information stolen during the Starwood breach is insufficient, for example, for a third party to open up a new account in Plaintiff's name or to gain access to personal accounts likely to have the information needed to open such an account (e.g., a social security number). Thus, in order for the Court to conclude that there is any credible, future risk of identity theft it would have to speculate as to whether a third-party with only Plaintiff's name and address could engage in wholesale identity theft. What's more, as is made clear by Plaintiff's request to be compensated for the time and money he lost in the process of cancelling his compromised credit card, *see* FACC ¶¶ 70, 71, 82, the theft of Plaintiff's credit card poses no future threat of identity theft as it is no longer active. Thus, unlike in *In re Adobe* where it was clear that the third-party had the ability to engage in future identify theft, here, the Court would have to engage in a hypothetical line of reasoning in order to conclude that Plaintiff remains at risk of imminent identity theft given the small amount of useful personal information that a third-party potentially has at its fingertips. *See* 🔖 *Antman v. Uber Techs., Inc.*, 2015 WL 6123054, *11 (N.D. Cal. Oct. 19, 2015) (concluding that theft of plaintiff's name and driver's license was insufficient to demonstrate injury in fact because any harm that would result from such a misappropriation posed no credible risk of identity theft). Accordingly, because the PII stolen was limited only to Plaintiff's name, address, and credit card information, and because the credit card has since been cancelled, the Court finds that Plaintiff has not sufficiently alleged the credible threat of future identity theft needed in order to plead injury in fact for his causes of action.

### 3. Theft of PII

**\*6** Plaintiff alleges that he incurred a recognizable loss by the theft of his personal identifying information. In so doing, Plaintiff claims a property right to personal identifying information, but fails to identify any authority to support this proposition. Without more, the Court finds that the claimed loss of PII does not constitute a concrete harm sufficient for standing purposes. *Cf.* 🔖 *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (refusing to recognize a property right to personally identifiable data

as a basis for standing to sue in a data breach case). Nor does the mere violation of a consumer protection statute establish a "concrete" injury. *See* 🔖 *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549–50 (2016) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Thus, the Court concludes that alleging theft of PII, without more, is inadequate to demonstrate a harm that qualifies as an injury in fact for standing purposes.

### 4. Past Anxiety and Loss of Time to Mitigate or Avoid Harm

In this case, the FACC alleges lost time and expenses associated with "mitigat[ing] the actual...consequences of the data theft." FACC ¶¶ 70, 82. Defendants, in turn, argue that the FACC does not allege any facts demonstrating that Plaintiff suffered such lost time and expense. Plaintiff, however, has indicated that the alleged source of the injury is the stress and costs associated with "cancelling and reissuing credit cards," *id.* ¶ 70, and the "loss of productivity from efforts to mitigate the actual and future consequences of the theft of their identifying information and credit card records," *id.* ¶ 56.

The Supreme Court has observed that "concrete" for purposes of standing is not necessarily synonymous with "tangible." 🔖 *Spokeo, Inc.*, 136 S. Ct. at 1549 ("Although tangible injuries are perhaps easier to recognize...intangible injuries can nevertheless be concrete.") Although the Ninth Circuit has not yet decided whether anxiety or lost time to avoid financial loss qualifies as concrete injury, the Seventh Circuit has held that the loss of time resulting from a plaintiff taking action to mitigate the misuse of a credit card constitutes injury in fact. In *Remijas v. Neiman Marcus Grp., LLC*, the Seventh Circuit concluded that the time and money class members spent on resolving fraudulent charges and protecting against future identity theft was sufficient for standing purposes, even if the bank ultimately repaid the charges, because the customers "suffered the aggravation and loss of value of the time needed to set things straight, to reset payment associations after credit card numbers are changed, and to pursue relief for unauthorized charges." 🔖 794 F.3d 688, 693–94 (7th Cir. 2015); *accord* 🔖 *Lewert*, 819 F.3d at 967.

Case 4:24-cv-03300 Document 17-3 Filed on 10/29/24 in TXSD Page 21 of 107

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

Likewise, other district courts in the Ninth Circuit have ruled similarly. Recently, Judge Lucy Koh, relying on *Lewert* and *Remijas*, extended her ruling in *In re Adobe* to conclude that a Plaintiff's "us[e] [of] their own time for credit monitoring" in response to a data breach was a recoverable harm. *See* 🔖*In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at \*26 (N.D. Cal. May 27, 2016).

Here, Plaintiff has alleged that his credit card information was stolen and misused and that he arranged to cancel and reissue the compromised credit card after learning that his PII was misused. He further alleges that the need to mitigate his exposure to fraudulent charges and potential identity theft resulted in a loss of productivity. These allegations present a concrete, non-speculative harm that befell Plaintiff as a result of the Starwood breach. Accordingly, to the extent Plaintiff seeks relief for the loss of time and money spent to avoid losses caused by the data breach, his allegations are sufficient to state an injury in fact.

**C. Causation**

With regards to Plaintiff's claim arising under Section § 1798 of the California Customer Records Act, FACC ¶¶ 39–47, Defendants argue that the FACC asserts no factual basis for the conclusion that Defendants' alleged delayed in notifying Starwood customers of the data breach caused any harm. The Court agrees.

**\*7** Section 1798.82 of the CRA requires businesses to "disclose a breach of the security of the system following discovery or notification of the breach...in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82(a). While Plaintiff alleges that Defendants' "failure to provide prompt notice contributed to his losses," Plaintiff does not provide any further factual support demonstrating that Defendants' alleged violation of Section 1798.82 resulted in a cognizable injury in fact to himself or other class members. *See* ECF No. 25 at 6–7. Reviewing the FACC and Plaintiff's Opposition to Defendant's Motion to Dismiss, it is entirely unclear how any of the injuries identified by Plaintiff have been caused or compounded by Defendants' alleged failure to promptly notify Plaintiff or other class members of the Starwood breach. Plaintiff also does not allege any incremental harm suffered as a result of the alleged delay in notification. As such, Plaintiff has failed to allege any harm resulting from Defendants' purported delay in notifying Starwood customers of the breach.

This conclusion, moreover, comports with the court's decision in *In re Adobe*, where it concluded that plaintiffs had failed to plausibly allege that Adobe's delay in notifying customers of a 2013 data breach resulted in injury. 🔖 66 F. Supp. 3d at 1218 ("Plaintiffs have not alleged any injury traceable to Adobe's alleged failure to notify customers of the 2013 data breach in violation of Section 1798.82, because [p]laintiffs do not allege that they suffered any incremental harm as a result of the delay"). Just as the *In re Adobe* court concluded that Plaintiff had failed to allege injury in fact because Plaintiff had not traced any injury from the delayed notification, the Court, here, concludes that Plaintiff has not alleged injury in fact because he does not indicate what, if any, concrete harm resulted from Defendants' alleged failure to promptly notify Starwood customers of the data breach. Accordingly, because Plaintiff has failed to trace any harm from Defendants' delayed notification or to demonstrate a nexus between the alleged harm flowing from the delayed notification and Defendants' actions, Plaintiff has failed to adequately alleged causation with respect to his CRA § 1798.82 claim.

Defendants further argue that Plaintiff has also failed to sufficiently allege that Defendants' failure to maintain reasonable security practices, or Defendants' alleged violation of Section 1798.81.5(b) of the CRA, caused Plaintiff any injury in fact. Defendants point out that the FACC does not allege that the Starwood breach — as opposed to another contemporaneous data breach or other possible source of fraud — actually caused the unspecified fraudulent charges that Plaintiff allegedly suffered on his credit card. Yet the fact that other data breaches might have caused Plaintiff's private information to be exposed does nothing to negate Plaintiff's standing to sue here, given that Plaintiff has made a plausible showing, sufficient for pleading purposes, to demonstrate that his injuries are "fairly traceable" to the Starwood breach. *See* 🔖 *Neiman Marcus*, 794 F.3d 688, 693–94 (7th Cir. 2015); *see also* 🔖 *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1159 (D. Minn. 2014) ("Plaintiffs' allegations plausibly allege that they suffered injuries that are 'fairly traceable' to Target's conduct. This is sufficient at this stage to plead standing. Should discovery fail to bear out Plaintiffs' allegations, Target may move for summary judgment on the issue.") (citations omitted); 🔖 *Lewert*, 819 F.3d at 969 (stating that "[m]erely identifying potential alternative causes does not defeat standing").

The Court, therefore, finds that Plaintiff has insufficiently alleged causation for standing purposes as to his § 1798.82

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 22 of 107
Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 6523428

claim and sufficiently alleged it as to his § 1798.81.5, UCL, right of privacy, and negligence claims.

### D. Redressability

**\*8** To demonstrate redressability, a plaintiff must show that the injury "is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976). In the context of a class action suit, plaintiffs must also "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 503 (1975). Consequently, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of [herself] or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (citations omitted); *see also Bailey v. Patterson*, 369 U.S. 31, 32–33 (1962); *Indiana Emp't Sec. Div. v. Burney*, 409 U.S. 540, 544–45 (1973).

#### 1. Damages

A plaintiff's injuries cannot be redressed by a judicial decision to the extent that they have already been reimbursed for fraudulent charges. However, while this may be true for the fraudulent charges, it is not necessarily true for the mitigation expenses or the future injuries. *Remijas*, 794 F.3d at 697; *Lewert*, 819 F.3d at 969 (in establishing redressability, all class members should have the chance to show that they spent time and resources tracking down the possible fraud, changing automatic charges, and replacing cards as a prophylactic measure).

Here, the Court has concluded that Plaintiff's allegations that he lost time and money in the process of mitigating financial losses caused by the Starwood breach are sufficient to state an injury in fact. Because Plaintiff has not been reimbursed in any way for that expenditure of time and money, the Court concludes that the injury is redressible by judicial decision and, thus, is sufficient to allege the final element of Article III standing as to Plaintiff's request for damages.

#### 2. Injunctive Relief

Plaintiff must demonstrate standing for each form of relief he seeks. *See Friends of the Earth, Inc.*, 528 U.S. at 185. Plaintiff, thus, bears the burden of showing that he "personally would benefit in a tangible way" from the prospective injunctive and declaratory relief he requests. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998). Furthermore, where a named plaintiff seeks injunctive relief, the plaintiff must demonstrate that he or she — and any other proposed class members — are "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (citing *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("If Lyons has made no showing that he is realistically threatened by a repetition of his experience...he has not met the requirements for seeking an injunction in a federal court."); *DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974) (explaining that the named plaintiff must make a reasonable showing that he will again be subjected to the alleged illegality).

In the instant case, Plaintiff fails to establish "redressability" as to the request for injunctive relief because Plaintiff does not sufficiently allege that he is "realistically threated by a repetition of his experience" that is "likely to be redressed by a favorable decision" by this Court. *Simon*, 426 U.S. at 38, 41. Plaintiff contends that the relief he seeks via an injunction is obtainable because of his "fear of on-going data breaches" and "inten[t] to continue as a customer if his data can be adequately protected." ECF No. 25 at 4. However, as Defendants point out, "an order requiring Defendants to enhance their cybersecurity in the future (or an equivalent declaratory judgment) will not provide any relief for past injuries or injuries incurred in the future because of a data breach that has already occurred." ECF No. 22 at 12. The Court agrees with Defendants in this regard. If the Court were to issue injunctive relief based on Defendants' alleged past violations of § 1798.81.5(b) and § 1798.82 of the CRA, the relief afforded would be mostly "psychic satisfaction." *See Steel Co.*, 523 U.S. at 107 ("psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury"). Accordingly, the Court concludes that Plaintiff has failed to establish redressability as to his request for injunctive relief.

2016 WL 6523428

**\*9** To conclude: in view of the foregoing analysis of the standing factors, the Court **GRANTS** Defendants' Rule 12(b)(1) motion to dismiss as to Plaintiff's § 1798.82 CRA claim and Plaintiff's request for injunctive relief and **DENIES** Defendants' 12(b)(1) motion to dismiss as to Plaintiff's § 1798.81.5, UCL, negligence, and invasion of privacy causes of action.

## II. FAILURE TO STATE A CLAIM

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is warranted where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson*, 749 F.2d at 534. While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

"Determining whether a complaint states a plausible claim for relief will...be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In reviewing a motion to dismiss under Rule 12(b)(6), a court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). Legal conclusions, on the other hand, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). When ruling on a motion to dismiss, a court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, a court may deny leave to amend. *See DeSoto*, 957 F.2d at 658.

**\*10** A holding that a plaintiff has pled an injury in fact for purposes of Article III standing does not establish that he adequately pled his cause of action. *See Doe v. Chao*, 540 U.S. 614, 624–25 (2004) (explaining that an individual may suffer Article III injury and yet fail to plead a proper cause of action.)

### B. Analysis

#### 1. California Customer Records Act

CRA Section 1798.81.5(b) states:

> A business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate

Case 4:24-cv-03300 Document 17-3 Filed on 10/29/24 in TXSD Page 24 of 107
Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 6523428

to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

Cal. Civ. Code § 1798.81.5(b). CRA Section 1798.82, in relevant part, states:

> A person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement...or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

*Id.* § 1798.82(a).

Plaintiff alleges that Defendants violated the California CRA in two ways: (1) by failing to "implement and maintain reasonable security procedures," *see* FACC ¶ 43, and (2) by failing to notify affected customers in a timely manner, *see id.* ¶ 44.

As an initial matter, proof of damages is a threshold hurdle for both CRA causes of action. *See* Cal. Civ. Code § 1798.84(b) (permitting suit by "[a]ny customer *injured by* a violation of [the CRA]") (emphasis added). As concluded above, Plaintiff has failed to allege any injury proximately caused by any violation of § 1798.82(a). Accordingly, Plaintiff has failed to state a cause of action under § 1798.82. Thus, only Plaintiff's § 1798.81.5 claim remains. However, that Plaintiff has pled an injury in fact for purposes of Article III standing as to the §

1798.81.5 claim does not establish that he has adequately pled damages for the cause of action. *See* Doe v. Chao, 540 U.S. at 624–25. Plaintiff, therefore, must have sufficiently alleged that he was *injured by* a violation of the CRA in order for the cause of action to survive the motion to dismiss. [8]

Defendants argue that Plaintiff has failed to allege sufficient facts demonstrating that Defendants failed to maintain reasonable cybersecurity practices as required by § 1798.81.5. ECF 22-1 at 23. More specifically, Defendants assert that the FACC, primarily, only offers legal conclusions and hyperbole in support of the claim. *See, e.g.,* FACC ¶ 6 ("Instead of installing proper safeguards, Starwood essentially invited the information to be stolen, exposing highly valuable and private information of its customers."). While it is true that Plaintiff's FACC is short on specifics, one allegation that does give some indication of how Defendants' cybersecurity was supposedly insufficient states that "Starwood, among other things, failed to 'appropriately encrypt customers' data in its possession." *Id.* ¶¶ 6, 28. Plaintiff separately suggests that Defendants' "security systems and protocols" should have been designed, implemented, maintained, and tested "consistent with industry standards and requirements." *Id.* ¶ 66.

**\*11** The Court finds that Plaintiff has sufficiently alleged, at the pleading stage, a legal duty and a corresponding breach as to inadequate security measures. *See* In re Sony Gaming Networks & Customer Data Sec. Breach Litig., 996 F. Supp. 2d 942, 966 (S.D. Cal. 2014) (holding that plaintiffs had adequately alleged breach of duty to provide reasonable security by pleading that they gave personal information to Sony as part of commercial transaction, and that Sony failed to employ reasonable security measures to protect the information, including failing to use industry-standard encryption); *see also* Witriol v. LexisNexis Grp., 2006 WL 4725713, at \*7–8 (N.D. Cal. Feb. 10, 2006) (denying defendants' motion to dismiss negligence claim based on failure to protect security and confidentiality of consumer information because plaintiff had sufficiently alleged a corresponding duty owed to plaintiffs). Because Plaintiff alleges that he provided his PII to Defendants as part of a commercial transaction, and that Defendants failed to employ reasonable security measures to protect such PII, such as the utilization of industry-standard encryption, the Court finds that Plaintiff has sufficiently alleged a legal duty and a corresponding breach at this stage.

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

For the foregoing reasons, the Court finds that Plaintiff has plausibly alleged a cause of action based upon the lack of reasonable security procedures under § 1798.81.5, and failed to allege a cause of action for failure to notify customers in a timely fashion under § 1798.82(a). Thus, the Court **GRANTS** Defendants' motion to dismiss the § 1798.82(a) claim without prejudice and **DENIES** Defendant's motion to dismiss the § 1798.81.5 claim.

### 2. California Unfair Competition Law

California's Unfair Competition Law ("UCL") provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200, *et seq.* Plaintiff alleges that Defendants' acts and practices violating § 1798.90, *et seq.*, of the CRA constitute unlawful and unfair business practices. *See generally* FACC ¶¶ 48–55.

In order for Plaintiff to sue Defendants for unlawful and unfair business practices, Plaintiff must also demonstrate that it has UCL-specific standing. In order to establish standing under the UCL, a plaintiff's claim must specifically involve lost money or property. *See Kwikset Corp. v. Superior Court*, 246 P.3d 877, 886 (Cal. 2011); *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1348 n.31 (Cal. Ct. App. 2009) ("[The] UCL's standing requirements appear to be more stringent than the federal standing requirements....Proposition 64...added a requirement that a UCL plaintiff's 'injury in fact' specifically involve 'lost money or property.' (Cal. Bus. & Prof. Code, § 17204)"); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014) ("Whereas a federal plaintiff's injury in fact may be intangible and need not involve lost money or property,...a UCL plaintiff's injury in fact [must] specifically involve lost money or property.") (internal quotation marks omitted).

Here, Plaintiff has alleged that unauthorized charges were made on his credit card, that he will incur damages to monitor identity theft, and that he has spent time responding to the unauthorized charges on his credit card. As discussed above in the Standing section, none of these allegations demonstrate that Plaintiff has suffered a loss of money or property. In addition, as stated above, Plaintiff has, moreover, failed to establish that the loss of his PII constitutes a form of property that could qualify as property under the UCL.

Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's second cause of action for violation of California's UCL without prejudice.

### 3. Invasion of Privacy

Under California law, to adequately state a claim for invasion of privacy, a plaintiff must demonstrate three elements: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a serious invasion of the privacy interest. *See, e.g., Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 654–55 (Cal. 1994).

**\*12** Plaintiff's FACC does not allege sufficient facts to plead an invasion of a legally protected privacy interest, *see generally* FACC ¶¶ 58–64, and Plaintiff's legal conclusions that "Defendants are guilty of oppression, fraud, or malice by permitting unauthorized disclosure of Plaintiff's [ ] personal credit card information with a willful and conscious disregard of Plaintiff's [ ] right to privacy" do not sufficiently demonstrate a "serious invasion of privacy," *see id.* ¶ 63. Plaintiff fails, for example, to allege any facts that would suggest that the data breach was an intentional violation of Plaintiff's and other class members' privacy, as opposed to merely a negligent one. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (citing *Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1127–28 (N.D. Cal. 2008), *aff'd*, 380 Fed.Appx. 689 (9th Cir. 2010) (stating that "[e]ven negligent conduct that leads to theft of highly personal information, including social security numbers, does not 'approach [the] standard' of actionable conduct under the California Constitution and thus does not constitute a violation of Plaintiffs' right to privacy").

Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's third cause of action for invasion of privacy without prejudice.

### 4. Negligence

Plaintiff alleges that Defendants did not "take adequate security measures to protect the information they obtained," FACC ¶ 21; *see also* ECF No. 25 at 7, and that Defendants owed a duty to Plaintiff and class members "to exercise reasonable care in ...securing, safeguarding, and

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

protecting...personal information," FACC ¶ 66, and to "timely disclose any incidents of data breaches," *id.* ¶ 68. As a result of Defendants' alleged breach of these duties, Plaintiff alleges numerous injuries suffered by Plaintiff and class members, including theft of their credit card information, costs associated with prevention of identity theft, and costs associated with time spent and loss of productivity, among other injuries. *See id.* ¶ 70.

Generally speaking, in actions for negligence, liability is limited to damages for physical injuries and recovery of economic loss is not allowed. *See 🚩 Aas v. Superior Court of San Diego Cty.*, 24 Cal. 4th 627, 636 (Cal. 2000) (citing 📁 *Seely v. White Motor Co.*, 63 Cal. 2d 9, 23 (Cal. 1965)); *cf.* 📁 *Krottner v. Starbucks Corp.*, 406 Fed.Appx. 129, 131 (9th Cir. 2010) (no cognizable injury on negligence claim where no loss related to an attempt to open a bank account was alleged and plaintiff waived any argument that his alleged anxiety constituted an actionable injury). In the absence of (1) personal injury, (2) physical damage to property, (3) a special relationship existing between the parties, or (4) some other common law exception to the rule, recovery of purely economic loss is foreclosed. *See* 📁 *Kalitta Air, LLC v. Cent Tex. Airborne Sys., Inc.,* 315 Fed.Appx. 603, 605 (9th Cir. 2008) (quoting 📁 *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63–65 (Cal. 1979)). Here, Plaintiff alleges nothing more than pure economic loss. Plaintiff alleges no personal injury or physical damage to his property, and puts forth no facts to demonstrate that a special relationship existed between him and Defendants. *See* FACC ¶ 29.

Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's fourth cause of action for negligence without prejudice.

### 5. Negligence Per Se

In California, negligence per se is "a presumption of negligence [that] arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff

suffered as a result of the violation of the statute." *See, e.g.*, 📁 *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 938 (Cal. 1998) (citations omitted). Accordingly, negligence per se is simply a codified evidentiary doctrine and does not per se establish tort liability. 📁 *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1284–85 (Cal. Ct. App. 2006). Stated differently, negligence per se does not state an independent cause of action because "[t]he doctrine does not provide a private right of action for violation of a statute." *People of California v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1087 (S.D. Cal. 2008) (quoting 📁 *Quiroz*, 140 Cal. App. 4th at 1285.)

**\*13** Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's fifth cause of action for negligence per se with prejudice.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss, (ECF. No. 22), be **GRANTED** in part and **DENIED** in part.

2. Federal Rule of Civil Procedure 15 provides that courts should freely grant leave to amend "when justice so requires." Accordingly, the Court **GRANTS** Plaintiff **twenty (20) days** from the issuance of this Order to file a Second Amended Complaint that addresses the pleading deficiencies noted above. Failure to meet the twenty-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice. Plaintiffs may not add new causes of actions or parties without leave of the Court or stipulation of the parties pursuant to Rule 15.

**IT IS SO ORDERED.**

Dated: November 3, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6523428

Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6523428

---

## Footnotes

1       See ▢ *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141–43 (9th Cir. 2010) (holding that theft of plaintiffs' names, addresses, and social security numbers amounted to injury in fact because acquisition of that information exposed plaintiffs to an increased risk of future identity theft, which was a "credible threat of real and immediate harm").

2       See ▢ *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214–15 (N.D. Cal. 2014) (concluding that likelihood that plaintiff's personal information would be misused was "certainly impending" given that third-parties had targeted defendants' servers, spent weeks collecting personal information, had decrypted credit card numbers, and given that some stolen information had surfaced on the Internet).

3       See ▢ *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3rd Cir. 2011) (finding that plaintiffs lacked standing because their allegations of harm were hypothetical and relied on speculation that the hacker read, copied, and understood their personal information; that they intended to use the information to commit future criminal acts; and that they had the capacity to make unauthorized transactions in the future).

4       See ▢ *Key v. DSW, Inc.*, 454 F. Supp. 2d 684, 689–90 (S.D. Ohio 2006) (concluding that no injury in fact occurred when plaintiff had alleged that unauthorized persons had obtained access to personal customer information because the allegations amounted only to the "possibility of harm at a future date"); *see also* *Hinton v. Heartland Payment Sys., Inc.*, 2009 WL 704139, at *1 (D.N.J. Mar. 16, 2009) (sua sponte dismissing case because plaintiff failed to assert that a third party has actually used his credit information to either open a credit card account or otherwise secure a fraudulent benefit and because allegations of increased risk of identity theft and fraud "amount[ed] to nothing more than mere speculation"); ▢ *Bell v. Acxiom Corp.*, 2006 WL 2850042, at *2 (E.D. Ark. Oct. 3, 2006) (rejecting plaintiff's allegation of increased risk of identity theft where plaintiff had not alleged that she had suffered anything greater than an increased risk of identity theft).

5       *See Whalen v. Michael Stores Inc.*, 153 F. Supp. 2d 577, 580–81 (E.D.N.Y. 2015) *appeal docketed*, No. 16-352 (2d Cir. Feb. 5, 2016) (finding failure to allege injury in fact because, among other things, plaintiff had failed to allege that she suffered an unreimbursed charge); *see also* ▢ *Hammond v. Bank of New York Mellon Corp.*, 2010 WL 2643307, at *8 (S.D.N.Y. June 25, 2010) (Article III standing lacking where unauthorized charges from misuse of personal information were reimbursed).

6       Plaintiff has alleged this form of harm even though it is confined to cases involving medical information under ▢ Cal. Civ. Code § 56.10 *et seq.* While Plaintiff references this section in identifying common issues of fact, there are no allegations that Defendants are health care providers and that ▢ § 56.10 applies to them. FACC ¶¶ 38, 70.

7       In his FACC, Plaintiff only seeks injunctive relief, declaratory relief, and attorney fees, and only reserves a right to seek damages. FACC ¶¶ 45, 64, 72, 84.

8       Neither party has addressed whether "injury" under § 1798.84(b) extends to non-monetary forms of loss. Without further briefing on this question, the Court will not sua sponte address the issue or rely on it in considering the motion to dismiss.

---

**Dugas v. Starwood Hotels & Resorts Worldwide, Inc., Not Reported in Fed. Supp. (2016)**

2016 WL 6523428

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Green v. eBay Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2066531

KeyCite Yellow Flag - Negative Treatment

Distinguished by Hays v. Frost & Sullivan, Inc., W.D.Tex., August 16, 2024

2015 WL 2066531
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

Collin GREEN, Plaintiff

v.

EBAY INC., Defendant.

Civil Action No. 14–1688.
|
Signed May 4, 2015.

### ORDER AND REASONS

SUSIE MORGAN, District Judge.

**\*1** Before the Court is Defendant eBay Inc.'s ("eBay") Motion to Dismiss Plaintiff's Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [1] In its motion, eBay first argues the Class Action Complaint should be dismissed pursuant to Rule 12(b)(1) because Plaintiff Collin Green, the sole named Plaintiff in this action, has failed to allege a cognizable injury-in-fact; therefore, he lacks Article III standing to pursue this case in federal court. In the alternative, eBay contends the Class Action Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

This case raises the issue of whether the increased risk of future identity theft or identity fraud posed by a data security breach confers Article III standing on individuals whose information has been compromised by the data breach but whose information has not yet been misused. After considering the parties' briefs and the relevant case law, the Court finds itself positioned with the majority of district courts that have held the answer is no. Because Plaintiff has failed to allege a cognizable Article III injury, the Court grants eBay's motion and dismisses the Class Action Complaint for lack of standing.

### BACKGROUND

eBay is a global e-commerce website that enables its over 120 million active users to buy and sell in an online marketplace. [2] In its normal course of business, eBay maintains personal information of its users, including: names, encrypted passwords, dates of birth, email addresses, physical addresses, and phone numbers. [3] In February and March 2014, unknown persons accessed eBay's files containing this user information (the "Data Breach"). [4] On May 21, 2014, eBay notified its users of the Data Breach and recommended that users change their passwords. [5] Although eBay also collects other information, including credit card and bank account information, there is no indication that any financial information was accessed or stolen during the Data Breach. [6]

Plaintiff Collin Green filed this 10–count consumer privacy putative class action against eBay on behalf of himself and all eBay users in the United States whose personal information was accessed during the Data Breach. [7] Plaintiff alleges that as a direct and proximate result of eBay's conduct, "Plaintiff and the putative class members have suffered economic damages," [8] "actual identity theft, as well as (i) improper disclosures of their personal information; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud due to eBay's failures; (iii) the value of their time spent mitigating identity theft and/or identity fraud, and/or the increased risk of identity theft and/or identity fraud; (iv) and deprivation of the value of their personal information." [9] The Class Action Complaint asserts federal causes of action under the Federal Stored Communications Act, Fair Credit Reporting Act, and Gramm–Leach–Bliley Act and several state law causes of action, including negligence, breach of contract, and violation of state privacy laws. eBay now moves to dismiss the Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a claim. [10]

### ANALYSIS

**\*2** The gravamen of eBay's motion to dismiss is that Plaintiff lacks Article III standing to bring this action in both his individual and representative capacities. eBay contends the Court lacks subject-matter jurisdiction because Plaintiff "has

not alleged any cognizable injury whatsoever, and he thus lacks Article III standing ."[11] eBay argues "Plaintiff does not allege that he has been injured by misuse of the stolen information[,] ... that anyone has used his password, or that anyone has even tried to commit identity fraud with his information-let alone that anyone has actually succeeded in doing so—and that he has thereby suffered harm."[12] Instead, eBay claims "Plaintiff relies on vague, speculative assertions of *possible future* injury—that *maybe* at some point in the *future,* he *might* be harmed.... But the speculative possibility of future injury does not constitute injury-in-fact."[13] eBay asserts that the Supreme Court recently made clear in *Clapper v. Amnesty International USA* that a future injury must be "certainly impending" to establish injury-in-fact, and "[b]ecause Plaintiff has not alleged specific facts constituting an injury that is present or 'certainly impending,' Plaintiff lacks standing and the Complaint must be dismissed."[14] In support, eBay points to numerous post-*Clapper* data breach cases where courts have held that neither the increased risk of identity theft nor expenses incurred to mitigate this speculative risk constitute injury-in-fact as required for Article III standing.[15]

Plaintiff argues eBay has misconstrued recent Supreme Court case law on standing and contends the Class Action Complaint sufficiently alleges injury-in-fact because Plaintiff and the putative class members are now subject to the "statistically certain threat" of identity theft or identity fraud, and they have incurred, or will incur, costs to mitigate that risk.[16] Plaintiff states his personal information was stolen, along with that of all of the members of the putative class, and "[e]mpirical data shows a vast number of the class members will be significantly harmed."[17] Although Plaintiff concedes the entire class may not suffer injury,[18] he argues the Fifth Circuit "has explained ... that the fact a section of the class may not suffer the damages alleged is not sufficient to destroy Article III standing; it is the allegation of injury that determines at this phase."[19]

"Article III of the United States Constitution limits the jurisdiction of federal courts to actual 'Cases' and 'Controversies.' "[20] "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue."[21] Because standing is a matter of subject-matter jurisdiction, a motion to dismiss for lack of standing is properly brought pursuant to Federal Rule

of Civil Procedure 12(b)(1).[22] Federal courts must dismiss an action if, "at any time," it is determined that subject-matter jurisdiction is lacking.[23] As the party invoking federal jurisdiction, the plaintiff constantly bears the burden of establishing the jurisdictional requirements, including standing.[24]

**\*3** "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.' "[25] The first prong focuses on whether the plaintiff suffered harm, the second focuses on who inflicted that harm, and the third focuses on whether a favorable decision will likely alleviate that harm.[26] Although all three elements are required for Article III standing, the injury-in-fact element is often determinative.[27]

In the class action context, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class."[28] "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."[29]

In this case, eBay contends Green, the only named Plaintiff, lacks standing because he has failed to allege a cognizable injury. The injury-in-fact element "helps ensure that the plaintiff has a personal stake in the outcome of the controversy."[30] Recently, the Supreme Court in *Clapper v. Amnesty International USA* provided guidance on the standard for establishing injury-in-fact:[31]

> [A]n injury must be concrete, particularized, and actual or imminent.... Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of possible future injury are not sufficient.[32]

Following *Clapper,* the majority of courts faced with data breach class actions where complaints alleged personal

information was accessed but where actual identity theft was not alleged have applied this "certainly impending" standard; notably, where plaintiffs have alleged their injury was the increased risk of identity theft, courts have dismissed the complaints for lack of Article III standing.[33] These courts found that the mere increased risk of identity theft or identity fraud alone does not constitute a cognizable injury unless the harm alleged is certainly impending.[34]

For example, in *Strautins v. Trustwave Holdings, Inc.,* a hacker infiltrated the South Carolina Department of Revenue, and "approximately 3.6 million Social Security numbers, 387,000 credit and debit card numbers, and tax records for 657,000 businesses had been exposed."[35]  The plaintiff filed a class action claiming she and the other class members incurred the following injuries:

> (1) untimely and/or inadequate notification of the Data Breach; (2) improper disclosure of [personal identifying information]; (3) loss of privacy; (4) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Data Breach; (5) the value of time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (6) deprivation of the value of [personal identifying information]; and (7) violations of rights under the Fair Credit Reporting Act.[36]

**\*4**  The court in *Strautins* stated that "[t]hese claims of injury, however, are too speculative to permit the complaint to go forward."[37]  This is because under *Clapper,* "allegations of *possible* future injury are not sufficient to establish standing.... [T]he threatened injury must be *certainly impending*."[38]

Even where actual fraudulent credit card charges are made after a data breach, courts have held the injury requirement still is not satisfied if the plaintiffs were not held financially responsible for paying such charges. For example, in *Peters v. St. Joseph Services Corp.,* hackers infiltrated a health care service provider's network and accessed personal information of patients and employees, including names, social security numbers, birthdates, addresses, medical records, and bank account information.[39]  Even though there was an attempted purchase on the plaintiff's credit card, which was declined by the plaintiff when she received a fraud alert, the court held the plaintiff did not have standing.[40]  The Court found the plaintiff's theory based on a certainly impending or substantial risk of identity theft/fraud was too speculative and

attenuated to constitute injury-in-fact because she was unable to "describe how [she would] be injured without beginning the explanation with the word 'if.' "[41]  Similarly, the court in *Remijas v. Neiman Marcus Group, LLC* found the complaint did not adequately allege standing on the basis of increased risk of future identity theft.[42]  Despite the fact that thousands of Neiman Marcus customers had actual fraudulent charges on their credit cards, the court found the plaintiffs failed to allege that any of the fraudulent charges were unreimbursed, and the court was "not persuaded that unauthorized credit card charges for which none of the plaintiffs are financially responsible qualify as 'concrete' injuries."[43]

Although Plaintiff's Class Action Complaint states all members of the putative class "have suffered actual identity theft,"[44]  Plaintiff makes this conclusory statement without any allegations of actual incidents of identity theft that *any* class member has suffered, let alone that Plaintiff himself has suffered. Plaintiff does not allege that any of the information accessed was actually misused or that there has even been an attempt to use it. Plaintiff has not alleged that his password was decrypted and utilized or that any of his other personal information has been leveraged in any way. As Plaintiff's opposition makes clear, his true argument is that his injury-in-fact is the increased risk of future identity theft or identity fraud—not actual identity theft or identity fraud.[45]  Thus, for Plaintiff to have standing under Article III, the threat of identity theft or identity fraud must be concrete, particularized, and imminent-meaning the harm must be certainly impending.[46]

The Court finds Plaintiff has failed to allege an injury-in-fact: the allegations in the Complaint fail to demonstrate a concrete and particularized actual or threatened injury that is certainly impending. In most data breach cases, the complaints allege sensitive information was stolen, such as financial information or Social Security numbers.[47]  In such cases, courts nonetheless have found that the mere risk of identity theft is insufficient to confer standing, even in cases where there were actual attempts to use the stolen information.[48]  In this case, there is no evidence that any financial information or Social Security numbers were accessed during the Data Breach. Additionally, the fact there is no evidence of actual or even attempted identity theft or identity fraud further supports the Court's finding that Plaintiff has failed to show the alleged future injury is certainly impending. Furthermore, "[i]t is well settled that '[a]

Green v. eBay Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2066531

claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties,' "[49] and the existence of Plaintiff's alleged injury in this case rests on whether third parties decide to do anything with the information. If they choose to do nothing, there will never be an injury.

**\*5** Indeed, Plaintiff's Complaint makes clear that he does not face a certainly impending risk of future identity theft or identity fraud. For example, the Complaint states: "Criminals who now possess Plaintiffs' [sic] and the class members' personal information *may* hold the information for later use, or continue to sell it between identity thieves. Thus, Plaintiff and the class members must be vigilant *for many years* in checking for fraud in their name, and be prepared to deal with the steep costs associated with identity fraud."[50] Additionally, the Complaint states: "Studies indicate that individuals whose personal information is stolen are approximately 9.5 times more likely than other people to suffer identity fraud. Moreover, it can take time before the identity thieves use the stolen information."[51] However, an increase in the risk of harm is irrelevant—the true question is whether the harm is certainly impending.[52] Just as in *Peters v. St. Joseph Sevices Corp.,* the allegations in Plaintiff's Class Action Complaint make clear that "[t]he misuse of the accessed information could take any number of forms, at any point in time.... It may even be impossible to determine whether the misused information was obtained from exposure caused by the Data Breach or from some other source. [Plaintiff's] theory of standing 'relies on a highly attenuated chain of possibilities.' As such, it fails to satisfy the requirement that 'threatened injury be certainly impending to constitute injury in fact.' "[53]

Although Plaintiff claims "[t]he only purpose to steal the information [from eBay] is to profit from it,"[54] nothing in the Complaint indicates the threat of future identity theft or identity fraud is certainly impending. The potential injury in this case is far too hypothetical or speculative to meet *Clapper's* certainly impending standard.[55] Whether Plaintiff and other class members actually become victims of identity theft depends on numerous variables, including whether their data was actually taken when it was accessed, whether certain information was decrypted, whether the data was actually misused or transferred to another third party and misused, and whether or not the third party succeeded in misusing the information. The mere fact that Plaintiff's information was accessed during the Data Breach is insufficient to establish injury-in-fact. Thus, the potential threat of identity theft or identity fraud, to the extent any exists in this case, does not confer standing on Plaintiff to pursue this action in federal court.[56]

The Complaint also alleges that Plaintiff and the putative class members have spent, or will need to spend, both time and out-of-pocket expenses to protect themselves from identity theft or identity fraud and/or the increased risk of either occurring.[57] As the Supreme Court made clear in *Clapper,* mitigation expenses do not qualify as injury-in-fact when the alleged harm is not imminent.[58] Therefore, Plaintiff's allegations relating to costs already incurred or that may be incurred to monitor against future identity theft or identity fraud likewise fail to constitute injury-in-fact for standing purposes.[59]

**\*6** Based on Plaintiff's failure to allege facts showing he has suffered an actual or imminent injury, the Court must dismiss the Class Action Complaint for lack of standing. This disposition is in line with the vast majority of post-*Clapper* data breach cases where no actual identity theft or identity fraud was alleged.[60] Plaintiff lacks standing to sue in federal court unless and until he suffers an actual injury or faces an imminent injury traceable to the Data Breach that can be fully compensated with money damages, and there is simply no compensable injury at this time.

Given the Court's lack of original jurisdiction over Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Thus, the state law claims are dismissed without prejudice.[61]

## CONCLUSION

Based on the foregoing analysis and discussion, Plaintiff has not adequately alleged Article III standing. For that reason, the case must be dismissed for want of subject-matter jurisdiction.[62] Accordingly,

**IT IS ORDERED** that eBay's Motion to Dismiss for lack of standing (R. Doc. 20) be and hereby is **GRANTED,** and the Class Action Complaint is **DISMISSED** without prejudice.

32 NO. 25 Westlaw Journal Computer and Internet 15

App. 030

2015 WL 2066531

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2066531

---

**Footnotes**

1  R. Doc. 20.

2  R. Doc. 1 ¶ 3.

3  *Id.* ¶ 4.

4  *Id.*

5  *Id.* ¶ 5.

6  *Id.* ¶¶ 19–20 ("At this time Plaintiff is unsure how much, if any, of these additional highly detailed classes of personal information were also stolen due to eBay's failures."). Additionally, Plaintiff incorporates by reference into his Complaint eBay's Form 8–K for the period ending May 21, 2014, R. Doc. 1 ¶ 13 n. 1, which eBay requested that the Court consider in conjunction with its motion to dismiss. R. Doc. 23. The Form 8–K incorporates by reference a press release issued by eBay on May 21, 2014, which states: "The company said it has ... no evidence of any unauthorized access to financial or credit card information, which is stored separately in encrypted formats.... The company also said it has no evidence of unauthorized access or compromises to personal or financial information for PayPal users. PayPal data is stored separately on a secure network, and all PayPal financial information is encrypted." R. Doc. 23–6.

7  R. Doc. 1 ¶ 123.

8  *Id.* ¶ 55.

9  *Id.* ¶ 61.

10  R. Doc. 20.

11  R. Doc. 20–1 at p. 12.

12  *Id.*

13  *Id.*

14  *Id.* (citing 🚩 — U.S. ——, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)).

15  R. Doc. 20–1 at pp. 17–18. For examples of such cases, see *infra* note 33.

16  R. Doc. 24.

17  *Id.* at pp. 13, 15.

18  *Id.* at p. 15.

19    *Id.* at p. 17.

20    🚩 *Crane v. Johnson,* ––– F.3d ––––, No. 14–10049, 783 F.3d 244, 2015 WL 1566621, at *7 (5th Cir. Apr.7, 2015) (citing U.S. CONST., art. III, § 2).

21    🚩 *Clapper v. Amnesty Int'l USA,* ––– U.S. ––––, ––––, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013) (internal quotation marks and citation omitted).

22    *See* FED.R.CIV.P. 12(b)(1). A motion to dismiss for lack of standing may be either 'facial' or 'factual.' " *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.,* 778 F.3d 502, 504 (5th Cir.2015) (citing 🚩 *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981)). eBay does not "submit[ ] affidavits, testimony, or other evidentiary matters" to factually challenge the Court's jurisdiction; rather, eBay attacks the sufficiency of the Class Action Complaint on the grounds that the pleaded facts do not establish Article III standing. *Id.;* R. Doc. 20. Accordingly, eBay's motion is a facial attack, and the Court may consider only the allegations in the Class Action Complaint and any documents referenced therein or attached thereto when determining whether Plaintiff's jurisdictional allegations are sufficient. *See* 🚩 *Paterson,* 644 F.2d at 523.

23    *See* FED.R.CIV.P. 12(h)(3).

24    *See* 🚩 *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001) (citations omitted); 🚩 *Crane,* 783 F.3d 244, 2015 WL 1566621, at *3.

25    🚩 *Susan B. Anthony List v. Driehaus,* ––– U.S. ––––, ––––, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (alteration in original) (quoting 🚩 *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The fact that Plaintiff alleges statutory violations does not alone establish standing. *See* 🚩 *In re Barnes & Noble Pin Pad Litig.,* No. 12–8617, 2013 WL 4759588, at *3 (N.D.Ill. Sept.3, 2013) ("Even assuming the statutes have been violated by the delay or inadequacy of [Defendant's] notification, breach of these statutes is insufficient to establish standing without any actual damages due to the breach. Plaintiffs must plead an injury beyond a statutory violation to meet the standing requirement of Article III.").

26    *See* 🚩 *Lujan,* 504 U.S. at 560–61.

27    *See Toll Bros. v. Twp. of Readington,* 555 F.3d 131, 138 (3d Cir.2009); *Bellow v. U.S. Dep't of Health & Human Servs.,* No. 10–165, 2011 WL 2470456, at *5 (E.D.Tex. Mar.21, 2011) *report and recommendation adopted,* No. 10–165, 2011 WL 2462205 (E.D.Tex. June 20, 2011).

28    🚩 *Brown v. Protective Life Ins. Co.,* 353 F.3d 405, 407 (5th Cir.2003) (internal quotation marks and citation omitted).

29    🚩 *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

30    🚩 *Susan B. Anthony List,* 134 S.Ct. at 2341 (internal quotation marks and citation omitted).

31    ––– 🚩 ––– U.S. ––––, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

32    🚩 *Id.* at 1147 (alteration omitted) (internal quotation marks and citations omitted).

Green v. eBay Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2066531

33   *See, e.g.,* 🚩 *In re Horizon Healthcare Servs., Inc. Data Breach Litig.,* No. 13–7418, 2015 WL 1472483 (D.N.J. Mar.31, 2015) (unpublished); *Peters v. St. Joseph Servs. Corp.,* —— F.Supp.3d ——, No. 14–2872, 2015 WL 589561 (S.D.Tex. Feb.11, 2015); 🚩 *Storm v. Paytime, Inc.,* ——F.Supp.3d ——, No. 14–1138, 2015 WL 1119724 (M.D.Pa. Mar.13, 2015); 🚩 *Lewert v. P.F. Chang's China Bistro, Inc.,* No. 14–4787, 2014 WL 7005097, at *4 (N.D.Ill.Dec.10, 2014) (unpublished), *appeal docketed,* No. 14–3700 (7th Cir. Dec. 12, 2014); 🚩 *Remijas v. Neiman Marcus Grp., LLC,* No. 14–1735, 2014 WL 4627893 (N.D.Ill. Sept.16, 2014) (unpublished), *appeal docketed,* 14–3122 (7th Cir. Sept. 26, 2014); 🚩 *Galaria v. Nationwide Mut. Ins. Co.,* 998 F.Supp.2d 646 (S.D.Ohio 2014); 🚩 *Strautins v. Trustwave Holdings, Inc.,* 27 F.Supp.3d 871 (N.D.Ill.2014); 🚩 *In re Barnes & Noble Pin Pad Litig.,* No. 12–8617, 2013 WL 4759588 (N.D.Ill. Sept.3, 2013). *But see* 🚩 *In re Target Corp. Data Sec. Breach Litig.,* —— F.Supp.3d ——, No. MDL 14–2522, 2014 WL 7192478, at *2 (D.Minn. Dec.18, 2014) (finding the plaintiffs sufficiently alleged injury in a data breach case without citing *Clapper* or the certainly imminent standard).

34   Plaintiff cites three post-*Clapper* cases involving the threat of future identity theft or identity fraud where the courts found standing: 🚩 *Moyer v. Michaels Stores, Inc.,* No. 14–561, 2014 WL 3511500, at *5 (N.D.Ill. July 14, 2014) (unpublished); 🚩 *In re Adobe Sys., Inc. Privacy Litig.,* —— F.Supp.3d ——, No. 135226, 2014 WL 4379916 (N.D.Cal. Sept.4, 2014); and 🚩 *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,* 996 F.Supp.2d 942 (S.D.Cal.2014). In *Moyer,* the court concluded that the Supreme Court's decision in *Susan B. Anthony List v. Driehaus,* a more recent opinion discussing the injury-in-fact requirement for standing, indicates *Clapper's* imminence standard is a rigorous standing analysis to be applied only in cases that involve national security or constitutional issues. 🚩 2014 WL 3511500 (citing 🚩 —— U.S. ——, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014)). In *Susan B. Anthony List,* the Supreme Court stated: "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a " 'substantial risk' " that the harm will occur.' " 🚩 134 S.Ct. at 2341 (quoting 🚩 *Clapper,* 133 S.Ct. at 1147, 1150, n. 5). Although there are conflicting readings of the *Clapper* standard in light of *Susan B. Anthony List,* the underlying facts in this case lead to the conclusion that Plaintiff lacks standing under either the certainly impending or substantial risk standard. Additionally, all three cases Plaintiff points to are distinguishable from the instant case. Those courts analyzed the cases under pre-*Clapper* circuit precedent, finding *Clapper* did not overrule the precedent by setting forth a new Article III framework. Both *In re Sony* and *In re Adobe* cite the Ninth Circuit's opinion in 🚩 *Krottner v. Starbucks,* 628 F.3d 1139 (9th Cir.2010). 996 F.Supp.2d at 961–62, 2014 WL 4379916, at *6. *Moyer* cites the Seventh Circuit's opinion in 🚩 *Pisciotta v. Old National Bancorp,* 499 F.3d 629 (7th Cir.2007). 🚩 2014 WL 3511500, at *6. Additionally, all three cases involved stolen financial information, such as credit or debit card numbers, whereas Plaintiff in this case has not alleged any financial information was stolen.

35   🚩 27 F.Supp.3d 871, 872 (N.D.Ill.2014).

36   🚩 *Id.* at 875.

37   *Id.*

38   *Id.* (internal quotation marks and citations omitted).

39   No. 14–2872, 2015 WL 589561 (S.D.Tex. Feb.11, 2015).

40    *Id.*

41    *Id.* at *5 (internal quotation marks and citation omitted). The plaintiff also alleged other injuries tied to the data breach. She alleged that someone attempted to access her Amazon account by using her son's name, which plaintiff claimed could have only been obtained from the names and next-of-kin information she provided to the health care service provider. *Id.* at *2. Additionally, she claimed the data breach was the reason she received daily phone solicitations from medical products and service providers. *Id.* She further complained her email account and mailing address were compromised. *Id.*

42    🚩 No. 14–1735, 2014 WL 4627893, at *3 (N.D.Ill. Sept.16, 2014).

43    *Id.*

44    R. Doc. 1 ¶¶ 61, 77, 87, 91, 120.

45    R. Doc. 24.

46    *See* 🚩 *Crane v. Johnson,* —— F.3d ——, No. 14–10049, 783 F.3d 244, 2015 WL 1566621, at *6 (5th Cir. Apr.7, 2015) (citing 🚩 *Clapper v. Amnesty Int'l USA,* —— U.S. ——, ——, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) and 🚩 *Susan B. Anthony List v. Driehaus,* —— U.S. ——, ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014)).

47    *See, e.g.,* 🚩 *In re Horizon Healthcare Servs., Inc. Data Breach Litig.,* No. 13–7418, 2015 WL 1472483 (D.N.J. Mar.31, 2015) (unpublished); 🚩 *Lewert v. P.F. Chang's China Bistro, Inc.,* No. 14–4787, 2014 WL 7005097, at *4 (N.D.Ill.Dec.10, 2014) (unpublished); 🚩 *Strautins v. Trustwave Holdings, Inc.,* 27 F.Supp.3d 871, 872 (N.D.Ill.2014).

48    *See, e.g., Peters v. St. Joseph Servs. Corp.,* No. 14–2872, 2015 WL 589561 (S.D.Tex. Feb.11, 2015); 🚩 *Remijas v. Neiman Marcus Grp., LLC,* No. 14–1735, 2014 WL 4627893, at *3 (N.D.Ill. Sept.16, 2014); 🚩 *In Re Barnes & Noble Pin Pad Litigation,* 2013 WL 4759588 (N.D.Ill. Sept.3, 2013).

49    🚩 *Hotze v. Burwell,* —— F.3d ——, No. 14–20039, 2015 WL 1881418, at *9 (5th Cir. Apr.24, 2015) (second alteration in original) (quoting 🚩 *Little v. KPMG LLP,* 575 F.3d 533, 540 (5th Cir.2009) and citing 🚩 *Clapper,* 133 S.Ct. at 1150).

50    R. Doc. 1 ¶¶ 33–34 (emphasis added).

51    *Id.* ¶ 33.

52    *See* 🚩 *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.,* 45 F.Supp.3d 14, 25 (D.D.C.2014).

53    No. 14–2872, 2015 WL 589561, at *5 (S.D.Tex. Feb.11, 2015) (quoting 🚩 *Clapper,* 133 S.Ct. at 1147–48).

54    R. Doc. 24 at p. 15.

55    *See* 🚩 *Clapper,* 133 S.Ct. at 1148; 🚩 *Susan B. Anthony List v. Driehaus,* —— U.S. ——, ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) ("An injury must be concrete and particularized and actual or imminent,

2015 WL 2066531

not conjectural or hypothetical." (internal quotation marks and citation omitted)). To the extent there is any relevant difference between the "certainly impending" and "substantial risk" standards, Plaintiff in this case has not demonstrated either.

56 Because the Court finds Plaintiff has not satisfied the injury-in-fact element required for him to have standing, the Court need not address the traceability or redressability elements.

57 R. Doc. 1 ¶ 61.

58 *See* 🚩 *Clapper,* 133 S.Ct. at 1155 (stating plaintiffs "cannot manufacture standing by incurring costs in anticipation of non-imminent harm").

59 Additionally, because there have been no reported incidences of actual identity theft or identity fraud as a result of the Data Breach and since no financial information or Social Security numbers were accessed during the Data Breach, there is no reason to believe such mitigation costs are necessary. The Complaint also alleges "deprivation of the value of their personal information." R. Doc. 1 ¶ 61, 77, 87, 91, 120. Even if the Court were to find that personal information has an inherent value and the deprivation of such value is an injury sufficient to confer standing, Plaintiff has failed to allege facts indicating how the value of his personal information has decreased as a result of the Data Breach. *See* 🚩 *Galaria v. Nationwide Mut. Ins. Co.,* 998 F.Supp.2d 646, 659 (S.D.Ohio 2014) ("A few courts have concluded plaintiffs' PII does not have inherent monetary value. Others hold that even if PII has value, the deprivation of which could confer standing, plaintiffs must allege facts in their Complaint which show they were actually deprived of that value in order to have standing." (internal quotation marks and citations omitted)). Neither has Plaintiff alleged an injury-in-fact with respect to overpayment. *See* 🚩 *Lewert v. P.F. Chang's China Bistro, Inc.,* No. 14–4787, 2014 WL 7005097, at *2 (N.D.Ill.Dec.10, 2014) (unpublished).

60 *See* supra note 33; *see also* 🚩 *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.,* 45 F.Supp.3d 14, 27–28 (D.D.C.2014) ("This is not to say that courts have uniformly denied standing in data-breach cases. Most cases that found standing in similar circumstances, however, were decided pre-*Clapper* or rely on pre-*Clapper* precedent and are, at best, thinly reasoned." (citations omitted)).

61 The Court expresses no opinion on the viability of Plaintiff's state law claims.

62 It is thus unnecessary for the Court to consider eBay's remaining arguments under Federal Rule of Civil Procedure 12(b)(6).

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4052741
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, San Antonio Division.

Don HAYS, on Behalf of Himself and
All Others Similarly Situated, Plaintiff,

v.

FROST & SULLIVAN, INC., Defendant.

SA-23-CV-01490-FB
|
Signed August 16, 2024

**Attorneys and Law Firms**

Raina C. Borrelli, Pro Hac Vice, Strauss Borrelli PLLC, Chicago, IL, Joe Kendall, Kendall Law Group, Dallas, TX, for Plaintiff.

Gregory S. Hudson, Cozen O'Connor, Houston, TX, for Defendant.

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

ELIZABETH S. ("BETSY") CHESTNEY, UNITED STATES MAGISTRATE JUDGE

**\*1 To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant Frost & Sullivan, Inc.'s Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction and Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim [#7]. All pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#10]. The undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After considering Plaintiff's response to the motion [#15] and Defendant's reply [#16] and for the reasons set forth below, it is recommended that Defendant's motion to dismiss be granted in part as to Plaintiff's breach of fiduciary duty and invasion of privacy claims. In all other respects, the motion should be denied.

**I. Background**

Plaintiff Don Hays filed his Class Action Complaint, on behalf of himself and all others similarly situated, against Defendant Frost & Sullivan, Inc., alleging Defendant's failure to protect the highly sensitive data of its current and former employees and clients from a data breach. According to the Complaint, Defendant is a business consulting firm with 1,200 employees in 45 offices across the globe. (Compl. [#1], at ¶ 13.) Defendant has a Privacy Policy in which it outlines its duties to employees and clients regarding their sensitive personal information and describes the company's security policies and procedures protecting data from unauthorized access. (Id. at ¶ 19.)

The Complaint alleges that from March 10, 2023, to July 8, 2023, Defendant was the target of a cyberattack and the personal identifiable information ("PII") (names and Social Security numbers) of at least 279 employees and clients was exposed. (Id. at ¶¶ 13, 20–23.) According to the Complaint, Defendant waited until September 5, 2023, 59 days after it noticed the data breach, to notify the proposed class members of the breach and the resulting risk of identity theft. (Id. at ¶¶ 24–26.) Plaintiff is a former employee of Defendant who alleges his PII was compromised in the data breach and that he was injured as a result of the breach. (Id. at ¶¶ 38–40.) Plaintiff claims that he worked for Defendant for approximately 20 years and provided his PII as part of the employer-employee relationship. (Id. at ¶ 41.) Plaintiff's Complaint proposes the following class of plaintiffs:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Frost & Sullivan in July 2023, including all those individuals who received notice of the breach.

(Id. at ¶ 80.)

Plaintiff's Complaint contains specific allegations regarding the nature of the cyberattack based on several news reports regarding the data breach. According to the Complaint, the stolen data has already been sold "on a hacker forum," because a group known as "KelvinSecurity Team" posted on the forum that it was selling various databases related

2024 WL 4052741

to Defendant's employees and customers, including "6,000 customer records and 6,146 records for companies." (*Id.* at ¶ 33.) The Complaint further alleges that "the Akira ransomware gang" has already "dropped over 90 gigabytes of data belonging to [Defendant] on its darknet leak site" and that an additional 90 gigabytes of data "will be available soon" from the breach. (*Id.* at ¶ 35.)

**\*2** Plaintiff pleads that on information and belief his PII has already been published or will be published imminently by cybercriminals on the dark web, where data obtained through hacking is purchased and sold. (*Id.* at ¶¶ 34, 45.) Plaintiff alleges he has spent and will continue to spend significant uncompensated time and effort monitoring his accounts to protect himself from identity theft by enrolling in credit monitoring service and has suffered from a spike in spam messages and phone calls. (*Id.* at ¶¶ 48–49.) Plaintiff claims he fears for his personal financial security; suffers from anxiety, sleep disruption, stress, fear, and frustration; and worries about what information was exposed in the data breach. (*Id.* at ¶¶ 50–51.) Plaintiff asserts that he has suffered actual injury from the exposure of theft of his PII based on the foregoing, as well as the diminution in the value of his PII (a valuable commodity on the criminal black market) and a substantially increased risk of fraud, misuse, and identity theft. (*Id.* at ¶¶ 52–54, 58.)

Based on these allegations, Plaintiff asserts causes of action for negligence (Count One), negligence *per se* (Count Two), breach of implied contract (Count Three), breach of fiduciary duty (Count Four), invasion of privacy (Count Five), and unjust enrichment (Count Six). (*Id.* at ¶¶ 90–169.) Plaintiff seeks damages both on behalf of himself and the proposed class and injunctive relief as necessary to protect the interests of Plaintiff and the class through this suit. (*Id.* at ¶¶ 36–37.) Defendant has moved to dismiss Plaintiff's Class Action Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6). Defendant argues Plaintiff lacks standing to assert his claims because he has not suffered a cognizable injury in fact because he does not allege that he has been the victim of identity theft or fraud due to the data breach. Defendant also argues that some of Plaintiff's tort claims fail as a matter of law due to pleading deficiencies or legal defects with the claims. The parties appeared before the undersigned for an initial pretrial conference on April 3, 2024, and the undersigned heard brief argument on the motion. The undersigned has considered the parties' arguments from the conference as well

as their written filings, and the motion is ripe for the Court's review.

## II. Standing

Defendant first argues Plaintiff lacks standing to bring any of his claims and requests dismissal of his entire Class Action Complaint for lack of subject matter jurisdiction on this basis. The Court should deny Defendant's jurisdictional challenge because Plaintiff has pleaded a cognizable injury in fact for standing purposes to pursue his claims for both damages and injunctive relief.

### A. Legal Standards

Motions filed under Rule 12(b)(1) allow a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1); *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001). To survive a Rule 12(b)(1) motion to dismiss, a plaintiff must establish this Court's jurisdiction through sufficient allegations. *See Lujan v. Def. of Wildlife,* 504 U.S. 555, 561 (1992). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir. 1996)). "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Montez v. Dep't of Navy,* 392 F.3d 147, 149 (5th Cir. 2004) (quoting *Robinson v. TCI/US W. Commc'ns Inc.,* 117 F.3d 900, 904 (5th Cir. 1997)). The burden of proof rests on the party asserting jurisdiction. *Ramming,* 281 F.3d at 161.

**\*3** Absent standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims. *Cobb v. Cent. States,* 461 F.3d 632, 635 (5th Cir. 2006). The doctrine of standing addresses the question of who may properly bring suit in federal court and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan,* 504 U.S. at 560. Article III standing requires the satisfaction of three elements: (1) a concrete

and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendant's challenged conduct; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Id.* at 560–61. Defendant's motion focuses on the first requirement of standing—that a plaintiff must have suffered a concrete and particularized injury in fact to seek redress in federal court. "In class actions, 'named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class.' " *Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 407 (5th Cir. 2003) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

**B. Analysis**

Defendant contends that Plaintiff's Complaint fails to allege a concrete injury because Plaintiff alleges nothing more than a speculative and hypothetical risk of future harm caused by the data breach. More specifically, Defendant argues Plaintiff must allege he has been a victim of actual or attempted identity theft to have standing to pursue his claims.

Plaintiff responds that allegations of identity theft are not required to establish Article III standing. Plaintiff argues he has standing to pursue his tort claims for damages and injunctive relief because publication of his PII on the dark web is itself a violation of his privacy and a concrete injury. Plaintiff further argues that he has suffered the following additional injuries, each sufficient to confer standing: an increased risk of identity theft and fraud; the lost property value of his PII; psychological injuries of anxiety, sleep disruption, stress, fear, and frustration; a spike in scam messages and calls targeting Plaintiff; the expenditure of time spent responding to the data breach and mitigating the possibility of future harm; and the violation of his implied contractual rights regarding the preservation of the confidentiality of his PII. The undersigned agrees with Plaintiff that he has sufficiently pleaded an injury in fact for purposes of establishing his standing under Article III.

The Supreme Court has explained that for an injury to be cognizable for standing purposes, it must be "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (internal quotation and citation omitted). The Supreme Court has recognized three kinds of concrete harm: (1) tangible harms, like physical or monetary harms; (2) intangible harms, so

long as those injuries bear a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts; and (3) a sufficiently imminent and substantial material risk of future harm when a plaintiff is seeking injunctive relief, not damages. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 435–36 (2021). To have standing to pursue damages based on a risk of future harm, in addition to the imminence of the future harm, plaintiffs must also demonstrate a separate concrete harm caused "by their exposure to the risk itself." *Id.* at 438.

An imminent injury is one which is "certainly impending" or for which there is a "substantial risk" that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5). While plaintiffs are not required "to demonstrate that it is literally certain that the harms they identify will come about," a possible future injury—even one with an objectively reasonable likelihood of occurring—is not sufficient to satisfy the concrete-injury requirement. *Clapper*, 568 U.S. at 409–10, 414 n.5 (emphasis omitted).

**\*4** The Supreme Court most recently addressed these principles in *TransUnion LLC v. Ramirez*. In *TransUnion*, a plaintiff filed a class action on behalf of himself and over 8,000 class members seeking statutory damages for the alleged violation of the Fair Credit Reporting Act. 594 U.S. at 417–18. The lead plaintiff alleged that TransUnion had erroneously placed an alert on his credit report and the reports of numerous other consumers, indicating that he was a potential match to an individual on a list of "specially designated nationals who threaten American's national security" maintained by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"). *Id.* at 419–20. The plaintiff attempted to purchase a car from a dealership, but the dealership refused to sell him the vehicle after receiving a credit report from TransUnion that he was on OFAC's list. *Id.* at 420. It was stipulated by the parties that during the class period, TransUnion distributed similar reports to potential creditors concerning 1,853 of the 8,185 class members. *Id.* at 421.

The district court found that all 8,185 class members had standing to recover damages, and the Ninth Circuit affirmed. *Id.* at 422. The Supreme Court granted certiorari. *Id.*

2024 WL 4052741

In evaluating the plaintiff's alleged injuries for standing purposes, the Supreme Court distinguished between the class members whose false OFAC designations had been sent to third parties and those whose names had not been disclosed. *Id.* at 432–33. As to the 1,853 class members whose reports were disseminated, the Supreme Court had "no trouble" concluding that their injury, though intangible, was akin to the reputational harm of defamation—a harm traditionally recognized as providing a basis for lawsuits in American courts. *Id.* The Supreme Court did not "take further steps to evaluate whether those third parties *used* the information in ways that harmed the class members." *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 285 (2d Cir. 2023) (citing *TransUnion*, 594 U.S. at 433) (emphasis in original). As to the remaining class members whose credit reports were not shared with third parties, the Supreme Court concluded that they had not suffered a concrete injury because there is "no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *TransUnion*, 594 U.S. at 434 (internal quotation and citation omitted). The Supreme Court also rejected the remaining class members' efforts to establish standing to sue for damages based on a theory of a risk of future harm, reasoning that they had not demonstrated they "were independently harmed by their exposure to the risk itself—that is, that they suffered some other injury ... from the mere risk that their credit reports would be provided to third-party businesses." *Id.* at 437. The Court, however, left open the possibility that "a plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm" but did not address the issue because the plaintiffs did not rely on this theory of harm to establish standing. *Id.* at 436 & n.7.

Plaintiff asks the Court to apply the principles articulated in *TransUnion* to find that he has standing based on his allegations of having suffered two primary types of injuries—(1) the intangible harm of having his PII published on the dark web, and (2) the imminent future harm of identity theft and fraud due to the data breach. The Fifth Circuit has not yet addressed Article III's injury requirement in the context of a data breach case, but other courts of appeals have recently held that class action plaintiffs have standing to seek damages and injunctive relief in data breach cases based on similar allegations. *See Bohnak*, 79 F.4th at 285; *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 890 (11th Cir. 2023); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 374–77 (1st Cir. 2023); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 157–58 (3d Cir. 2022). All of these cases were decided after and relied upon the reasoning of the Supreme Court's recent standing analysis in *TransUnion*. These cases are instructive and provide support for Plaintiff's arguments regarding both his alleged intangible injury and his alleged risk of future harm.

**\*5** The Third Circuit's opinion in *Clemens v. ExecuPharm Inc.* focused on standing based on the alleged risk of future identity theft. The plaintiff in *Clemens* brought a class action against her former employer, a global pharmaceutical company, regarding a data breach at the company. 48 F.4th at 150. The plaintiff alleged that an identified hacking group stole the sensitive information of current and former employees, held the information for ransom, and then posted the data on the dark web where the information was made available for download. *Id.* The stolen data included names, Social Security numbers, birth dates, addresses, taxpayer IDs, banking information, credit card numbers, driver's licenses, tax forms, and passport numbers. *Id.* The complaint alleged that the plaintiff faced a risk of identity theft and fraud based on the data breach and the harm associated with the investment of time and money spent to mitigate the risk of that future injury. *Id.* at 151. The plaintiff alleged that, to prevent identity theft, she had reviewed her financial records and credit reports, transferred banking accounts to new financial institutions, and enrolled in credit monitoring. *Id.* The plaintiff also alleged that she had sustained therapy costs based on the emotional distress the breach caused her. *Id.* The district court dismissed the complaint for lack of jurisdiction, finding that an increased risk of identity theft resulting from a security breach was insufficient to establish an Article III injury for purposes of standing. *Id.*

The Third Circuit reversed, applying *TransUnion* to hold that the substantial risk of identity theft or fraud can constitute a concrete injury where the plaintiff alleges both an imminent future injury and "additional, currently felt concrete harms." *Id.* at 155–56. In finding a concrete injury, the Third Circuit emphasized several factual components of the plaintiff's case that pushed the risk of future injury from merely hypothetical to imminent, relying on a framework for data breach cases developed by the Second Circuit in *McMorris v. Carlos Lopez & Assocs.*, 995 F.3d 295 (2d

Cir. 2021). 🔖 *Id.* at 153–54. In *McMorris*, the court identified three factors for courts to consider when asked to evaluate whether a plaintiff has alleged a concrete injury by alleging an increased risk of identity theft or fraud based on unauthorized data disclosure. 🔖 995 F.3d at 303. These factors include (1) whether the plaintiff's data was exposed as a result of a targeted attempt to obtain that data versus an inadvertent disclosure; (2) whether any portion of the dataset has already been misused, even if the plaintiff has not yet experienced identity theft or fraud; and (3) whether the type of data that has been exposed is sensitive in nature, such as names and Social Security numbers (versus solely account numbers or banking information), [1] such that there is a high risk of identity theft or fraud. *Id.*

In *Clemens*, the Third Circuit applied the *McMorris* factors and found that the data breach was caused by a known ransomware group notorious for sophisticated hacking schemes and that the hackers had acted intentionally and already misused the data by encrypting it and posting it on the dark web after holding it for ransom. 🔖 48 F.4th at 156–57. Additionally, the type of data at issue could easily be used to perpetrate identity theft, as it included Social Security numbers, dates of birth, and full names of employees. *Id.* Finding the future risk of harm to be "sufficiently imminent and concrete," the Third Circuit also emphasized the fact that the lead plaintiff had alleged additional currently felt harms—emotional distress and related therapy costs and time and money involved in mitigating the fallout of the data breach. 🔖 *Id.* at 156.

There are numerous parallels between the plaintiff's standing allegations in the *Clemens* case and Plaintiff's standing allegations here. Like the plaintiff in *Clemens*, Plaintiff alleges that the data breach at issue was caused by an intentional cyberattack by an identified "ransomware gang" known as "Akira." (Compl. [#1], at ¶ 25.) Additionally, the Complaint alleges that the gang had already misused the data by posting over 90 gigabytes of data on its "darknet leak site" and announced the intention to make 90 more gigabytes of data available in the near future. (*Id.*) There are also allegations that a group known as "KelvinSecurity Team" was already selling the stolen databases on a hacker forum. (*Id.* at ¶ 33.) As to the consideration of the type of data stolen, this case, like *Clemens*, involves the type of PII that could easily be used to perpetrate identity theft—names and Social Security numbers. (*Id.* at ¶ 22.) Based on the three

*McMorris* factors, the risk of identity theft alleged by Plaintiff is not merely conjectural or speculative; there are concrete identifiable risks of imminent future harm to Plaintiff and the class members based on the posting of their PII on the dark web in hopes of selling the data for future gain. Finally, like the plaintiff in *Clemens*, Plaintiff alleges that he has already undertaken various steps to attempt to mitigate future harm. Plaintiff alleges that Defendant's letter informing its employees and clients of the breach directed those whose PII was stolen in the cyberattack to review account statements, monitor credit reports, contact the three major credit reporting bureaus for copies of credit reports, and contact consumer reporting bureaus to take steps to protect the PII from identity theft, and that, as directed, Plaintiff has spent significant time and effort monitoring his accounts and enrolling in credit monitoring services. (*Id.* at ¶¶ 27, 48.)

**\*6** The Third Circuit's decision in *Clemens* is not an outlier in its analysis of the alleged injury of the risk of future identity theft. The First, Second, and Eleventh Circuits have also found class plaintiffs to have alleged a concrete injury based on the risk of future identity theft and fraud based on even thinner allegations. In *Bohnak v. Marsh & McLennan Cos.*, the Second Circuit concluded that the plaintiff had alleged a concrete risk of imminent future harm where the class action complaint described a targeted and intentional data breach against the plaintiff's former employer, resulting in unauthorized access to employees' names and Social Security numbers, even though there were no allegations that the data had already been misused by the hackers. 🔖 79 F.4th at 289. Even though the plaintiff in *Bohnak* had not pleaded facts relevant to all three of the *McMorris* factors, the court found that "allegations of a targeted hack that exposed [her] name and SSN to an unauthorized actor are sufficient to suggest a substantial likelihood of future harm, satisfying the 'actual or imminent harm' component of an injury in fact." *Id.* The Second Circuit went on to conclude that the plaintiff had alleged additional injury—the costs incurred mitigating the consequences of the data breach—and that Plaintiff had standing to bring her claims for damages. 🔖 *Id.* at 286.

Similarly, in *Webb*, the First Circuit concluded that the two lead plaintiffs in a data breach class action both had standing to pursue damages based on the plausible allegation of a "concrete injury in fact based on the material risk of future misuse" of PII and "a concrete harm caused by exposure to this risk." 🔖 72 F.4th at 374. Yet only one of the plaintiffs had experienced actual identity theft through the filing of

2024 WL 4052741

a fraudulent tax return. *Id.* at 370. The second plaintiff did not allege any known misuse of his data, and there were no allegations regarding the actual identity of the hacker or regarding the sale or posting of the stolen data on the dark web. *See id.* The First Circuit nonetheless concluded that future harm was imminent in light of the fact that the PII had been "deliberately taken by thieves intending to use the information to their financial advantage" through a "targeted attack rather than inadvertently"; that one of the employees had already experienced the misuse of the stolen data; and that the nature of the PII stolen (names and Social Security numbers) was particularly susceptible to misuse through identity theft. *Id.* at 375 (citing *McMorris*, 72 F.4th at 303).

The Eleventh Circuit similarly found a substantial risk of future injury even where the PII stolen was only financial information, rather than names and Social Security numbers at issue in the other circuit court cases and the case currently before the Court. *Green-Cooper*, 73 F.4th at 890. In *Green-Cooper*, the class action complaint alleged that hackers had targeted Chili's restaurant systems and stolen customer card data and personally identifiable information and then posted it on Joker Stash, an online marketplace for stolen payment data. *Id.* at 886–87. Two of the three named plaintiffs alleged that they had experienced unauthorized charges on the card they had used at Chili's; the third plaintiff canceled the card before ever experiencing fraudulent charges. *Id.* at 887. The Eleventh Circuit nonetheless held that all three named plaintiffs had adequately alleged a concrete injury sufficient for Article III standing to seek damages because they alleged their credit card and personal information was "exposed for theft and sale on the dark web" and there was a substantial risk of future injury through the misuse of the personal information associated with the hacked credit cards. *Id.* at 889–90.

Defendant argues, unconvincingly, that Plaintiff's asserted injuries are too speculative to constitute concrete harm, relying primarily on two 2015 district court cases from within the Fifth Circuit. *See Peters v. St. Joseph Servs. Corp.*, 74 F. Supp. 3d 847 (S.D. Tex. 2015); *Green v. eBay Inc.*, Civil Action No. 14-1688, 2015 WL 2066531 (E.D. La. May 4, 2015). Not only do these cases predate *TransUnion* (which significantly diminishes their persuasive value), but they also were issued prior to the articulation of the *McMorris*

framework and involved significant factual distinctions from the data breach allegations in this case.

**\*7** In *Green*, in finding the alleged injuries to be too speculative to confer standing to pursue damages, the Louisiana district court emphasized that the class action complaint in that case did not contain any allegations that "any of the information accessed was actually misused or that there has even been an attempt to use it." 2015 WL 2066531, at \*4. In contrast, here Plaintiff alleges the actual sale of the PII at issue on the dark web by known hacker entities. Additionally, in *Green* the court also emphasized that there was no evidence that "any financial information or Social Security numbers were accessed during the Data Breach," the precise opposite of the allegations here. *Id.*

The holding in *Peters* is also inapposite for several reasons. In *Peters*, the district court concluded that the alleged injuries suffered by the plaintiff as a result of the data breach —attempted charges to her credit card, attempted charges to her Amazon.com account, spam email, and telephone solicitations—failed to confer standing because, according to the court, these injuries were not redressable through the suit because the plaintiff had not alleged any quantifiable damage or loss. 74 F. Supp. 3d at 857. Here, in challenging standing, Defendant is not arguing lack of redressability. As to the future risk of identity theft, the Texas district court summarily dismissed the injury as too speculative based on vague allegations of an increased risk of future identity theft without the supporting allegations regarding the nature of the attack and the actual misuse of the data on a large scale by ransomware gangs pleaded here. *See id.*

In contrast, the detailed allegations in the Class Action Complaint currently before the Court fit squarely into both the *McMorris* framework for evaluating the imminence of future harm from a data breach and the Supreme Court's recognition of a substantial and imminent risk of future harm as a concrete Article III injury where there are allegations of a separate concrete harm caused by the "exposure to the risk itself." *TransUnion*, 594 U.S. at 437. In summary, Plaintiff has pleaded a concrete Article III injury to support his claim for damages based on the actual and imminent risk of future identity theft and the separate harm caused by that risk, namely the expenditure of time and money enrolling in credit monitoring services. [2]

2024 WL 4052741

That leaves the question of whether Plaintiff's Complaint also alleges another type of concrete injury recognized by the Supreme Court in *TransUnion*—an intangible harm bearing a close relationship to a harm traditionally recognized by the courts, such as the reputational harm at issue in the Supreme Court's case. Plaintiff asks the Court to also find that the publication of PII on the dark web is itself a concrete injury sufficient to confer standing to pursue damages in a data breach case. The Eleventh Circuit endorsed this reasoning in *Green-Cooper*, as did the Second Circuit in *Bohnak*. The Eleventh Circuit concluded that having one's credit card data and personal information "floating around on the dark web" was itself a present intangible injury and established standing to sue for damages. *Green-Cooper*, 73 F.4th at 890. The Second Circuit similarly concluded that the unauthorized access to a person's name and Social Security number was similar to the harm suffered as a result of the tort of public disclosure of private facts—a harm traditionally recognized by the courts—and was also analogous to the publication of misleading information to third parties at issue in *TransUnion*. *Bohnak*, 79 F.4th at 285.

*8 The same conclusion is supported by Plaintiff's allegations in this case. The Supreme Court's recognition of the intangible harm caused by the distribution of inaccurate credit information to third parties in *TransUnion* reasonably can be extended to the context of the largescale publication of stolen PII on the dark web—a marketplace for selling personal information to actors with nefarious intent—and the actual sale of that material. As the Second Circuit noted, this type of alleged harm is analogous to the harm associated with the common-law analog of public disclosure of private facts. *See TransUnion*, 594 U.S. at 436. Accordingly, in addition to pleading a concrete and imminent risk of future identity theft, Plaintiff has pleaded the current intangible injury associated with the publication and sale of his PII on the dark web.

Based on the foregoing, the District Court should deny Defendant's motion to dismiss for lack of standing and conclude that Plaintiff has sufficiently alleged both the future risk of imminent identity theft and the intangible harm associated with the posting of his PII on the dark web. Given that the undersigned has found two types of injuries, each sufficient to confer standing to pursue damages on its own, the Court need not address Plaintiff's other theories of standing based on damage to Plaintiff's property interest in his PII,

the increase in scam messages and calls, or a violation of Plaintiff's implied contractual rights.

### III. Failure to State a Claim

Defendant also asks the Court to dismiss several of Plaintiff's claims for failure to state a claim pursuant to Rule 12(b)(6). For the reasons that follow, the Court should grant Defendant's motion to dismiss as to Plaintiff's breach-of-fiduciary-duty claim and his invasion-of-privacy claim, but his other claims should survive Defendant's motion.

#### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In short, a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief. *See Twombly*, 550 U.S. at 570. In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (internal quotation omitted). However, a court need not credit conclusory allegations or allegations that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678).

#### B. Analysis

Defendant argues that Plaintiff's claims for breach of implied contract, breach of fiduciary duty, invasion of privacy, and

unjust enrichment all fail as a matter of law. Defendant does not seek dismissal of Plaintiff's negligence and negligence *per se* claims. The Court should dismiss Plaintiff's breach-of-fiduciary-duty and invasion-of-privacy claims but deny Defendant's motion as to the claims for breach of implied contract and unjust enrichment.

### i. Breach of Implied Contract

**\*9** Plaintiff's Complaint pleads a cause of action for breach of implied contract on behalf of himself and the proposed class. (Compl. [#1], at ¶¶ 121–37.) The elements for a breach-of-an-implied-contract claim in Texas are: (1) the existence of a valid implied contract; (2) performance or tendered performance by the plaintiff; (3) breach of the implied contract by the defendant; and (4) damages resulting from the breach. *USAA Tex. Lloyds Co. v. Menchaca,* 545 S.W.3d 479, 501 n.21 (Tex. 2018) (listing elements for claim of breach of contract); *Plotkin v. Joekel,* 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting that elements of breach of contract are identical whether contract is express or implied). To adequately plead the existence of a valid implied contract, a plaintiff must plead facts that support the same elements as for express contracts: (1) an offer; (2) an acceptance; (3) mutual assent or a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *DeClaire v. G & B McIntosh Family Ltd. P'ship.,* 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Defendant argues Plaintiff has failed to plead facts in support of the first element of his breach-of-implied-contract claim because he has not pleaded facts that would demonstrate the existence of a valid implied contract regarding a promise to safeguard Plaintiff's PII. Specifically, Defendant argues that there was no meeting of the minds between the parties to support the finding of an implied contract.

The Court should reject Defendant's argument and find that Plaintiff's Complaint pleads a cause of action for breach of implied contract and allow this claim to proceed past the pleading stage. The basis of Plaintiff's implied contract claim is that he, like other employees of Defendant/putative class members, was required to provide his PII to Defendant as a condition of employment (and that the putative class members who were clients of Defendant were also required to do so as a condition of receiving Defendant's services). (Compl. [#1], at ¶ 122.) Plaintiff alleges that there was an implied promise by Defendant to protect and not disclose the PII to unauthorized persons, as evidenced by Defendant's Privacy Policy. (*Id.* at ¶¶ 125–127.)

According to the Complaint, Defendant's Privacy Policy "governs [Defendant's] data collection, processing, and usage practices" and promises to use the PII "only in compliance with this Privacy Policy." (*Id.* at ¶ 127.) The Privacy Policy assures employees and clients that Defendant "will never sell" PII to any third party; that Defendant "adheres to the Privacy Shield Principles" of the U.S. Department of Commerce; that Defendant "has a consistent level of data protection and security" across the organization; that Defendant's breach procedures ensure the identification, assessment, investigation, and reporting of "any personal data breach within 72 hours of becoming aware of the breach"; and that Defendant uses "a variety of security technologies and procedures to help protect ... personal data from unauthorized access, use or disclosure" and has "robust information security policies and procedures in place to protect personal information from unauthorized access." (*Id.* at ¶ 19.) Plaintiff asserts that these promises gave rise to an implied contract and that Defendant breached the contract by failing to safeguard his information; failing to notify him promptly of the intrusion into its computer systems; failing to comply with industry standards; failing to comply with the legal obligations incorporated into the agreements; and failing to ensure confidentiality and integrity of PII. (*Id.* at ¶ 133.)

Defendant's motion does not cite any case applying Texas law addressing a breach of implied contract claim in the context of a data breach case. And the undersigned found none. However, the undersigned's independent research revealed that many districts courts have denied motions to dismiss claims of breach of implied contract where the movant argues the plaintiff's pleadings do not plead facts to support that a valid implied contract exists, but the alleged implied contract arises in the employer-employee context, and there are documents outside of the employment contract itself addressing the employer's policies as to data retention and protection. *See Archey v. Osmose Utilities Servs., Inc.,* No. 20-CV-05247, 2022 WL 3543469, at \*4 (N.D. Ill. Aug. 18, 2022) (noting that courts "that have found an implied contract in the employee-employer data breach context have done so when the plaintiffs were able to point to some document, expression, or action of the employer which indicated an intention to protect the employee's personal information"). And privacy policies like the one described in Plaintiff's Complaint have been recognized as a plausible basis for finding that a valid implied contract exists under

various state laws across the country. *See* 🚩 *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022) (denying motion to dismiss a breach-of-implied-contract claim where the plaintiffs pleaded the existence of a privacy policy applying to personal information collected by the employer); 🚩 *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 486 (D. Md. 2020) (denying motion to dismiss under Oregon law on basis that Marriott and Starwood's privacy statements concerning their collection and use of personal information of customers could plausibly form basis of breach-of-implied-contract claim); 🚩 *Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 801 (W.D. Wis. 2019) (finding it was reasonable to infer that the parties intended to incorporate the defendant's privacy policy regarding the protection of PII into their contract for health services); 🚩 *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) (denying motion to dismiss breach-of-implied-contract claim where the employer's privacy policy and security-practices manual stated that it "maintains robust procedures designed to carefully protect the PII with which it [is] entrusted"). Such policies plausibly support "a finding of an implicit promise to protect employees' personal information in exchange for their employment" or in exchange for their business. 🚩 *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d at 591; *see also* 🚩 *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 821 (E.D. Ky. 2019) (denying motion to dismiss breach-of-implied-contract claim where employee alleged that employer implicitly agreed to safeguard the employee's PII by requiring employees to provide said information as a condition of employment).

**\*10** In contrast, courts have dismissed breach-of-implied-contract claims where a plaintiff's pleadings do not identify any company-specific documents or policies from which one could infer an implied contractual duty to protect the plaintiff's personal information. *See, e.g., Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1221 (11th Cir. 2023) (affirming dismissal of a breach-of-implied-contract claim under Georgia law where plaintiff only made "bare assertion" that defendants agreed to safeguard his PII without any allegations that defendants agreed to be bound by any data retention or protection policy); 🚩 *Longenecker-Wells v. Benecard Servs. Inc.*, 658 Fed. App'x 659, 662–63 (3d Cir. 2016) (affirming dismissal of a breach-of-implied-implied contract claim where plaintiffs failed to plead any

facts beyond the employment relationship upon which a contractual promise to safeguard PII from third-party hackers could be inferred); 🚩 *Antman v. Uber Techs., Inc.*, Case No. 15-cv-01175-LB, 2018 WL 2151231, at \*12 (N.D. Cal. May 10, 2018) (granting motion to dismiss claim of breach of implied contract where plaintiffs failed to plead any facts about an implied contract regarding security of private information). Consistent with the well-reasoned decisions described above, the undersigned concludes that Plaintiff has sufficiently pleaded facts that, if ultimately proven, would demonstrate that an implied contract exists. [3]

**ii. Breach of Fiduciary Duty**

Plaintiff's claim of breach of fiduciary duty alleges that Defendant had a fiduciary duty to act for the benefit of Plaintiff and the putative class members in securing their PII and that Defendant breached that duty by failing to sufficiently protect their PII and failing to diligently discover, investigate, and give notice of the data breach. (Compl. [#1], at ¶¶ 138–44.) The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the breach of that duty; and (3) an injury to the plaintiff or benefit to the defendant. 🚩 *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Defendant argues Plaintiff fails to plead facts to support the existence of a fiduciary duty between the parties because Texas law forecloses such a duty in the context of an employer-employee relationship. The undersigned agrees.

It is well settled that "[i]n Texas, employers generally do not owe fiduciary duties to their employees." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 153 (Tex. App.—Houston [1st Dist.] 2005, reh'g overruled (Mar. 13, 2006), review denied (Jun. 2, 2006)) ("Texas does not recognize a fiduciary duty ... owed by an employer to an employee."). Numerous federal courts have dismissed fiduciary-duty claims in the employment context on this basis. *See, e.g., Arizmendi v. ORC Indus.*, Civ. A. No. B-06-125, 2007 WL 1231464, at \*1 (S.D. Tex. Apr. 26, 2007); *Garcia v. Communities in Schs. of Brazoria Cnty, Inc.*, Civ. A. No. H-18-4558, 2019 WL 2420079, at \*11 (S.D. Tex. June 10, 2019).

Plaintiff argues that it is premature to dismiss the breach-of-fiduciary-duty claim because there was a "special relationship" between Plaintiff and Defendant giving rise

to a fiduciary duty to safeguard the PII. Yet Plaintiff has not directed the Court to any case finding that an employer has a fiduciary duty to its employees. A special relationship of trust and confidence may, however, impose an informal fiduciary duty in the context of a business transaction. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995). But Plaintiff was not in a business relationship with Defendant and has not pleaded any such special relationship here. Accordingly, the Court should grant Defendant's motion to dismiss as to Plaintiff's breach of fiduciary duty claim.

### iii. <u>Invasion of Privacy</u>

**\*11** Defendant also seeks dismissal of Plaintiff's claim of invasion of privacy. There are two elements to this tort under Texas law: "(1) an intentional intrusion, physically or otherwise upon another's solitude, seclusion or private affairs or concerns" that "(2) would be highly offensive to a reasonable person." *Amin v. United Parcel Serv., Inc.*, 66 F.4th 568, 576 (5th Cir. 2023) (quoting *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993)). Also, "Texas courts have held that intrusion upon private affairs typically requires either a trespass or an attempt to discover or perceive private information." *Id.* at 577. Defendant argues that, although hacking into a private computer could give rise to a privacy claim, *see Hovanec v. Miller*, Civ. A. No. SA-17-CV-766-XR, 2018 WL 1221486, at \*10 (W.D. Tex. Mar. 7, 2018), that claim may only be asserted against the hackers themselves —not Defendant. Defendant contends that Plaintiff has not alleged a plausible theory of invasion of privacy based on any intrusion *by Defendant* upon Plaintiff's private affairs, as Plaintiff does not allege that Defendant took any action directed towards Plaintiff that led to the data breach.

Plaintiff responds that in Texas an invasion-of-privacy claim can be based on a negligent or an intentional act, and that Defendant negligently stored Plaintiff's data, making it vulnerable to a data breach. There is a split among Texas courts of appeals on whether to recognize a cause of action for negligent invasion of privacy. *Compare Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 54 (Tex. App.—Corpus Christi-Edinburg 2001, reh'g overruled) ("Although some courts in Texas recognize negligent invasion of privacy, we decline to adopt a negligent invasion of privacy cause of action."); *Childers v. A.S.*, 909 S.W.2d 282, 291 (Tex. App.—Fort Worth 1995, no writ) (declining to adopt a negligent-invasion-of-privacy claim) *with Boyles v. Kerr*, 806 S.W.2d 255, 259 (Tex. App.—Texarkana 1991), *rev'd on other grounds*, 855 S.W.2d 593 (Tex. 1993) (op. on reh'g) ("[T]he basis for liability in a privacy action may rest upon a negligent, as well as an intentional, invasion."); *C.T.W. v. B.C.G.*, 809 S.W.2d 788, 796 (Tex. App.—Beaumont 1991, no writ) ("An intrusion or violation of personal privacy can be brought about negligently ...."). The reasoning of those courts rejecting such a cause of action is more persuasive and better predicts how the Texas Supreme Court would likely resolve the split in authority. Thus, the District Court should dismiss this claim.

In applying Texas law, this Court must first look to the decisions of the Texas Supreme Court. *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 764 (5th Cir. 2019). If the Texas Supreme Court has not ruled on an issue, this Court must make an *Erie* guess, predicting what the Texas Supreme Court would do if faced with the same facts. *Id.* Intermediate state court decisions are typically "the strongest indicator of what a state supreme court would do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016).

The Texas Supreme Court defines the invasion of privacy as an intentional tort. *Billings v. Atkinson*, 489 S.W.2d 858, 861 (Tex. 1973) (describing the invasion of privacy as a "willful tort which constitutes legal injury"). The Texas Supreme Court is likely to reject a negligent theory of invasion of privacy if faced with such a claim. In *Boyles*, one of the two cases cited by Plaintiff recognizing a negligent-invasion-of-privacy claim, the court of appeals had endorsed both a claim of negligent invasion of privacy and negligent infliction of emotional distress. 806 S.W.2d at 259. On appeal from that decision, the Texas Supreme Court reversed the court of appeals as to the claim of negligent infliction of emotional distress, reasoning that infliction of emotional distress is an intentional tort. *Boyles v. Kerr*, 855 S.W.2d 593, 595–97 (Tex. 1993). In doing so, the Texas Supreme Court overruled its prior precedent in *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649 (Tex. 1987), which had recognized a negligent-infliction-of-emotional-distress claim. *Id.* The Supreme Court did not address the negligent-invasion-of-privacy claim because the plaintiff in *Boyles* abandoned the claim before the Supreme Court's decision. *Id.* at 601. Had the claim still been a part of the case, the Texas Supreme Court

App. 045

would have been likely to reject the claim based on the same reasoning.

**\*12** The only other case relied upon by Plaintiff, *C.T.W.* (cited *supra*), was decided prior to *Boyles* and relied upon *Garrard* and the negligent theory for an intentional-infliction-of-distress claim in extending the lesser intent requirement to the invasion-of-privacy context. 809 S.W.2d at 796. In light of the overruling of *Garrard* by the Texas Supreme Court and its holding that Texas no longer recognizes a separate cause of action for negligent infliction of emotional distress, this Court should decline to follow the outdated courts of appeals decisions recognizing a negligent-invasion-of-privacy claim.

Additionally, several federal district court decisions have rejected Plaintiff's theory and dismissed invasion-of-privacy claims based on a theory of negligence or vicarious liability as unavailable under Texas law. *See, e.g., Jackson v. Methodist Hosps. of Dallas*, No. 3:05-CV-1345-N, 2006 WL 8437071, at *1 (N.D. Tex. July 19, 2006) (emphasizing that invasion of privacy is an intentional tort and dismissing negligent invasion of privacy claim); *Aguinaga v. Sanmina Corp.*, No. 3:97-CV-1026-G, 1998 WL 241260, *4 (N.D. Tex. 1998) (emphasizing that invasion of privacy is an intentional tort and dismissing invasion-of-privacy claim based on a theory of vicarious liability). In summary, the Court should grant Defendant's motion to dismiss as to Plaintiff's invasion-of-privacy claim.

### iv. Unjust Enrichment

The last cause of action challenged by Defendant is Plaintiff's unjust-enrichment claim. Defendant's primary argument for the dismissal of this claim is that it is not an independent cause of action but rather a theory of recovery dependent on another viable cause of action. Defendant argues that because all of Plaintiff's claims fail for lack of standing or as a matter of law, this cause of action must be dismissed as well. The Court should reject this argument as a basis for dismissal of Plaintiff's unjust-enrichment allegations.

First, although there is some confusion among the courts as to whether unjust enrichment is an independent cause of action or merely a quasi-contractual theory of recovery, *see Perales v. Bank of Am., N.A.*, No. CIV.A. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014) (surveying Texas law), the Texas Supreme Court has repeatedly recognized and affirmed claims of unjust enrichment. *See Ye v. Zhang*, No. 4:18-CV-4729, 2021 WL 5862093, at *2 (S.D. Tex. June 8, 2021) (citing *Trial v. Dragon*, 593 S.W.3d 313, 323

n.6 (Tex. 2019) (referring to unjust enrichment and money had and received as distinct claims); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 683, 683 (Tex. 2000) (discussing unjust enrichment as a "claim" based on quasi-contract), *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (recognizing unjust-enrichment claim). Moreover, the undersigned has concluded that most of Plaintiff's claims should survive Defendant's motion to dismiss. Plaintiff pleads unjust enrichment "in the alternative to his breach of contract claim." (Compl. [#1], at ¶ 161.) Plaintiff is permitted to plead alternative theories of recovery. Fed. R. Civ. P. 8(a)(3). Accordingly, the Court should deny Defendant's motion to dismiss on this basis.

Defendant also argues that Plaintiff has failed to plead the elements of this cause of action. Regardless of whether unjust enrichment is properly characterized as a cause of action or a theory of recovery, the elements of proof are clear. "To recover under unjust enrichment, a claimant must prove: (1) that valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by that person; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Reveille Trucking, Inc. v. Lear Corp.*, No. 4:14-CV-511, 2017 WL 661521, at *13 (S.D. Tex. Feb. 17, 2017). "Under Texas law an unjust enrichment claim requires showing that one party 'has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.' " *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 379–80 (5th Cir. 2020) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). Defendant argues that Plaintiff has failed to adequately allege that Defendant obtained a benefit from Plaintiff by fraud, duress, or taking of an undue advantage. The undersigned disagrees.

**\*13** Plaintiff pleads that Defendant is liable for unjust enrichment because it benefited from the provision of PII (which was required to collect payment from clients or to facilitate the employment of employees) and therefore facilitated its ability to provide its business consulting services worldwide. (Compl. [#1], at ¶¶ 162–63.) Plaintiff further alleges that rather than providing adequate security measures, it "enriched itself by saving the costs they reasonably should have expended" on such measures and

Hays v. Frost & Sullivan, Inc., Slip Copy (2024)

2024 WL 4052741

avoided its data-security obligations at Plaintiff's and the class members' expense. (*Id.* at ¶¶ 165–66.)

Defendant has not provided the Court with any authority supporting its argument that Plaintiff cannot plead undue advantage by asserting that Defendant unjustly benefited from shirking its data-security obligations by skimping on security measures and leaving Plaintiff to suffer the consequences. The Court should allow this claim and/or theory of recovery to proceed past the pleading stage and deny Defendant's motion to dismiss on this basis.

### IV. Conclusion and Recommendation

Having considered the motion, response, and reply, and the governing law, the undersigned recommends that Defendant Frost & Sullivan, Inc.'s Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction and Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim [#7] be **granted in part** as to Plaintiff's breach-of-fiduciary-duty and invasion-of-privacy claims. In all other respects, the motion should be **denied**. Plaintiff has standing to pursue his claims for damages and injunctive relief, and his claims of negligence, negligence *per se*, breach of implied contract, and unjust enrichment shall survive Defendant's motion.

### V. Instructions for Service and
### Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The party shall file the objections with the Clerk of Court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

**All Citations**

Slip Copy, 2024 WL 4052741

### Footnotes

1   *See also* *In re SuperValu, Inc.*, 870 F.3d 763, 770 (8th Cir. 2017) (noting that stolen credit card information "does not include any personally identifying information, such as social security numbers, birth dates, or driver's license numbers" and that this type of data "generally cannot be used alone to open unauthorized new accounts") (internal citation and quotation omitted).

2   The undersigned notes that prior to *TransUnion*, the Supreme Court rejected a theory of standing based on the cost of mitigation measures taken to protect a plaintiff's communications from being the subject of unauthorized surveillance. *Clapper*, 568 U.S. at 401. The holding in *Clapper* does not foreclose the Court's consideration of the mitigation measures allegedly taken by Plaintiff in this case. With respect to costs incurred

to mitigate a future risk of harm, the thrust of the *Clapper* decision was that a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."

🚩 *Id.* at 402. The Supreme Court in *Clapper* first concluded that the plaintiffs had failed to allege an imminent and "certainly impending" future injury. 🚩 *Id.* at 401–02. Here, Plaintiff has pleaded an imminent and concrete risk of future harm and therefore may also rely on related currently felt harms to establish standing to pursue damages. Also, it is notable that here, Plaintiff cannot be accused of manufacturing standing given the allegation that Plaintiff was directed to take mitigation measures by Defendant.

3    The undersigned notes that Plaintiff refers to a breach of the duty of good faith and fair dealing in context of his allegations supporting his breach-of-implied-contract claim. Defendant makes several arguments regarding the duty of good faith and fair dealing in its motion to dismiss. The undersigned does not construe Plaintiff's Complaint as pleading a separate claim based on the covenant of good faith and fair dealing and therefore has not and need not address these arguments.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---



# *In re ESO Sols., Inc. Breach Litig.*

United States District Court for the Western District of Texas, Austin Division

July 30, 2024, Decided; July 30, 2024, Filed

1:23-CV-1557-RP

**Reporter**
2024 U.S. Dist. LEXIS 134337 *

IN RE ESO SOLUTIONS, INC. BREACH LITIGATION

**Counsel:**  **[*1]** For Billy Love, individually and on behalf of all others similarly situated, Consol Plaintiff: John A. Yanchunis, Morgan & Morgan PA, Tampa, FL; Paul D. Stickney, Stickney Mediations PLLC, Dallas, TX; Bruce W. Steckler, LEAD ATTORNEY, Steckler Wayne Cherry & Love PLLC, Dallas, TX.

For BON SECOURS MERCY HEALTH INC., Consol Defendant: Austin P. Smith, LEAD ATTORNEY, Steckler Wayne & Love PLLC, Dallas, TX.

For Deborah Todd, Consol Plaintiff: Joe Kendall, LEAD ATTORNEY, Kendall Law Group, Dallas, TX; John A. Yanchunis, LEAD ATTORNEY, Morgan & Morgan PA, Tampa, FL.

For ESO Solutions Inc., Defendant: Christopher J. Seusing, LEAD ATTORNEY, Wood Smith Henning & Berman LLP, New York, NY; Daniel Jose Paret, LEAD ATTORNEY, Wood Smith Henning & Berman LLP, Dallas, TX.

For Essie Jones, Essie McVay, Essie Jones, formerly known as, Essie Jones, individually and on behalf of all others similarly situated, Plaintiffs: Gary M. Klinger, Milberg Coleman Bryson Phillips Grossman PLLC, Chicago, IL; Joe Kendall, Kendall Law Group, Dallas, TX; Bryan L. Bleichner, Christopher P. Renz, LEAD ATTORNEYS;PRO HAC VICE, Philip J. Krzeski, Chestnut Cambronne PA, Minneapolis, MN; Gregory Haroutunian, PRO HAC VICE, Clayeo **[*2]** C. Arnold A Professional Corp., Sacramento, CA; M. Anderson Berry, PRO HAC VICE, Arnold Law Firm, Sacramento, CA.

For George Simpson, Jaime Thomas, Robert Day, Consol Plaintiffs: John A. Yanchunis, LEAD ATTORNEY, Morgan & Morgan PA, Tampa, FL.

For Larry Claybo, Consol Plaintiff: Joe Kendall, LEAD ATTORNEY, Kendall Law Group, Dallas, TX.

For Michael Smith, individually and on behalf of his minor children J.S. B.S. T.S. and B.S. and on behalf of all others similarly situated, Tussie Smith, Consol Plaintiffs: Austin P. Smith, LEAD ATTORNEY, Steckler Wayne & Love PLLC, Dallas, TX; Bruce W. Steckler, LEAD ATTORNEY, Steckler Wayne Cherry & Love PLLC, Dallas, TX; Anthony L. Parkhill, PRO HAC VICE, Barnow and Associates P.C., Chicago, IL.

For Steven Guiffre, Consol Plaintiff: Joe Kendall, LEAD ATTORNEY, Kendall Law Group, Dallas, TX; John A. Yanchunis, LEAD ATTORNEY, Morgan & Morgan PA, Tampa, FL; Kevin Laukaitis, LEAD ATTORNEY, Laukaitis Law LLC, San Juan, PR.

**Judges:** ROBERT PITMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT PITMAN

# Opinion

## ORDER

Before the Court is Defendant ESO Solutions, Inc.'s ("ESO") Motion to Dismiss. (Dkt. 25). Plaintiffs Steven Guiffre, et al. ("Plaintiffs") filed a response, (Dkt. 31), and ESO **[*3]** filed a reply, (Dkt. 34). Also before the Court is ESO's Motion to Strike Class Allegations, (Dkt. 24), and the parties' responsive briefing. (Dkts. 26, 27). Having considered the parties' submissions, the record, and the applicable law, the Court will grant in part and deny in part the motion to dismiss and deny the motion to strike.

## I. BACKGROUND

ESO is a software company that provides services for hospitals and healthcare facilities. (Am. Compl., Dkt. 16,

2024 U.S. Dist. LEXIS 134337, *3

at 2). As part of these services, ESO collects and stores the personal identifying information ("PII") and personal health information ("PHI") of former and current patients at healthcare services that use ESO's software. (*Id.*). Plaintiffs allege that ESO "made promises and representations to its clients' patients that" private information "would be kept safe and confidential, that the privacy of that information would be maintained, and that [ESO] would delete any sensitive information after it was no longer required to maintain it." (*Id.* at 6-7).

However, on September 28, 2023, ESO detected a data breach of its computer systems. (*Id.* at 8-9). Its notice letter, sent to victims of the breach, states that an "unauthorized third party **[*4]** may have acquired [] personal data during this incident." (*Id.*). This stolen information included patients' names, social security numbers, phone numbers, addresses, medical treatment information, and insurance and payer information. (*Id.*). ESO noted that, as of December 12, 2023, it did not have evidence that any of the stolen personal information had been misused. (*Id.*).

Plaintiffs filed suit on December 21, 2023, as a putative class of victims of the ESO data breach. (Compl., Dkt. 1). They allege that their private information will end up for sale on the dark web, the breach increases the risk that their identities will be stolen, and they have lost time and resources attempting to mitigate the risk of identity theft due to the breach. (Am. Compl., Dkt. 16, at 30-32). Plaintiffs bring claims for negligence, negligence per se, breach of a third-party beneficiary contract, unjust enrichment, and violations of the deceptive trade practices acts of Florida, North Carolina, and New York. (*Id.* at 57-80).

On March 28, 2024, ESO moved to dismiss the complaint. (Dkt. 25). The central thrust of ESO's motion is that Plaintiffs have not suffered a concrete injury solely by having their private **[*5]** information exposed to third parties. Because no harm has resulted from the breach of their data, ESO alleges that Plaintiffs' injury is purely speculative, resting only on the possibility that a malicious actor will one day misuse their information. (*Id.* at 14-16). ESO argues that Plaintiffs' claims for diminished value of personal information and loss of time are insufficient to establish harm. (*Id.* at 16-18). ESO also moves to dismiss for failure to state a claim, arguing that ESO owes no duty to Plaintiffs, there is no proximate cause, and their negligence per se, third-party beneficiary, and unjust enrichment claims fail as a matter of law. (*Id.* at 25-31). Finally, ESO alleges that Plaintiffs have failed to show the elements of the

deceptive trade practices. (*Id.* at 33-40). Separately, ESO moves to strike Plaintiffs' class allegations, arguing that they cannot meet the requisite standard under *Rule 23*. (Mot. Strike, Dkt. 24).

## II. LEGAL STANDARD

### A. *Rule 12(b)(1)*

*Federal Rule of Civil Procedure 12(b)(1)* allows a party to assert lack of subject-matter jurisdiction as a defense to suit. *Fed. R. Civ. P. 12(b)(1)*. Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal **[*6]** statutes. *Kokkonen v. Guardian Life Ins. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*. A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998)*. "The burden of proof for a *Rule 12(b)(1)* motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001)*. "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a *Rule 12(b)(1)* motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton, 529 F.3d 548, 557 (5th Cir. 2008)*.

### B. *Rule 12(b)(6)*

Pursuant to *Rule 12(b)(6)*, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. In deciding a *12(b)(6)* motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)* (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)*). "To survive a *Rule 12(b)(6)* motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Sullivan, 503 F.3d 397, 401 (5th Cir. 2007)* (citing *Bell Atl. Corp. v.*

*Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). That is, "a complaint must contain **[\*7]** sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a *12(b)(6)* motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008)* (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004)*. But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey, 540 F.3d at 338*. "[A] motion to dismiss under *12(b)(6)* 'is viewed with disfavor and is rarely granted.'" **[\*8]** *Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011)* (quoting *Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009)*).

## C. Motion to Strike Class Allegations

Under *Federal Rule of Civil Procedure 12(f)*, a court may strike from any pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. Under *Rule 23(d)*, the court may "require that the pleadings be amended to eliminate allegations about representation of absent persons." *Fed. R. Civ. P. 23(d)(1)(D)*. "Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." *John v. National Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007)*. *See also General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)* ("Sometimes the issues are plain enough from the

pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.").

## III. MOTION TO DISMISS

### A. *12(b)(1)*

1. Current Caselaw on Article III Standing for Data Breach Cases

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *U.S. Const., Art. III, § 2*. The doctrine of standing gives meaning to these constitutional limits by ensuring that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which **[\*9]** the court so largely depends for illumination." *Massachusetts v. EPA, 549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)* (quoting *Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)*) (internal quotation marks omitted). Even a plaintiff who seeks to represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins, 578 U.S. 330, 338 n.6, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)* (citing *Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 40 n.20, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)*) (internal quotation marks omitted). Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*.

The constitutional minimum for standing requires three elements. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. First, plaintiffs must have suffered an injury in fact - an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* "Second, there must be a causal connection between the injury and the conduct complained of ...." *Id.* Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id. at 561*.

In a recent Supreme Court case, a class of plaintiffs

2024 U.S. Dist. LEXIS 134337, *9

brought suit against TransUnion, a credit reporting agency, alleging that TransUnion failed to maintain accurate credit files. *See TransUnion LLC v. Ramirez, 594 U.S. 413, 417, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)* **[*10]** . The Supreme Court found standing for plaintiffs whose credit files had been disseminated to third-party business but denied standing to plaintiffs whose reports had not been disseminated to others. *Id.* The Supreme Court rejected the notion that misleading credit files which could be disseminated to third parties in the future qualified as a concrete injury. *Id. at 435.* Because the threat of dissemination was no more than a risk of future harm, the Court denied standing to that subclass. *Id. at 435-37.*

The Fifth Circuit has not dealt with Article III standing in a data breach case since the Supreme Court's *TransUnion* opinion. However, the Fifth Circuit did address a similar standing issue in *Perez v. McCreary, Veselka, Bragg & Allen, P.C., 45 F.4th 816, 820 (5th Cir. 2022).* There, a plaintiff sued a law firm for sending a debt collection letter without disclosing that limitations on the debt had run. The plaintiff did not pay the debt, but lost time by verifying that her debt's limitations had run. *Id.* The Fifth Circuit dismissed the case for lack of standing, finding that the risk of financial harm never materialized and therefore did not constitute a concrete injury. *Id. at 823-25.*

The circuit court emphasized that the intangible harms inquiry should generally focus on the "types of harms protected at common law, not the precise point at which those harms become actionable." *Id. at 822* (quoting *Cranor v. 5 Star Nutrition, L.L.C., 998 F.3d 686, 693 (5th Cir. 2021)*). The applicable test, then, is whether the plaintiff "show[s] that the type of harm he's suffered is similar in kind to a type of harm that the common law has recognized as actionable." *Id.* While the plaintiffs **[*11]** in *Perez* claimed that they were "subjected . . . to a material risk of financial harm," the Fifth Circuit held that theory of standing was "foreclosed by *TransUnion*" because "if a risk hasn't materialized, the plaintiff hasn't yet been injured." *Id. at 824.* The court of appeals further rejected the plaintiff's loss-of-time theory of standing, noting that the court is "not aware of any tort that makes a person liable for wasting another's time" but noted that "future parties [could] develop the question further." *Id. at 825.*[1]

Unlike the Fifth Circuit, other circuits have directly analyzed standing in data breach cases following *TransUnion.* In *Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365 (1st Cir. 2023),* the First Circuit dealt with a putative class action against a home-delivery pharmacy service that suffered a data breach allowing third parties to access the plaintiffs' personal information. Following the data breach, an unauthorized third party filed a fraudulent tax return in the name of Alexsis Webb, one of the lead plaintiffs. *Id. at 373.* The circuit court found this was evidence of actual misuse and easily sufficed to establish injury. *Id.* While Marsclette Charley, another lead plaintiff, had not shown misuse of her personal information, the circuit still found that she had standing because **[*12]** the misuse of Webb's information plausibly made the misuse of Charley's information imminent and substantial. *Id. at 374-77.* Still, the First Circuit found the plaintiffs lacked standing as to their request for injunctive relief, noting that there was no clear evidence a future breach would occur. *Id. at 378.*

The Third Circuit reached a similar conclusion in 2022. In *Clemens v. Execupharm, Inc., 48 F.4th 146, 150 (3d Cir. 2022),* a company was hacked, exposing its employees' information to those hackers. The plaintiff then took protective measures to monitor her information, including buying credit monitoring services. *Id.* The plaintiff then sued to recover these mitigation costs and compensate for the risk of future identity theft. *Id.* The Third Circuit found standing, noting that "if the plaintiff's knowledge of the substantial risk of identity theft causes him to presently experience emotional distress or spend money on mitigation measures like credit monitoring services, the plaintiff has alleged a concrete injury." *Id. at 156.*

_____

*F.3d 826, 828 (7th Cir. 2018)* (Easterbrook, J.) (recognizing that the opportunity cost of "one's own time needed to set things straight" following a data breach "can justify money damages, just as [it] support[s] standing"); *In re Gen. Motors LLC Ignition Switch Litig., 339 F. Supp. 3d 262, 307 (S.D.N.Y. 2018)* ("[T]he overwhelming majority of states adhere to the view that lost-time damages are the equivalent of lost earnings or income."); *Clemens, 48 F.4th at 158* (recognizing injury for lost time that would have otherwise been put to profitable use); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613, 622 (4th Cir. 2018)* (same); *Galaria v. Nationwide Mut. Ins., 663 F. App'x 384, 388 (6th Cir. 2016)*; *Lewert v. P.F. Chang's China Bistro, Inc., 819 F.3d 963, 967 (7th Cir. 2016)*; *Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365 (1st Cir. 2023)* (collecting cases and recognizing the injury even after *TransUnion*).

_____

[1] The injury for lost time enjoys support in some other circuits, especially where the time would otherwise have been put to profitable use. *See Dieffenbach v. Barnes & Noble, Inc., 887*

2024 U.S. Dist. LEXIS 134337, *12

The Second Circuit dealt with near-identical facts in *Bohnak v. Marsh & McLennan Companies, Inc., 79 F.4th 276, 285 (2d Cir. 2023)*. The circuit court similarly found standing because "exposure of [Plaintiff's] PII to unauthorized third parties [] bears some relationship to a well-established common-law analog: public disclosure **[*13]** of private facts." *Id.* The Second Circuit also credited the mitigation cost theory of standing, noting that expenses associated with prevention and detection of identity theft constituted concrete harms. *Id.*

Last, the Eleventh Circuit found a concrete injury where "hackers took credit card data and corresponding personal information from the Chili's restaurant systems and affirmatively posted that information for sale" to third parties. *Green-Cooper v. Brinker Int'l, Inc., 73 F.4th 883, 889 (11th Cir. 2023)*, *cert. denied sub nom. Brinker Int'l, Inc. v. Steinmetz, 144 S. Ct. 1457, 218 L. Ed. 2d 689 (2024)*. Nonetheless, a concurring opinion emphasized that "a mere data breach does not, standing alone, satisfy the requirements of Article III standing" nor would the sole "increased risk" of identity theft. *Id. at 895* (Branch, J., concurring).

### 2. Plaintiffs' Lost Time is Not Recognized as an Article III Injury

With these principles in mind, the Court turns to Plaintiffs' specific allegations against ESO. First, Plaintiffs allege that they have lost time attempting to mitigate damages from ESO's data breach. (Am. Compl., Dkt. 16, at 29-30). As *Perez* explains, the Fifth Circuit is "not aware of any tort that makes a person liable for wasting another's time ....." *45 F.4th at 825*. Although the Fifth Circuit noted that it did "not conclusively decide whether such injuries **[*14]** are closely related to traditional harms," Plaintiffs do not press the issue here. *Id.* Instead, in their response, Plaintiffs cite several out-of-circuit district court cases recognizing lost time as a concrete injury. (*See* Resp., Dkt. 31, at 15-16). But it is not enough for Plaintiffs to identify caselaw in other circuits—they must meaningfully differentiate their injuries from those rejected in *Perez*. Plaintiffs fail to do so. Because Plaintiffs make no arguments against *Perez*'s analysis of common law torts or show a more concrete injury than that in *Perez*, their claim for lost time must be similarly dismissed as an insufficiently concrete injury.

### 3. Plaintiffs' Heightened Risk Claim Fails

*Perez* also forecloses Plaintiffs' claim that the mere risk of misuse or heightened vulnerability of their data is a concrete injury. As the Fifth Circuit held, "if a risk hasn't

materialized, the plaintiff hasn't yet been injured." *Perez, 45 F.4th at 824*; *see also Williams v. Bienville Orthopaedic Specialists, LLC, No. 1:23CV232-LG-MTP, 2024 U.S. Dist. LEXIS 107885, 2024 WL 3387169, at *5 (S.D. Miss. June 18, 2024)* ("[Plaintiffs] have not alleged an injury-in-fact because they have not alleged misuse or actual access of their private information."); *Logan v. Marker Group, Inc., No. 4:22-CV-174, 2024 U.S. Dist. LEXIS 126653, 2024 WL 3489208, at *4 (S.D. Tex. July 18, 2024)* (noting that the theory of heightened risk "has been rejected by courts in the Fifth Circuit on several occasions). Here, absent any evidence **[*15]** of actual or imminent misuse, the risk to Plaintiffs has not materialized. Under Fifth Circuit precedent, the heightened risk of identity theft and fraud does not suffice for an Article III injury.

Again, Plaintiffs' argument is not to contest *Perez*'s applicability, but to cite out-of-circuit cases upholding standing in data breach cases. (*See* Resp., Dkt. 31, at 4-7 ("[T]he overwhelming trend across circuit courts in data breach cases is to recognize a sufficiently imminent threat of injury where the data exfiltrated allows the thieves the means to commit identity theft and fraud.")). The relevant question is whether *this* circuit's precedent recognizes such an injury, not what courts in other circuits have found. Under the plain language of *Perez*, mere heightened risk has not materialized and therefore is not an "actual" harm. *45 F.4th at 824*.

Two Plaintiffs—Deborah Todd and Steven Guiffre—do allege actual misuse, but neither allegation is plausibly traceable to ESO's breach. Todd alleges that "unknown third parties made unauthorized, and fraudulent, charges to her Amazon account." (Am. Compl., Dkt. 16, at 49). Guiffre, meanwhile, alleges that he "received a call from a blocked number and . . . was asked questions **[*16]** regarding his trust fund." (*Id.* at 39). Both claims lack traceability—the complaint does not allege that ESO possessed information related to Todd's Amazon account or Guiffre's trust fund.[2] In their amended complaint, Plaintiffs fail to allege a plausible link between their lost PII and the suspected fraudulent activity. Though there are imaginable ways Plaintiffs could feasibly overcome this burden (such as alleging that ESO possessed data about the Amazon account or trust fund), Plaintiffs make no such allegations in the

---

[2] Guiffre's trust fund claim is especially suspect because it is unclear why a bad actor who *already* possesses Guiffre's data would call Guiffre to seek that same data.

2024 U.S. Dist. LEXIS 134337, *16

complaint. Based on the present pleading, the fraudulent charges and phone call are not fairly traceable to ESO.

Each named Plaintiff also alleges that they have suffered an "increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach." (Am. Compl., Dkt. 16, at 37-50). Absent more factual allegations, this increase in spam cannot be attributed to ESO's data breach. "Spam calls, texts, and e-mails have become very common in this digitized world, and a number of courts have declined to confer standing when considering an increase in spam communications." *McCombs v. Delta Grp. Elecs., Inc., 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023)* (collecting cases). Without specific facts linking the [*17] spam to ESO's data breach, the increase in spam is not traceable to ESO.

### 4. Plaintiffs' Mitigation Expenses and Emotional Distress Are Concrete Injuries

While the heightened risk of a data breach does not confer standing, dicta from the Fifth Circuit suggests that mitigation efforts may show a concrete injury. In *Perez*, the court of appeals noted that a "plaintiff can sue for damages if the risk materializes or causes a separate injury-in-fact, such as emotional distress. But those are suits based on those injuries, not the risk itself." *45 F.4th at 822* (internal citations omitted). Here, while the risk of breach may not have materialized, it has "cause[d] a separate injury-in-fact" because Plaintiffs have spent money to mitigate their injury. *Id.* This conclusion aligns with other circuit precedent, which similarly recognizes mitigation damages as a concrete injury when taken in response to the substantial threat of harm.[3] *See Clemens, 48 F.4th at 150; Bohnak, 79 F.4th at 285; Webb, 72 F.4th at 370.*

---

[3] In a similar case decided only a month ago, a Mississippi district court found that a plaintiff's claim for mitigation costs effectively falls alongside a claim for increased risk. *Williams, 2024 U.S. Dist. LEXIS 107885, 2024 WL 3387169, at *5* ("[P]laintiffs' claimed mitigation expenses, anxiety, sleeplessness, and other forms of emotional distress are insufficient to establish standing in the absence of allegations of misuse or actual theft of the data."). Another case, published last week, similarly dismissed mitigation damages. *See Logan, 2024 U.S. Dist. LEXIS 126653, 2024 WL 3489208, at *6.* Both *Williams* and *Logan*, however, do not cite *Perez*'s discussion that mitigation efforts should be treated as a distinct injury from the harm itself. Recognizing that it is a very close question, this Court holds that such damages are cognizable here.

The Eleventh Circuit has noted that a plaintiff cannot "conjure standing . . . by inflicting injuries on himself to avoid an insubstantial, non-imminent risk of identity theft." *Tsao v. Captiva MVP Rest. Partners, LLC, 986 F.3d 1332, 1345 (11th Cir. 2021)*). At the time Plaintiffs were informed of the breach, however, they reasonably feared [*18] an imminent injury. Plaintiffs' full names, addresses, phone numbers, Social Security numbers, and medical records were exposed. (Resp., Dkt. 31, at 6). In other words, forfeiting all "the keys to the kingdom" constituted a substantial risk. *See In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1263 (11th Cir. 2021)* ("Given the colossal amount of sensitive data stolen, including Social Security numbers, names, and dates of birth . . ., we have no hesitation in holding that Plaintiffs adequately alleged that they face a material and substantial risk of identity theft ....") (quotations omitted). The injury was reasonably imminent at the time of the mitigation measures because Plaintiffs could reasonably suspect that someone would immediately seek to misuse their data.

The Fifth Circuit's precedent in *Perez* also appears to allow Plaintiffs' emotional distress injuries to proceed. Again, the court of appeals noted that "a plaintiff can sue for damages if the risk materializes or causes a separate injury-in-fact, *such as emotional distress*" because "those are suits based on those injuries, not the risk itself." *Perez, 45 F.4th at 822* (emphasis added) (internal citations omitted). Here, Plaintiffs allege that they have "suffer[ed] fear, anxiety, and stress" and are "very worried" as [*19] a result of the data breach. (Am. Compl., Dkt. 16, at 39, 41). This distress constitutes a separate, cognizable injury.

In addition, Plaintiffs' distress from the alleged exposure of their health information has a common law analogue. To recap, the relevant inquiry is whether "the type of harm [a plaintiff] suffered is similar in kind to a type of harm that the common law has recognized as actionable." *Perez, 45 F.4th at 822.* Infringements upon the right to privacy are historically actionable at common law. *See, e.g., Patel v. Facebook, 932 F.3d 1264, 1272 (9th Cir. 2019)* ("[V]iolations of the right to privacy have long been actionable at common law.") (quoting *Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017)*); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763 n.15, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989)* (recognizing common law's protection of a privacy right). A patient's health information is generally private, and its inadvertent disclosure is protected by law. *See, e.g., Health Insurance Portability and Accountability Act, 42*

U.S.C. §§ 1320d, et seq. By having their medical records exposed, Plaintiffs have suffered an injury akin to those protected by the common law right of privacy. Claims for distress from the disclosure of private health information is a sufficiently concrete injury.

5. Diminished Value of PII is Not Cognizable

In their amended complaint, Plaintiffs allege that their "Private Information, which has an inherent market value in both legitimate and dark markets, [*20] has been damaged and diminished by its compromise and unauthorized release." (Am. Compl., Dkt. 16, at 34-35). ESO seeks to dismiss these claims, arguing that diminution of PII is not recognized in the Fifth Circuit. (Mot. Dismiss, Dkt. 25, at 16).

District courts nationwide are split on whether diminution of PII constitutes a concrete injury. One court in Maryland noted that "the growing trend across courts that have considered this issue is to recognize the lost property value of this information." In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig., 440 F. Supp. 3d 447, 461 (D. Md. 2020). However, district courts in Texas have been more skeptical, with at least three dismissing similar "loss-of-value" claims. See Ellis v. Cargill Meat Sols., No. 4:22-CV-864-Y, 2023 U.S. Dist. LEXIS 235047, 2023 WL 9547632 (N.D. Tex. Oct. 31, 2023); Logan, 2024 U.S. Dist. LEXIS 126653, 2024 WL 3489208, at *7; Williams, 2024 U.S. Dist. LEXIS 107885, 2024 WL 3387169, at *6.

Even if diminished PII weas cognizable in the Fifth Circuit, Plaintiffs do not plausibly show their PII has diminished in value. Plaintiffs fail to allege that they attempted to or would have ever sold their PII. (See Am. Compl., Dkt. 16). Nor do they allege that if they now attempted to sell their PII, they would be forced to accept a diminished price for it. (See id.). Most problematically, Plaintiffs fail to plausibly show that their information is (or was) being actively distributed on the dark web or any other marketplace for private information. The [*21] PII was stolen from ESO, but Plaintiffs have not plausibly alleged it has been distributed any further. Until Plaintiffs plausibly allege the actual distribution of their information, they cannot viably claim that their PII has diminished in value.

Plaintiffs suggest that there is inherent harm in loss of PII because it "interfere[s] with their fiscal autonomy." (Resp., Dkt. 31, at 15 (citing Plaintiffs v. MGM Resorts Int'l, 638 F. Supp. 3d 1175, 1191 (D. Nev. 2022))). But Plaintiffs identify no in-circuit cases recognizing "interference with fiscal autonomy" as a concrete injury

or one traditionally remedied at common law. Accordingly, Plaintiffs' claim for diminished PII value will be dismissed.

6. Plaintiffs' Benefit of the Bargain Claim Fails

Finally, Plaintiffs claim harm under a "benefit of the bargain" theory, wherein they allegedly agreed to provide their medical information to ESO in exchange for ESO agreeing to safeguard that information. (Am. Compl., Dkt. 16, at 36-37). Plaintiffs fail to allege the price they paid to their health providers—let alone any sum to be used for data security. See Williams, 2024 U.S. Dist. LEXIS 107885, 2024 WL 3387169, at *15 ("[P]laintiffs' claims of injury-in-fact based on lack of benefit-of-the-bargain . . . are not well-taken. There is no allegation that any of the plaintiffs [*22] paid a certain amount of money to [Defendant] in exchange for protection of their private information ....") (internal citations omitted). More problematically, Plaintiffs allege a contractual injury for their tort claim—Plaintiffs claim that they lost the benefit of the bargain, but if Plaintiffs have any relevant contract, it is with the healthcare providers who are ESO's clients, not with ESO itself.

A 2002 Fifth Circuit case discusses a similar oscillation between tortious claims for contractual damages:

> The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege—failure to warn and sale of a defective product—are products liability claims. Yet, the damages they assert—benefit of the bargain, out of pocket expenditures—are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact.

Rivera v. Wyeth-Ayerst Lab'ys, 283 F.3d 315, 320-21 (5th Cir. 2002).

Plaintiffs do not allege a contract with ESO or privity with the company. They cannot disguise their tort claim [*23] as a contractual injury to obtain standing. See id. Accordingly, the benefit of the bargain claim will be dismissed.

7. Plaintiffs Lack Standing to Pursue Injunctive Relief

Finally, the Court considers Plaintiffs' ability to seek

injunctive relief.[4] Plaintiffs seek an order enjoining ESO from failing to safeguard their data in the future and requiring ESO to encrypt or destroy Plaintiffs' information, maintain a comprehensive information security program, stop storing data on a cloud-based database, engage with third-party penetration testers, educate class members about the harms they face, and undergo regular third-party auditing. (Am. Compl., Dkt. 16, at 80-84).

A plaintiff seeking injunctive relief must face a future injury that is "certainly impending." *Whitmore v. Ark., 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)*. "The threat of injury must be real and immediate not conjectural or hypothetical." *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)* (cleaned up). Here, Plaintiffs' suit stems from ESO's fall 2023 data breach, and the main remedies they seek are correspondingly retrospective. In order to obtain prospective relief, Plaintiffs must show that injuries from a future ESO data breach are substantially likely and certainly impending. For several reasons, Plaintiffs cannot do **[*24]** so.

Most importantly, Plaintiffs do not plausibly allege that ESO is likely to be imminently hacked again. The complaint quotes and repeatedly references ESO's data breach letter, which states that the company has "[taken] the affected systems offline, secured our network environment, and engaged in third-party forensic specialists to assist [the company] with investigating the extent of any authorized activity." (Am. Compl., Dkt. 16, at 8). The letter also states that ESO "implemented measures to confirm the security of its systems" and "safely restored its systems and operations via viable backups." (*Id.* at 53 n.58). However, Plaintiffs state that they "are at risk of harm due to the exposure of their Personal Information and [ESO's] failure to address the security failings that lead to such exposure." (*Id.* at 69). This sentence is wholly conclusory because it is unsupported by factual allegations that ESO has actually failed to address the previous vulnerability in its systems. Plaintiffs do not plausibly assert facts that would contest ESO's

assertions in its letter that it has since secured its systems.

Because Plaintiffs fail to allege an ongoing vulnerability, they do not allege **[*25]** their data with ESO is more at risk than with any other data holder. Of course, ESO *could* suffer another data breach and Plaintiffs' information *could* theoretically be exposed once again. However, "[i]f that risk were deemed sufficiently imminent to justify injunctive relief, virtually every company and government agency might be exposed to requests for injunctive relief like the one the plaintiffs seek here." *Webb, 72 F.4th at 378*. Like the First Circuit in *Webb*, this Court declines to extend injunctive relief to every plaintiff whose data is theoretically at risk of disclosure.

Plaintiffs' injunctive relief falters on other grounds, too. An injury must be "certainly impending" to warrant injunctive relief. *Clapper v. Amnesty Intern. USA, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013)*. A "highly attenuated chain of possibilities" ordinarily "does not satisfy the requirement that threatened injury must be certainly impending." *Id. at 410*. Here, a subsequent data breach relies on just such an attenuated chain of possibilities. A hacker must first discover the same vulnerability as the previous hacker. If the vulnerability has been patched, the hacker must discover an entirely new vulnerability, adding another layer of speculation to the likelihood of the injury. The hacker must then actually **[*26]** breach ESO's systems, obtain Plaintiffs' data, and distribute that information to other third parties. This is a highly speculative chain of events; while a subsequent data breach remains possible, it is a far stretch to describe it as "certainly impending." *See Logan, 2024 U.S. Dist. LEXIS 126653, 2024 WL 3489208, at *7-8* (finding no standing for injunctive relief where there was no risk of imminent harm from past breach).

Two of Plaintiffs' injunctive requests do not depend on a subsequent data breach: (1) purchasing credit monitoring services for Plaintiffs, and (2) educating Plaintiffs about the threats they face as a result of the loss of their personal information. (Am. Compl., Dkt. 16, at 70). As to credit monitoring services, ESO has already offered free credit monitoring to those affected by the breach. (*See* Am. Compl., Dkt. 16, at 43). Plaintiffs fail to allege that this service is insufficient or that impending future harms would be mitigated if the Court ordered ESO to provide credit monitoring for a longer period. Absent such allegations, Plaintiffs do not face imminent harm that would justify an order for credit

---

[4] ESO characterizes this as a failure to state a claim on the merits. (Mot. Dismiss, Dkt. 25, at 30). The Court need not address the merits because it has a threshold obligation to consider whether it has Article III jurisdiction over these claims. *See, e.g., Cibolo Waste, Inc. v. City of San Antonio, 718 F.3d 469, 473 (5th Cir. 2013)* ("Every party that comes before a federal court must establish that it has standing to pursue its claims.").

monitoring.

Second, Plaintiffs do not plead adequate harms stemming from the lack of education provided by ESO. The data **[\*27]** breach letter from ESO lays out the information that was leaked and offers specific resources "so that [Plaintiffs] can take precautionary steps to help protect yourself, should [Plaintiffs] wish to do so." (*Id.* at 1 n.1). Those include using the credit monitoring service provided by ESO and setting up fraud alerts, account monitoring, and credit freezes. (*Id.*). Plaintiffs will not suffer any imminent injury if the Court does not order ESO to provide services it has already provided. Accordingly, Plaintiffs lack standing to pursue injunctive relief.

## B. *12(b)(6)*

In sum, Plaintiffs state a concrete injury with regards to their mitigation efforts, distress, and loss of private information. Having found standing with respect to these claims, the Court turns to ESO's motion to dismiss for failure to state a claim. ESO alleges that (1) Plaintiffs' negligence claim fails as a matter of law because ESO owed no duty to Plaintiffs, the allegations do not demonstrate proximate cause, and Plaintiffs have not alleged sufficient damages; (2) Plaintiffs' negligence per se claim fails because Texas law requires that the violated statute provide a private right of action; (3) Plaintiffs' breach of third-party **[\*28]** beneficiary contract claim fails because they were not third-party beneficiaries; (4) Plaintiffs fail to meet the elements of unjust enrichment; and (5) Plaintiffs' various deceptive trade practices claims fail. (Mot. Dismiss, Dkt. 25, at 25-40). The Court will address each in turn.

1. Plaintiffs State a Valid Claim for Negligence

a. Plaintiffs Plausibly Allege a Duty

ESO argues that it owed no duty to Plaintiffs because Texas law does not recognize a general duty to control the conduct of third persons or to protect another against the criminal acts of a third party. (Mot. Dismiss, Dkt. 25, at 25-26). "A duty arises when a person's conduct poses a foreseeable risk to another that could be avoided by the exercise of ordinary care." *Mendez v. Caterpillar Inc., No. SA-09-CA-978-XR, 2011 U.S. Dist. LEXIS 151697, 2011 WL 6999659, at \*14 (W.D. Tex. Dec. 16, 2011)*. Courts "consider[] several factors, including the risk, foreseeability, and the likelihood of injury versus the social utility of the actor's conduct, the defendant's burden in guarding against that injury."

*Washington v. United States HUD, 953 F. Supp. 762, 773 (N.D. Tex. 1996)* (citing *Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990)*).

Application of these common law factors shows that ESO plausibly owed a duty to safeguard Plaintiffs' private health information. *See In re Capital One Consumer Data Sec. Breach Litig., 488 F. Supp. 3d 374, 397 (E.D. Va. 2020)* (holding that the defendant likely owed an independent legal duty to plaintiffs under Texas law "by creating **[\*29]** a so-called data lake without adequate safeguards to protect against hacking"). The risk of a breach is evident and foreseeable, as ESO retained the sensitive health and identifying information of "potentially over two million individuals." (Am. Compl., Dkt. 16, at 17). Plaintiffs allege that companies retaining health information are known subjects of hacking attempts and that it is an established risk in the industry. (*See id.* at 15-25). The burden to protect that information is almost entirely on ESO—Plaintiffs cannot feasibly audit the security of ESO's data retention systems, nor are they at liberty to choose whether their healthcare provider uses ESO or another data retention system. ESO is best positioned to ensure that it uses reasonable and effective data protection measures. Given that ESO's business is to charge for the retention of private health information, ESO bears the predominant burden of ensuring it does so securely. Under Texas common law principles, ESO has a duty to safeguard patient information ESO chooses to retain. *See Greater Houston Transp. Co., 801 S.W.2d at 525*.

Moreover, Texas law recognizes that "if a criminal's conduct is a foreseeable result of the prior negligence of a party, the criminal act may **[\*30]** not excuse that party's liability." *Barton v. Whataburger, Inc., 276 S.W.3d 456, 462 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)* (citing *Phan Son Van v. Pena, 990 S.W.2d 751, 753 (Tex. 1999)*). To impose liability on a defendant for negligence in failing to prevent the criminal conduct of another, a plaintiff "must show both that the defendant committed negligent acts and that it knew or should have known that, because of its acts, the crime (or one like it) might occur." *Id.* (citing *Restatement (Second) of Torts § 448* (1965)). It is plausible that ESO knew or should have known that its systems would face data breach attempts. Accordingly, the intervening criminal acts of the hacker(s) do not shield ESO from liability.[5]

---

[5] ESO contends the injury was not foreseeable because it has

2024 U.S. Dist. LEXIS 134337, *30

b. Plaintiffs Allege Proximate Cause

ESO briefly argues that Plaintiffs do not allege proximate cause between ESO's negligence and their claimed injuries. (Mot. Dismiss, Dkt. 25, at 27-28). "Breach of a duty proximately causes an injury if the breach is a cause in fact of the harm and the injury was foreseeable." *Hall v. Lewis, 639 S.W.3d 197 (Tex. App.—Houston [1st Dist.] 2021, no pet.).* "Cause in fact requires proof that the negligent act or omission was a substantial factor in bringing about the harm and that but for the negligent act or omission, the harm would not have occurred." *Id.* As the Court already held, Plaintiffs' injuries were foreseeable. As to Plaintiffs' surviving claims—mitigation damages, distress, **[*31]** and loss of privacy—there is little genuine doubt that ESO's breach was a "substantial factor" in bringing about those harms. Plaintiffs feared the loss of their data and purchased credit monitoring services in response to learning of the ESO data breach. (*See* Am. Compl., Dkt. 16, at 37-50). Proximate cause is satisfied.

ESO further alleges that Plaintiffs do not show sufficient damages resulting from ESO's alleged negligence. (Mot. Dismiss, Dkt. 25, at 27). Specifically, ESO suggests that a "Plaintiff must show that she suffered a financial loss and incurred the responsibility for the financial loss." (*Id.*). Here, the breach prompted Plaintiffs to purchase credit monitoring services, which constitutes a financial loss. Accordingly, Plaintiffs' negligence claim survives the pleading stage.

2. Plaintiffs Do Not Allege a Negligence Per Se Claim

_____

"never been subject to a prior data security incident" and "had no knowledge that its data security systems were inadequate" or "would be a target of a crime by an unknown third-party hacker." These statements rely on matters outside the pleading and cannot be considered at the 12(b)(6) stage. *See Dorsey, 540 F.3d at 338.* Even if they were considered, the statements are difficult to credit. ESO is a healthcare software company and must have had some awareness of the potential for data breaches. Nor, as ESO contends, are Plaintiffs "theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." (Reply, Dkt. 31, at 10 (citing *Holcombe v. United States, No. SA-18-CV-555-XR, 2021 U.S. Dist. LEXIS 125971, 2021 WL 2821125, at *38 (W.D. Tex. July 6, 2021)*)). "Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others." ***Barton, 276 S.W. 3d at 463.*** A person of ordinary intelligence could anticipate criminal data breach attempts, and no "extraordinary sequence" of unforeseeable events is necessary to result in a hacking attempt.

"Negligence per se is a tort concept whereby the civil courts adopt a legislatively imposed standard of conduct as defining the conduct of a reasonably prudent person." *Moughon v. Wolf, 576 S.W.2d 603, 604 (Tex. 1978).* "To establish negligence per se, a plaintiff must prove: (1) the defendant's act or omission is in violation of a statute or ordinance; (2) the injured person was within the class **[*32]** of persons which the ordinance was designed to protect; and (3) the defendant's act or omission proximately caused the injury." *Lopez-Juarez v. Kelly, 348 S.W.3d 10, 27 (Tex. App.—Texarkana 2011, pet. denied).* "Negligence per se is not a separate cause of action that exists independently of a common-law negligence cause of action. Rather, negligence per se is merely one method of proving a breach of duty, a requisite element of any negligence cause of action." *Thomas v. Uzoka, 290 S.W.3d 437 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).*

ESO alleges that "a statute is not an appropriate basis for a negligence per se claim when 'a legislative body declines to provide for an individual private right of action in a statute and instead provides a comprehensive regulatory scheme with limited private remedies.'" (Mot. Dismiss, Dkt. 25, at 28 (quoting *Walters v. Blue Cross & Blue Shield of Tex., Inc., No. 3:21-CV-981-L, 2022 U.S. Dist. LEXIS 55061, 2022 WL 902735, at *5 (N.D. Tex. Mar. 28, 2022)* and *Armstrong v. Sw. Airlines Co., No. 3:20-CV-3610-BT, 2021 U.S. Dist. LEXIS 182759, 2021 WL 4391247, at *3 (N.D. Tex. Sept. 24, 2021)*)). Plaintiffs do not seriously contest this argument, but instead contend that the FTC Act provides for private rights of action and enforceable duties. (Resp., Dkt. 31, at 24). However, as this Court has previously held, "The Fifth Circuit has made clear there is no private cause of action for violation of the FTC Act." *See Arquero v. McGinnis Tessitore Wutscher LLP, No. A-12-CV-432 LY, 2013 U.S. Dist. LEXIS 204000, 2013 WL 12393918, at *3 (W.D. Tex. Feb. 5, 2013),* report and recommendation adopted, *No. A-12-CV-432-LY, 2013 U.S. Dist. LEXIS 203998, 2013 WL 12393985 (W.D. Tex. Mar. 11, 2013).* Accordingly, while ESO's violations of HIPAA or the FTC Act may speak to the relevant standard of care, they cannot show an automatic **[*33]** breach of duty to establish negligence per se.

3. Plaintiffs Do Not Plead a Third-Party Beneficiary Claim

A breach of third-party beneficiary claim under Texas law requires that the contracting parties intended to secure a benefit for the third party and the contracting

parties entered into the contract directly for the third party's benefit. *Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc., 663 S.W.3d 569, 583 (Tex. 2023)*. "[I]n other words, the contracting parties 'must have intended to grant the third party the right to be a 'claimant' in the event of a breach.'" *Id.* (quoting *First Bank v. Brumitt, 519 S.W.3d 95, 102 (Tex. 2017)*). "Texas law disfavors contract interpretations that imply a third-party beneficiary." *See Tarasiewicz v. PNC Bank, N.A., No. SA-22-CV-00816-XR, 2023 U.S. Dist. LEXIS 64782, 2023 WL 2940025, at *3 (W.D. Tex. Apr. 13, 2023)*.

Here, Plaintiffs fail to allege their third-party beneficiary status. ESO contracted with Plaintiffs' healthcare providers, and the benefits of those contracts were that ESO would be financially compensated in exchange for safely storing patient information. Undoubtedly, Plaintiffs benefitted from this contract insofar as they visited healthcare providers who could access their healthcare records. But that benefit is incidental and the "fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract." **[*34]** *MCI Telecommunications Corp. v. Tex. Utilities Elec. Co., 995 S.W.2d 647, 651 (Tex. 1999)*. The contract here must be "directly for [Plaintiffs'] benefit" as a creditor or donee. *Id.* Here, Plaintiffs "benefited only incidentally by the performance of the contract" and fail to allege a clear intent on the part of ESO to benefit Plaintiffs. *See Corpus Christi Bank & Tr. v. Smith, 525 S.W.2d 501, 502-03 (Tex. 1975)*. Accordingly, the third-party beneficiary claim must be dismissed.

4. Plaintiffs Do Not Plead Unjust Enrichment

Unjust enrichment is an equitable theory of recovery where a party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage, *Heldenfels Bros. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992)*, and the receipt of those benefits is not governed by contract, *Lone Star Steel Co. v. Scott, 759 S.W.2d 144, 154 (Tex. App.—Texarkana 1988, writ denied)*. Plaintiffs do not plead fraud or duress and they do not plausibly show undue advantage. While ESO may have negligently secured Plaintiffs' data, there are no facts to suggest they obtained a benefit[6] through

undue advantage. Plaintiffs allege that if they knew of ESO's negligent data security, they would not have provided the company with their healthcare data. (Am. Compl., Dkt. 16, at 67-68). Even accepting this as true, it does not show that ESO took advantage of Plaintiffs. "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded **[*35]** for an unfortunate loss to the claimant." *Heldenfels, 832 S.W.2d at 42* (quotations omitted).

5. Deceptive Trade Practices

a. Florida Law

Plaintiffs' claim for Deceptive and Unfair Trade Practices under Florida law seeks only declaratory and injunctive relief. (Am. Compl., Dkt. 16, at 71-73; Resp., Dkt. 31, at 21). However, as previously discussed, Plaintiffs lack standing to pursue claims for declaratory and injunctive relief. Accordingly, the claim under Florida law will be dismissed.

b. North Carolina

The parties dispute whether *Rule 9*'s heightened pleading standard applies to claims for deceptive trade practices under North Carolina law. The question is ultimately unnecessary because Plaintiffs' claims do not survive even the less stringent *Twombly*/*Iqbal* standard. A North Carolina deceptive trade practice claim requires proof of three elements: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused injury to the plaintiff or his business. *Hill v. AQ Textiles LLC, 582 F. Supp. 3d 297, 316 (M.D.N.C. 2022)*.

> What is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace. The [North Carolina] Supreme Court defines an unfair practice as one which offends established public **[*36]** policy as well as . . . one which is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A deceptive practice is one which has the capacity or tendency to deceive; proof of actual deception is not necessary. In determining whether a representation is deceptive, its effect on the average consumer is considered.

*Lincoln v. Bueche, 166 N.C. App. 150, 158, 601 S.E.2d 237 (2004)* (cleaned up) (citing *Abernathy v. Ralph Squires Realty Co., 55 N.C. App. 354, 357, 285 S.E.2d 325 (1982)*).

---

[6] ESO did not benefit from any quasi-contract with Plaintiffs. ESO contracted with healthcare providers and benefitted from those providers. Plaintiffs do not plausibly allege how ESO benefitted from Plaintiffs using their services, and ESO suggests that it actually incurred marginal *costs* by serving Plaintiffs. (*See* Reply, Dkt. 34, at 13).

2024 U.S. Dist. LEXIS 134337, *36

Plaintiffs do not plausibly allege an unfair or deceptive trade practice. In their complaint, Plaintiffs identify several practices they allege are unfair or deceptive, including ESO's failure to implement security measures; failure to foresee security risks; failure to comply with privacy standards of care; misrepresentation that it would protect privacy; and suppression of the fact that it did not secure information. (Am. Compl., Dkt. 16, at 74-75). These sound in negligence—not deceptive trade practices. *See Noble v. Hooters of Greenville (NC), LLC, 199 N.C. App. 163, 172, 681 S.E.2d 448 (2009)* ("Plaintiffs' opportunity and capacity to recover for their injuries exists, if at all, in their ability to recover for violations . . . based on their negligence theories.").[7]

Plaintiffs do not plausibly show that ESO's representations about its data security practices were "immoral, unethical, oppressive, unscrupulous, **[*37]** or substantially injurious to consumers" as needed to allege an unfair practice. *Lincoln, 166 N.C. App. at 158*. As to deceptive acts, there are no indications of actual deception. Plaintiffs' complaint is that their data was breached, not that ESO represented that its data was fully secure when it was not.

While Plaintiffs allege that ESO should have disclosed information like not implementing security measures or not foreseeing security risks, they do not plausibly allege this conduct was misleading. Plaintiffs fault ESO for representing that it "use[d] a variety of industry-standard security technologies and procedures" to protect "personal information from unauthorized access, use, or disclosure." (Am. Compl., Dkt. 16, at 15). That policy is not plausibly deceptive because Plaintiffs do not show it is untrue or misleading. The fact that ESO suffered a data breach does not automatically mean the company failed to use industry-standard security technologies. More importantly, ESO's privacy notice details the privacy policy *specifically for its website*—it is not a policy for how ESO treats patient information. (*See* Reply, Dkt. 34, at 9). Plaintiffs do not allege this policy was distributed to them or to ESO's healthcare **[*38]** clients as indicative of some general data retention guarantee, meaning that there is no causal link between the "deceptive" statement and Plaintiffs' injuries.

---

[7] Plaintiffs' theory would transform every negligence claim into a deceptive trade practice claim. Their claim essentially amounts to: ESO was deceptive because it did not disclose its negligence. While deceptive trade practices and negligence are not mutually exclusive, a viable trade practice claim must allege some sort of deceptive or unfair act beyond simple negligence.

Accordingly, the North Carolina deceptive trade claim fails.

c. New York Law

A New York deceptive trade practices ("NYGBL") claim requires that: (1) the defendant's acts were consumer oriented, (2) the acts or practices are deceptive or misleading in a material way, and (3) the plaintiff has been injured as a result. *Goldemberg v. Johnson & Johnson Consumer Companies, Inc., 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014)*. At least one New York state court has found that a healthcare provider's "alleged failure to safeguard information on [their] networks did not mislead plaintiff in any material way and does not constitute a deceptive practice within the meaning of [the NYGBL]." *Smahaj v Retrieval-Masters Creditors Bur., Inc., 69 Misc. 3d 597, 609, 131 N.Y.S.3d 817 (N.Y. Sup. Ct. 2020)*; *In re Am. Med. Collection, No. CV 19-MD-2904, 2021 U.S. Dist. LEXIS 240360, 2021 WL 5937742, at *32 (D.N.J. Dec. 16, 2021)* (citing same). Where a defendant promises to implement security measures for a patient's data and such security measures are in fact implemented, the defendant's statements do not become deceptive because a previously unknown vulnerability is discovered or breached. *See In re Am. Med. Collection, 2021 U.S. Dist. LEXIS 240360, 2021 WL 5937742, at *32*; *see also Ladino v. Bank of Am., 52 A.D.3d 571, 861 N.Y.S.2d 683, 686 (N.Y. App. Div. 2d Dept. 2008)* ("Although [the defendant's] alleged conduct may have been negligent, it did not mislead the plaintiff in any material way and did not constitute a 'deceptive act' within the **[*39]** meaning of the statute.").

In a case dealing with a breach of a cryptocurrency account, the U.S. District Court for the Southern District of New York rejected a highly similar claim for deceptive trade practices. *See Yuille v. Uphold HQ Inc., 686 F. Supp. 3d 323, 344-48 (S.D.N.Y. 2023)*. The district court emphasized three relevant points: (1) a reasonable consumer cannot interpret a company's guarantee to use digital security measures as a guarantee of absolute security; (2) a company has not lied to consumers simply because it promised to use digital security measures but was later hacked; and (3) a company does not deceptively omit information when it fails to disclose a cybersecurity vulnerability if that vulnerability was unknown to the company. *Id.* That analysis is directly applicable here—while Plaintiffs allege negligence, they do not allege any facts tending to show that ESO was deceptive in failing to disclose that negligence.

2024 U.S. Dist. LEXIS 134337, *39

In response, Plaintiffs cite *Wallace v. Health Quest Sys. Inc., No. 20 CV 545 (VB), 2021 U.S. Dist. LEXIS 54557, 2021 WL 1109727, at \*15 (S.D.N.Y. Mar. 23, 2021)*. There, a healthcare provider used a "Notice of Privacy Practices" stating that it was "committed to protecting medical information" and would notify its customers of any potential data breach without any unreasonable delay. Because the company's information was breached and it did not notify **[\*40]** patients of the breach, the district court found that the company plausibly misled consumers. Plaintiffs claim that ESO was similarly misleading because its privacy policy promised to protect their data. (*See* Resp., Dkt. 31, at 35). Again, this "privacy policy" pertains to data submitted on ESO's website and is not plausibly alleged to be a general company-wide data policy. (*See* Reply, Dkt. 34, at 9). ESO's privacy policy for its website is not fairly traceable to Plaintiffs' stolen data from healthcare providers who used ESO's services. Plaintiffs do not allege that the website privacy policy governs how ESO treats patient information or that the website privacy policy is relied upon by consumers to predict their treatment of PII. Accordingly, their New York deceptive trade practices claim is dismissed.

## IV. MOTION TO STRIKE CLASS ALLEGATIONS

Next, the Court turns to ESO's motion to strike Plaintiffs' class allegations. (Dkt. 24). Motions to strike class allegations at the pleading stage should be granted only when "it is facially apparent from the pleadings that there is no ascertainable class ...." *John, 501 F.3d at 445 (5th Cir. 2007)*. A defendant may move to strike such allegations prior to discovery "in rare cases **[\*41]** where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Delarue v. State Farm Lloyds, 2010 U.S. Dist. LEXIS 151646, 2010 WL 11530499, at \*2 (E.D. Tex. Mar. 10, 2010)* (citing *Rios v. State Farm Fire & Cas. Co., 469 F. Supp. 2d 727, 740 (S.D. Iowa 2007)*).

Having reviewed Plaintiffs' complaint, the Court finds that it would be premature to strike Plaintiffs' class allegations and will instead decide the matter when Plaintiffs move to certify a class. *See Gant v. Whynotleaseit, LLC, No. H-13-3657, 2014 U.S. Dist. LEXIS 196055, 2014 WL 12606313, at \* 2 (S.D. Tex. Dec. 11, 2014)* (finding a motion to strike class allegations premature when discovery was ongoing); *Scott v. Scribd, Inc., No. H-09-3039, 2010 U.S. Dist. LEXIS 155674, 2010 WL 11646816, at \*1 (S.D. Tex. Feb. 24, 2010)* (finding a motion to strike class

allegations premature where there was no scheduling order and no discovery had been conducted at the time the motion was filed); *Alexander v. GeoVera Specialty Ins., No. 2:21-CV-03166, 2023 U.S. Dist. LEXIS 6696, 2023 WL 187333, at \*2 (W.D. La. Jan. 13, 2023)* (deferring decision on motion to strike class allegations to class certification stage). ESO's motion to strike the class under *Rule 23(b)(1)* and *23(b)(3)* rests upon the argument that the putative class has suffered injuries that are too disparate to be considered common or predominating. (*See* Mot. Strike, Dkt. 24, at 9-12, 16-18).[8] These questions are better fit for resolution after discovery has revealed the nature and extent of the class members' injuries. Accordingly, the Court will deny the motion to strike.

## V. CONCLUSION

For these reasons, **IT IS ORDERED** that ESO's Motion to Dismiss, (Dkt. 25), is **GRANTED IN PART** and **DENIED IN PART**. ESO's **[\*42]** motion is granted as to Plaintiffs' claims for lost time, heightened risk, diminished value of PII/PHI, loss of benefit of the bargain, declaratory and injunctive relief, negligence per se, breach of contract as a third-party beneficiary, unjust enrichment, and deceptive trade practices.

Plaintiffs' negligence claim survives with respect to their injuries for mitigation damages and any available damages for loss of privacy.

**IT IS FURTHER ORDERED** that ESO's Motion to Strike Class Allegations, (Dkt. 24), is **DENIED**.

**SIGNED** on July 30, 2024.

/s/ Robert Pitman

ROBERT PITMAN

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[8] Because the Court has dismissed Plaintiffs' claims for injunctive relief, their certification request under *Rule 23(b)(2)* is moot.

2021 WL 5772496

🚩 KeyCite Yellow Flag - Negative Treatment
Not Followed on State Law Grounds   Orthman v. Premiere Pediatrics,
PLLC,   Okla.Civ.App. Div. 3,   January 5, 2024

574 F.Supp.3d 985
United States District Court, W.D. Oklahoma.

Robert LEGG, individually and on behalf of
himself and all others similarly situated, Plaintiff,
v.
LEADERS LIFE INSURANCE COMPANY, Defendant.

CIV-21-655-D
|
Signed 12/06/2021

**Synopsis**
**Background:** Customer, whose personal identifying
information was allegedly stolen in data breach, brought
putative class action against life insurance company alleging
claims of negligence, breach of implied contract, breach of
implied covenant of good faith and fair dealing, and deceptive
practices in violation of the Maryland Consumer Protection
Act, and seeking declaratory and injunctive relief. Company
filed motion to dismiss for lack of standing.

**[Holding:]** The District Court, Timothy D. DeGiusti, Chief
Judge, held that customer's allegation was insufficient to
plead actual injury.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Lack of
Standing.

West Headnotes (15)

**[1]** **Federal Courts** 🔑 Case or Controversy
Requirement

Article III confines the federal judicial power to
the resolution of "Cases" and "Controversies."
U.S. Const. art. 3, § 2, cl. 1.

**[2]** **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Courts** 🔑 Rights and interests at
stake; adverseness

For there to be a case or controversy under
Article III, the plaintiff must have a personal
stake in the case, in other words, standing. U.S.
Const. art. 3, § 2, cl. 1.

**[3]** **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Civil Procedure** 🔑 Causation;
redressability

Constitutional standing requires a plaintiff to
show that he (1) suffered an injury in fact, (2)
that is fairly traceable to the challenged conduct
of the defendant, and (3) that is likely to be
redressed by a favorable judicial decision. U.S.
Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

**[4]** **Federal Civil Procedure** 🔑 In general;
injury or interest

"Injury in fact" element of Article III standing
requires plaintiff to show that he suffered
invasion of legally protected interest that
is concrete and particularized and actual or
imminent, not conjectural or hypothetical. U.S.
Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

**[5]** **Federal Civil Procedure** 🔑 In general;
injury or interest

"Concrete injury" required for Article III
standing may include tangible or intangible
harms, so long as they actually exist and are real,
and not abstract. U.S. Const. art. 3, § 2, cl. 1.

**[6]** **Federal Courts** 🔑 Nature of dispute;
concreteness

Real, existing injury is prerequisite to federal
jurisdiction because federal courts do not

App. 062

Legg v. Leaders Life Insurance Company, 574 F.Supp.3d 985 (2021)

2021 WL 5772496

adjudicate hypothetical or abstract disputes nor do they exercise general legal oversight of private entities. U.S. Const. art. 3, § 2, cl. 1.

[7]  **Federal Civil Procedure** 👈 In general; injury or interest

Party invoking federal jurisdiction bears the burden of establishing elements for standing.

[8]  **Federal Courts** 👈 Pleadings and motions

When considering standing in the context of a motion to dismiss, District Court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

[9]  **Federal Civil Procedure** 👈 Pleading

At the pleading stage of a case, a plaintiff must clearly allege facts demonstrating each element of Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[10]  **Federal Civil Procedure** 👈 Representation of class; typicality; standing in general

In a putative class action, the named representative must personally allege that he has Article III standing to sue. U.S. Const. art. 3, § 2, cl. 1.

[11]  **Federal Civil Procedure** 👈 In general; injury or interest
**Injunction** 👈 Persons entitled to apply; standing

Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek, for example, injunctive relief and damages.

[12]  **Federal Civil Procedure** 👈 In general; injury or interest

An objectively reasonable likelihood that a future injury will come to pass is inadequate to establish Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[13]  **Federal Civil Procedure** 👈 In general; injury or interest

A plaintiff cannot establish an imminent future injury for Article III standing purposes when they rely on a highly attenuated chain of possibilities or speculation about the decisions of independent actors. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

[14]  **Antitrust and Trade Regulation** 👈 Private entities or individuals
**Federal Civil Procedure** 👈 Consumers, purchasers, borrowers, and debtors
**Insurance** 👈 Parties

Customer's allegations that he faced an increased risk of fraud or identity theft at some point in the future, that he proactively took steps to mitigate risks of data breach, that his personal identifying information decreased in value, and that he lost benefit of the bargain, as a result of data breach of his personal identifying information from life insurance company, were insufficient to establish actual or imminent injury, as required to establish Article III standing, in putative class action against company alleging negligence, breach of implied contract, and violation of the Maryland Consumer Protection Act; though customer claimed an increase in frequency and amount of phishing emails, customer did not allege any actual misuse of his information or loss of value of his information, and risk of identity theft was small. U.S. Const. art. 3, § 2, cl. 1; 🚩 Md. Code Ann., Com. Law § 13-301; Fed. R. Civ. P. 12(b)(1).

13 Cases that cite this headnote

App. 063

Legg v. Leaders Life Insurance Company, 574 F.Supp.3d 985 (2021)

2021 WL 5772496

[15]    **Federal Civil Procedure** 🔑 In general;
injury or interest

A plaintiff cannot manufacture Article III
standing simply by incurring certain costs as a
reasonable reaction to a risk of harm. U.S. Const.
art. 3, § 2, cl. 1.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*987** Molly E. Brantley, Tyler J. Bean, William B.
Federman, Federman & Sherwood, Oklahoma City, OK, for
Plaintiff.

Brian D. Blackstock, Kyle N. Sweet, Sweet Law Firm,
Oklahoma City, OK, Claudia D. McCarron, Richard M.
Haggerty, Mullen Coughlin LLC, Devon, PA, James
Monagle, Mullen Coughlin LLC, Mt. Laurel, NJ, for
Defendant.

**ORDER**

TIMOTHY D. DeGIUSTI, Chief United States District Judge

**\*\*1** Before the Court is Defendant Leaders Life Insurance
Company's Motion to Dismiss Plaintiff's First Amended
Complaint [Doc. No. 11]. The motion seeks dismissal of
Plaintiff's claims pursuant to Fed.R.Civ.P 12(b)(1) and 12(b)
(6), or in the alternative an order striking certain allegations
pursuant to Fed.R.Civ.P. 12(f). Plaintiff has responded in
opposition [Doc. No. 12] and Defendant has replied [Doc. No.
13]. As explained below, Plaintiff has failed to plausibly plead
that he has suffered an injury in fact and he therefore lacks
standing to pursue his claims.

**BACKGROUND**

This putative class action involves a data breach at Defendant
Leaders Life Insurance Company. Plaintiff, a customer
of Leaders Life, alleges that in late November 2020,
a third-party intentionally accessed and removed folders
containing personal identifying information from Leaders
Life's computer systems. Id. at ¶ 19. Among the information
allegedly obtained was customer names, dates of birth, social

security numbers, and tax identification numbers. Id. at ¶¶
5, 21. In June 2021, nearly seven months after the data
breach, Leaders Life sent Plaintiff a letter informing him
of the cyberattack. The letter explained that "certain folders
on our system may have been accessed or removed from
our systems without authorization," "one or more of the
potentially impacted folders included protected information
related to **\*988** individuals," and "there is no indication that
your specific information was accessed or misused." Id. at ¶
21. Nevertheless, Plaintiff alleges that his personal identifying
information is "now in the hands of cybercriminals who will
use their PII [personal identifying information] to commit
fraud and identity theft." Id. at ¶ 23.

Plaintiff brings five claims on behalf of himself and a
putative class against Leaders Life as a result of the data
breach. First, he asserts that Leaders Life acted negligently in
failing to protect Plaintiff's information or provide adequate
data security. Second, he asserts that Leaders Life breached
an implied contract obligating it to provide adequate data
security. Relatedly, his third claim asserts that Leaders Life
breached an implied covenant of good faith and fair dealing
when it engaged in acts or omissions that have been declared
to be unfair trade practices. Fourth, he asserts that Leaders
Life engaged in deceptive practices in violation of the
Maryland Consumer Protection Act, 🚩 Md. Code Ann.,
Com. Law § 13-301.[1] Last, Plaintiff asserts a claim for
declaratory and injunctive relief based on Leaders Life's past
failure to comply with its contractual obligations and duties
of care and inability to prevent future cyberattacks.

Crucially, Plaintiff does not allege that he or any other
class member has been the victim of identity theft or fraud.
Instead, he describes his injuries as including "an imminent,
immediate, and continuing risk of harm from identity theft
and fraud." Id. at ¶ 72. Plaintiff further alleges that the "threat
of fraud and identity theft" has caused "increased emotional
distress and anxiety" as well as a loss of time and money spent
addressing and attempting to mitigate the consequences of the
data breach. Id. at ¶ 75.

**\*\*2** Defendant moves to dismiss under Fed.R.Civ.P. 12(b)
(1), arguing that Plaintiff has failed to plead an injury in fact
and therefore lacks standing to bring his claims.[2]

**STANDARD OF DECISION**

Legg v. Leaders Life Insurance Company, 574 F.Supp.3d 985 (2021)

2021 WL 5772496

**[1]** **[2]** **[3]** Federal courts are courts of limited jurisdiction. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, ––– U.S. ––––, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (internal quotation marks omitted). Constitutional standing requires a plaintiff to show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016).

**[4]** **[5]** **[6]** The first element – injury in fact – requires a plaintiff to show that he "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). A "concrete" injury may include tangible or intangible harms, so long as **\*989** they "actually exist" and are " 'real,' and not 'abstract.' " *Id.* A real, existing injury is a prerequisite to federal jurisdiction because "federal courts do not adjudicate hypothetical or abstract disputes" nor do they "exercise general legal oversight ... of private entities." *TransUnion*, 141 S. Ct. at 2190.

**[7]** **[8]** **[9]** **[10]** **[11]** As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing the three elements for standing. *Spokeo, Inc.*, 578 U.S. at 338, 136 S.Ct. 1540. When considering standing in the context of a motion to dismiss, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (quotation omitted). But even "at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338, 136 S.Ct. 1540 (quotation omitted). Further, in a putative class action, the named representative must personally allege that he has standing to sue. *See Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Big Elk v. Bd. of Cty. Comm'rs of Osage Cty.*, 3 F. App'x 802, 807 (10th Cir. 2001).

"And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 141 S.Ct. at 2208.

## DISCUSSION

**\*\*3** Data breaches of the type alleged here are becoming ubiquitous in our increasingly digital society and, unsurprisingly, are also becoming the subject of a growing amount of litigation. But does the mere fact that a data breach occurred necessarily mean that a customer has suffered a concrete injury, or is something more required? The Tenth Circuit has not had occasion to resolve this precise issue, but several other circuits have. After reviewing these decisions, the Court will summarize two relevant Supreme Court opinions – *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), and *TransUnion*, 141 S. Ct. at 2190 – before analyzing the allegations in this case.

### A. Relevant Circuit Court Decisions

The Fourth, Sixth, Seventh, Ninth, and District of Columbia Circuits have all found standing for a plaintiff who alleged he was the victim of a data breach. The earliest case is *Remijas v. Neiman Marcus, LLC*, 794 F.3d 688, 690 (7th Cir. 2015), a class action which involved the unauthorized exposure of 350,000 credit card numbers from the defendant's database and fraudulent charges on 9,200 of the cards. The Seventh Circuit held that even those plaintiffs who had not experienced fraudulent charges had standing to pursue their claims because their risk of future injury was substantial. *Id.* at 693. The court reasoned that "customers should not have to wait until hackers commit identity theft or credit-card fraud in order to give the class standing, because there is an 'objectively reasonable likelihood' that such an injury will occur." *Id.* (quoting *Clapper*, 568 U.S. at 410, 133 S.Ct. 1138).[3]

**\*990** Similarly, in *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016), the Sixth Circuit held that the plaintiffs had standing to bring claims against an insurance company following a cyberattack that exposed personal identifying information. In reaching this conclusion,

App. 065

Legg v. Leaders Life Insurance Company, 574 F.Supp.3d 985 (2021)

2021 WL 5772496

the Court explained that "[w]here a data breach targets personal information, a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints." *Id.* at 388. Like in *Remijas*, the complaint in *Galaria* included an allegation that the named class representative had already been the victim of attempted fraud. *Id.* at 387.

The District of Columbia Circuit likewise found standing in a data breach case because "a substantial risk of harm exists already, simply by virtue of the hack and the nature of the data that the plaintiffs allege was taken." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). Again, however, *Attias* included an allegation that two of the named plaintiffs had suffered identity theft as a result of the breach. *Id.* at 626 n.2.

The Fourth Circuit similarly found that the plaintiffs had standing to bring claims following a data breach where the plaintiffs alleged that they had "already suffered actual harm in the form of identity theft and credit card fraud." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018).[4] But the Fourth Circuit also made clear that "a mere compromise of personal information, without more, fails to satisfy the injury-in-fact element in the absence of an identity theft." *Id.* at 621.

**\*\*4** Finally, in *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) and *In re Zappos.com, Inc.*, 888 F.3d 1020, 1029 (9th Cir. 2018), the Ninth Circuit held that the plaintiffs had standing to bring claims based on a data breach because it placed them at imminent risk of identity theft. Both cases included allegations that at least one plaintiff had experienced some sort of misuse of his personal data following the breach. *Krottner*, 628 F.3d at 1142; *In re Zappos.com*, 888 F.3d at 1027.

Notably, all of the circuit court cases "conferring standing after a data breach based on an increased risk of theft or misuse included at least some allegations of actual misuse." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1340 (11th Cir. 2021). Conversely, where no allegations of misuse are present, circuit courts have generally declined to find standing. In *Reilly v. Ceridian Corp.*, 664 F.3d 38, 40 (3d Cir. 2011), the defendant suffered a security breach that may have allowed a third-party to read and copy data containing names, addresses, social security numbers, dates of birth, and bank account information of its customers' employees. The Third Circuit dismissed the case at the pleading stage, concluding that "[i]n data breach cases where no misuse is alleged ... there has been no injury." *Id.* at 45. The Third Circuit reasoned that the plaintiffs' allegations of "hypothetical, future injury" were insufficient because they

> rely on speculation that the hacker: (1) read, copied, and understood their personal information; (2) intends to commit future criminal acts by misusing the information; and (3) is able to use such information to the detriment of Appellants **\*991** by making unauthorized transactions in Appellants' names. Unless and until these conjectures come true, Appellants have not suffered any injury; there has been no misuse of the information, and thus, no harm.

*Id.* at 42.

The Eighth Circuit addressed standing in the context of a data breach in *In re SuperValu, Inc.*, 870 F.3d 763, 766 (8th Cir. 2017). Like the instant case, the plaintiffs in *SuperValu* argued that they "sufficiently alleged an injury in fact because the theft of their [credit] Card Information due to the data breaches at defendants' stores creates the risk that they will suffer identity theft in the future." *Id.* at 768-769. The Eighth Circuit dismissed the case for lack of standing at the pleading stage because allegations that "illicit websites are selling their Card Information to counterfeiters and fraudsters" were "speculative" and "fail[ed] to allege any injury 'to the plaintiff[s].' " *Id.* at 770 (quotation omitted). Further, the Eight Circuit held that the plaintiffs had not demonstrated a substantial risk of future identity theft because the report they relied on – a 2007 GAO report that is also cited in Plaintiff's Amended Complaint – does "not plausibly support the contention that consumers affected by

App. 066

a data breach face a substantial risk of credit or debit card fraud." *Id.* at 771.

More recently, the Eleventh Circuit addressed standing in the context of a data breach in *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344 (11th Cir. 2021). The plaintiff in *Tsao* alleged that the defendant had been the target of a cyberattack, his credit card information may have been accessed in the attack, and that he cancelled his credit cards as a result. The Eleventh Circuit dismissed for lack of standing because conclusory allegations of a continuing risk of identity theft "without specific evidence of some misuse of class members' data" does not establish a concrete injury. *Id.* at 1343-1344. [5]

**5 Last, the Second Circuit dismissed a data breach case for lack of standing in *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295 (2d Cir. 2021). There, the defendant's employee accidentally sent an email that contained personal identifying information of current and former employees. *Id.* at 298. The parties reached a settlement before the defendant's motion to dismiss was resolved, but the district court dismissed the case for lack of standing. *Id.* at 298-299. The Second Circuit affirmed, holding that a mere increased risk of identity theft can be a concrete injury, but that the allegations in this case were insufficient because the data was not intentionally targeted or misused in anyway. *Id.* at 303-304. [6]

*992 **B. Relevant Supreme Court Decisions**

[12] [13] Most cases declining to find standing in the data breach context rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). *Clapper* involved a group of plaintiffs whose work allegedly required them to engage in sensitive communications that might be subject to surveillance under a federal statute. *Id.* at 406, 133 S.Ct. 1138. The Supreme Court held that the plaintiffs did not have standing to enjoin the enforcement of the statute because a " 'threatened injury must be *certainly impending* to constitute injury in fact,' " and " '[a]llegations of *possible* future injury' are not sufficient." *Id.* at 409, 133 S.Ct. 1138 (quotation omitted) (alterations in original). Under this standard, an "objectively

reasonable likelihood" that a future injury will come to pass is inadequate. *Id.* at 410, 133 S.Ct. 1138. Further, a plaintiff cannot establish an imminent future injury for standing purposes when they "rel[y] on a highly attenuated chain of possibilities" or "speculation about the decisions of independent actors." *Id.* at 410-414, 133 S.Ct. 1138.

*Clapper* also held that measures the plaintiffs took to protect themselves from possible, future surveillance did not confer a present injury in fact. *Id.* at 415-416, 133 S.Ct. 1138. On this point, the Supreme Court explained that

> Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

> If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear.

*Id.* at 416, 133 S.Ct. 1138. In sum, the Supreme Court held "that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of non-imminent harm." *Id.* at 422, 133 S.Ct. 1138.

Relying on the risk of a future injury to show standing was further curtailed in *TransUnion LLC v. Ramirez*, ―― U.S. ――, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021), which postdates all of the circuit court opinions discussed above. There, a class of plaintiffs sued TransUnion under the Fair Credit Report Act for maintaining inaccurate credit reports. *Id.* at 2200. For a subset of plaintiffs, TransUnion actually provided the inaccurate reports to third-party businesses. *Id.* For the remaining plaintiffs, TransUnion only maintained the inaccurate credit reports in their internal system and never provided the information to third parties. *Id.* Those plaintiffs, the Supreme Court held, did not have standing to sue for a statutory violation of the Fair Credit Reporting Act because "the mere presence of an

Legg v. Leaders Life Insurance Company, 574 F.Supp.3d 985 (2021)

2021 WL 5772496

inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 2210. [7]

**\*\*6** The Supreme Court also considered whether the mere risk of future disclosure of the inaccurate credit reports constitutes a separate concrete injury. *Id.* Citing to *Clapper*, the Supreme Court explained that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, **\*993** at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* But where a plaintiff brings "a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a separate concrete harm." *Id.* at 2210-2211.

Applying these principles, the Supreme Court held that the plaintiffs whose reports were undisclosed did not suffer a concrete injury because they "did not demonstrate that the risk of future harm materialized" and they were not "independently harmed by their exposure to the risk itself." *Id.* at 2211. The Supreme Court further explained that in addition to the "fundamental problem with their argument based on the risk of future harm, the plaintiffs did not factually establish a sufficient risk of future harm to support Article III standing." *Id.* at 2211-2212. Although the plaintiffs "claimed that TransUnion could have divulged their misleading credit information to a third party at any moment," the Supreme Court held that the plaintiffs had not demonstrated a sufficient likelihood that the inaccurate information would be released. *Id.* at 2212.

The Supreme Court then reiterated that "the risk of future harm on its own does not support Article III standing for the plaintiffs' damages claim." *Id.* at 2213. Given the holding in *TransUnion*, it is far from clear that any case finding a concrete injury based merely on an abstract risk of future identity theft following a data breach is still good law, at least with respect to a claim for damages.

### C. Analysis of Plaintiff's Allegations

**[14]**   In this action, Plaintiff seeks injunctive relief and damages based not on any actual fraud or identity theft that occurred as a result of the data breach, but on the risk

that fraud or identity theft may occur in the future. But as explained in *TransUnion*, the risk of future harm alone cannot support standing for a damages claim. *Id.*

As to his request for injunctive relief, in order to show a concrete injury, Plaintiff must plausibly plead that the risk of future harm as a result of the data breach is imminent, meaning it is "certainly impending." *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138. Unlike the majority of circuit court cases that have found a concrete injury following a data breach, Plaintiff here does not allege that any misuse of the data has occurred. The closest Plaintiff comes to alleging misuse is a statement that there has been a "dramatic increase in the amount and frequency of phishing emails he has been receiving over the last few months." Compl. ¶ 53. But the receipt of phishing emails, while perhaps "consistent with" data misuse, does not "plausibly suggest" that any actual misuse of Plaintiff's personal identifying information has occurred. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Without any actual misuse of the data, Plaintiff relies on reports that describe the general risks of identity theft, explain how personal information can be sold on illicit internet sites, and identify other data breaches. But "[t]hese reports do nothing to clarify the risks to the plaintiffs in this case." *Tsao*, 986 F.3d at 1343. Further, according to Plaintiff's own allegations, the likelihood of identity theft occurring is relatively small: "nearly one out of four data breach notification recipients *becomes* a victim of identity fraud." Compl. ¶ 27 (emphasis in original). Assuming the truth of this allegation, a less than 25% chance that some form of identity fraud could occur at some unknown, future date can hardly be described as "certainly impending" or a "substantial risk." *See TransUnion*, 141 S.Ct. at 2210; **\*994** *Clapper*, 568 U.S. at 415 n.5, 133 S.Ct. 1138. This is particularly true given that identity theft or fraud will only occur if unknown third parties undertake a series of acts, including the comprehension and organization of the stolen data, the posting of the data for sale, the consummation of a transaction, and then the actual use of the data to make unauthorized purchases or open fraudulent accounts. A future risk of injury that relies on this sort of "speculation about the decisions of independent actors" is not sufficient to establish a concrete injury. *Clapper*, 568 U.S. at 410-414, 133 S.Ct. 1138; *see also Reilly*, 664 F.3d at 42 ("Unless and until

App. 068

2021 WL 5772496

these conjectures come true, Appellants have not suffered any injury; there has been no misuse of the information, and thus, no harm.").

**7** At best, then, Plaintiff's allegations lead to a plausible inference that at some unknown time in the future, some of the putative class members *may* be the victim of identity theft or fraud. Even accepting as true Plaintiff's allegations about the nature of the breach – that it was an intentional attack by cybercriminals – Plaintiff only pleads facts showing that there is a non-imminent risk of possible future injury following the data breach. This is not sufficient to confer standing. [8] *Clapper,* 568 U.S. at 409, 133 S.Ct. 1138.

No doubt wary that his allegations of future harm are insufficient to confer standing, Plaintiff additionally alleges that he has suffered an "actual injury" in the form of lost time, money, and annoyance associated with responding to the data breach and monitoring his accounts. *See* Compl. ¶¶ 58-59, 75. But none of these alleged harms qualifies as a concrete injury for standing purposes.

**[15]** As explained in *Clapper,* 568 U.S. at 416, 133 S.Ct. 1138, a plaintiff cannot "manufacture standing" simply by "incur[ing] certain costs as a reasonable reaction to a risk of harm." Thus, while it may have been reasonable to take some steps to mitigate the risks associated with the data breach, those actions cannot create a concrete injury where there is no imminent threat of harm. *Tsao,* 986 F.3d at 1344-1345 ("Tsao cannot conjure standing here by inflicting injuries on himself to avoid an insubstantial, non-imminent risk of identity theft."); *In re SuperValu, Inc.,* 870 F.3d at 769 (8th Cir. 2017) ("Because plaintiffs have not alleged a substantial risk of future identity theft, the time they spent protecting themselves against this speculative threat cannot create an injury."); *Reilly,* 664 F.3d at 46 ("Appellants' alleged time and money expenditures to monitor their financial information do not establish standing, because costs incurred to watch for a speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for Appellants' claims.").

Plaintiff also asserts that he has suffered an injury in the form of diminution in value of his personal identifying information because of the data breach. Assuming personal identifying information has a monetary value, Plaintiff fails to allege that

he attempted to sell his personal information and was forced to accept a decreased price. *See* *Chambliss v. Carefirst, Inc.,* 189 F. Supp. 3d 564, 572 (D. Md. 2016) (finding that plaintiffs had "failed to allege an injury in fact based on any diminution of the value of their personal information.").

In a final attempt to establish a concrete injury, Plaintiff asserts that he lost the benefit of his bargain with Leaders Life when he provided his personal identifying information and it was not kept secure. **\*995** Compl. ¶ 68. Plaintiff has not, however, indicated that he paid any sort of premium in exchange for data security or that the data breach diminished the value of the insurance products he received in return. *See id.* (finding that "Plaintiffs have not alleged any benefit-of-the-bargain loss that could constitute a cognizable injury in fact."); *see also* *Remijas,* 794 F.3d at 695 (describing plaintiff's diminution in value and benefit of the bargain theories as "dubious" and refraining from relying on these theories to support standing).

**8** Plaintiff has failed to plausibly allege an actual, present injury that would support his damages claim or an imminent threat of future harm that would support his claim for injunctive relief. Accordingly, he lacks standing to pursue his claims.

## CONCLUSION

The Court does not doubt that identity theft is a serious problem that involves a host of negative consequences for victims. But a data breach – even one that was intentional or involved sensitive information – does not necessarily equate to a concrete injury. In reaching this conclusion the Court does not imply that a plaintiff must always wait for identity theft or fraud to materialize before bringing suit based on a data breach, it only holds that the allegations in this case have not plausibly alleged an actual or imminent injury sufficient to establish Article III standing.

Accordingly, Defendant Leaders Life Insurance Company's Motion to Dismiss Plaintiff's First Amended Complaint [Doc. No. 11] is GRANTED, and the First Amended Complaint is DISMISSED without prejudice.

IT IS SO ORDERED this 6th day of December, 2021.

2021 WL 5772496

**All Citations**

574 F.Supp.3d 985, 2021 WL 5772496

---

### Footnotes

1   This particular claim is brought only on behalf of Plaintiff and a proposed subclass of Maryland customers.

2   Defendant also seeks dismissal under Fed.R.Civ.P. 12(b)(6) and seeks to strike certain allegations under Fed.R.Civ.P. 12(f). It is not, however, appropriate to address these arguments where the Court lacks subject matter jurisdiction over the case. *See* 🚩*D.L. v. Unified Sch. Dist. No.* 497, 392 F.3d 1223, 1229 (10th Cir. 2004) (explaining that "a determination that the district court lacked jurisdiction over a claim moots any other challenge to the claim, including a different jurisdictional challenge.").

3   The Seventh Circuit reached a similar result in 🚩*Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963 (7th Cir. 2016). There, the Court found that the plaintiffs' present injuries, which included fraudulent charges on a credit card for one of the named representatives but not the other, and the future risk of fraud were sufficient to confer standing. An earlier Seventh Circuit decision, 🚩*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007), explicitly held that the plaintiffs had standing to bring claims based on a data breach even though no misuse had occurred, but that case was decided prior to the Supreme Court's decision in 🚩*Clapper*, 568 U.S. at 398, 133 S.Ct. 1138, discussed *infra*.

4   In 🚩*Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017), the Fourth Circuit declined to find standing based on a threat of future injury following the theft of a laptop containing personal identifying information because the information had not been misused or intentionally targeted. The Fourth Circuit distinguished 🚩*Hutton* from 🚩*Beck* by noting that the 🚩*Hutton* plaintiffs alleged actual misuse of the data. 🚩*Hutton*, 892 F.3d at 621-622.

5   Four months after 🚩*Tsao*, the Eleventh Circuit decided 🚩*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021), cert. denied sub nom. *Huang v. Spector*, ––– U.S. ––––, 142 S.Ct. 431, 211 L.Ed.2d 254 (2021), which involved a data breach that exposed personal identifying information. Citing to 🚩*Tsao*, the Eleventh Circuit found that the plaintiffs had suffered a concrete injury, explaining that "the allegations of some Plaintiffs that they have suffered injuries resulting from actual identity theft support the sufficiency of all Plaintiffs' allegations that they face a risk of identity theft." 🚩*Id.* at 1263.

6   In a prior, unpublished decision, the Second Circuit dismissed a data breach case for lack of standing at the pleading stage even though there were allegations of misuse. 🚩*Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89, 90 (2d Cir. 2017). The plaintiff alleged that her credit card information was stolen in a data breach, fraudulent charges were made, and she faces a future risk of identity theft. The Second Circuit held that these allegations did not establish a concrete injury because the plaintiff was never asked to pay for any fraudulent charges and her stolen credit card was promptly cancelled. 🚩*Id.* at 90.

2021 WL 5772496

7    🚩 *TransUnion* was decided following a jury verdict for the plaintiffs. 🚩 141 S.Ct. at 2201.

8    The Court also rejects Plaintiff's conclusory allegations that he faces a concrete harm because a second cyberattack at Leaders Life is imminent.

---

**End of Document**                                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Logan v. Marker Group, Inc., Slip Copy (2024)

2024 WL 3489208

2024 WL 3489208
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

James LOGAN, Nathan Baxter, and Yusef
Harris, individually and on behalf of all others
similarly situated "Class Members," [1] Plaintiffs,

v.

MARKER GROUP, INC., Defendant.

Civil Action No. 4:22-CV-00174
|
Signed July 18, 2024

**Attorneys and Law Firms**

Jean Sutton Martin, Morgan & Morgan Mass Tort Dept.
Morgan & Morgan, Tampa, FL, for Plaintiffs.

Richard Haggerty, Mullen Coughlin LLC, Devon, PA,
Amanda Nicole Harvey, Mullen Coughlin LLC, Grapevine,
TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Drew B. Tipton, UNITED STATES DISTRICT JUDGE

 *1  Defendant Marker Group, Inc. ("Marker Group")
provides litigation support services to law firms. In December
2021, Marker Group notified its clients of a data breach in
its system that allowed an unknown third-party to access its
servers. Those servers contain sensitive, personal information
such as Social Security numbers, identifying information, and
medical records. As a result of the data breach, Plaintiffs
James Logan, Nathan Baxter, and Yusef Harris allege that
they were victims of identity theft and continue to face a risk
of future exposure to identity theft. They assert claims for
negligence, breach of implied contract, invasion of privacy,
unjust enrichment, breach of confidence, and violation of
the California Confidentiality of Medical Information Act
("CMIA"). They further seek a declaratory judgment that
Marker Group's existing security measures do not comply
with its contractual obligations and duties of care, and
that it must comply with these obligations and duties by
implementing and maintaining reasonable security measures.

Pending before the Court is Marker Group's Partial Motion
to Dismiss Plaintiffs' Amended Class Action Complaint. (Dkt.

No. 25). Marker Group seeks dismissal under Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6). [2]  After careful
review, the Motion is **GRANTED IN PART** and **DENIED
IN PART**.

**I. BACKGROUND** [3]

Specializing in multi-district litigation ("MDL") involving
personal injury claims, Marker Group "provides record
collection, medical review, data analysis, and many other
litigation support services to some of the world's most
prestigious defense law firms." (Dkt. No. 23 at 2). Marker
Group's services include the use of an online "[file transfer
protocol] platform system that allows medical records
and other personal information and documentation to be
uploaded, stored, sorted, and analyzed." (*Id.*). This platform
"serves as a centralized location for parties in large litigation
matters to manage medical records, plaintiff fact sheets,
and other discovery materials." (*Id.* at 7). Equipped with
"administrative, physical, and technical safeguards," Marker
Group promises "to ensure the maximum level of control and
security" and full compliance with information security laws.
(*Id.* at 3).

Plaintiffs in this case were "required to upload their medical,
pharmacy, and insurance records and other sensitive and
confidential information onto the Marker Group portal as
a condition of their participation in the MDL[.]" (*Id.* at
8). The information provided "included, without limitation,
their names, Social Security numbers, dates of birth,
and addresses" along with medical and personal health
information. (*Id.*).

 *2  On September 3, 2021, Marker Group "noticed
'suspicious activity' on its computer network and later
determined that files were accessed by an 'unknown,
unauthorized third-party[.]' " (*Id.* at 3–4). That December,
Marker Group issued a Notice of Data Breach Letter (the
"Notice") advising clients that breached files contained
protected health information and personally identifiable
information. (*Id.* at 4). The Notice had barely any
information indicating "how long these unauthorized third-
parties had access to the medical records and other sensitive
information[.]" (*Id.*).

Plaintiffs allege that as a result of this breach, they
"experienced fraudulent activity and identity theft ...
including but not limited to unauthorized loan applications,
bank account activity, tax fraud, and unemployment

App. 072

fraud." (*Id.* at 9). Before becoming aware of the breach, Logan "encountered a situation with his treating physician in which it appeared that information unrelated to him had been transmitted to his physician under his name[,]" an occurrence which he attributes to the data breach. (*Id.* at 22). Also as a result of the breach, Logan "received text messages from a medical facility ... confirming medical appointments that he did not make for himself." (*Id.*). For Baxter, the consequences of the breach came in the form of "a barrage of phone calls regarding Medicare insurance coverage ... relay[ing] information and offers that contradict his current coverage" as well as "unsolicited loan offers which contain his personal information." (*Id.* at 23). Lastly, following quickly on the heels of the breach, Harris learned that "an unauthorized individual opened a line of credit for $1500 in [his] name, using his Social Security number[.]" (*Id.*). Although Harris filed a police report and froze his credit accounts, the fraudulent activity still "negatively impacted his credit score." (*Id.* at 23–24).

Plaintiffs now bring this class action lawsuit against Marker Group alleging six counts: (1) negligence, (2) breach of implied contract, (3) invasion of privacy, (4) unjust enrichment, (5) breach of confidence, (6) declaratory judgment, and (7) violation of the CMIA. (*Id.* at 30–48). Plaintiffs also request declaratory relief. (*Id.* at 45–46). Marker Group filed a Partial Motion to Dismiss, (Dkt. Nos. 25, 25-1), arguing that the Court lacks subject matter jurisdiction over Logan and Baxter's claims, and that Plaintiffs failed to adequately plead a number of his claims.

## II. LEGAL STANDARD

### A. RULE 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss for "lack of subject matter jurisdiction." When considering a motion to dismiss under Rule 12(b)(1), a court must "accept the complaint's well-pleaded factual allegations as true." *Carver v. Atwood*, 18 F.4th 494, 496 (5th Cir. 2021). Dismissal for lack of subject-matter jurisdiction is appropriate "when the plaintiff does not 'plausibly allege all jurisdictional allegations.' " *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021) (quoting *Brownback v. King*, 592 U.S. 209, 217, 141 S.Ct. 740, 749, 209 L.Ed.2d 33 (2021)). "For a 12(b)(1) motion, the general burden is on the party asserting jurisdiction." *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021). "When a Rule 12(b)(1) motion is filed with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion 'before addressing

any attack on the merits.' " *D&G Holdings, L.L.C. v. Becerra*, 22 F.4th 470, 474 (5th Cir. 2022) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

### B. RULE 12(b)(6)

**\*3** Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss for "failure to state a claim upon which relief can be granted[.]" Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than ... 'labels and conclusions[.]' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "The defendant, as the moving party, bears the burden of proving that no legally cognizable claim for relief exists." *Flores v. Morehead Dotts Rybak, Inc.*, No. 2:21-CV-00265, 2022 WL 4740076, at *2 (S.D. Tex. Sept. 29, 2022) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.)).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's factual allegations as true and view those allegations in the light most favorable to the plaintiff. *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021). The court must evaluate whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at

Logan v. Marker Group, Inc., Slip Copy (2024)

2024 WL 3489208

1965). "Dismissal ... is appropriate where the plaintiff fails to allege 'enough facts to state a claim to relief that is plausible on its face' and thus does not 'raise a right to relief above the speculative level.' " *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. at 1965, 1974).

### C. RULE 12(f)

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Applicable only to pleadings, "motions under Ruler 12(f) are viewed with disfavor and are infrequently granted[.]" *SEC v. Faulkner*, No. 3:16-CV-01735, 2019 WL 2515000, at *1 (N.D. Tex. June 18, 2019) (quoting *FDIC v. Niblo*, 821 F.Supp. 441, 449 (N.D. Tex. 1993)). This is because it is a drastic remedy and is often sought as a dilatory tactic. *Id.* Rule 7(a) of the Federal Rules of Civil Procedure "limits the universe of allowed 'pleadings,' " and Rule 12(f) motions should only be granted "when the pleading to be stricken has no possible relation to the controversy." *Id.* (quotation omitted).

### III. DISCUSSION [4]

**\*4** In its Partial Motion to Dismiss, Marker Group argues that Plaintiffs' Amended Complaint, (Dkt. No. 23), should be dismissed "in its entirety as to Logan and Baxter pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction." (Dkt. No. 25-1 at 11). Marker Group asserts that because neither Logan nor Baxter have "suffered any actual injury, such as identity theft," they have failed to establish Article III standing. (*Id.* at 13–17). Marker Group further asserts that partial dismissal is appropriate because Plaintiffs have "failed to state a claim upon which relief can be granted for most of the causes of action in the Amended Complaint." (*Id.* at 8, 18–28). Lastly, Marker Group asks the Court to "strike the immaterial and impertinent allegations concerning identity theft that have nothing to do with the parties or facts of this case," such as "extraneous material concerning the actions of identity thieves and statistics about cybercrime." (*Id.* at 28–29).

In response to Marker Group's standing arguments, Plaintiffs counter that Logan and Baxter "have sufficiently alleged a concrete harm based on a substantial risk of future identity theft and actual identity theft," (Dkt. No. 28 at 10–12), and maintain that all Plaintiffs have standing to

seek injunctive relief, (*id.* at 18–19). Moreover, they assert that "the risk of future identity theft constitutes a concrete harm," and, therefore, "so do the Plaintiffs' efforts to mitigate that harm." (*Id.* at 16–18). Alternatively, Plaintiffs argue that a concrete injury exists in the form of "the lost or diminished value of their [personally identifiable information and protected health information] as a result of the Data Breach." (*Id.* at 18). As to Defendant's Rule 12(b)(6) arguments, Plaintiffs defend the sufficiency of the allegations pled in support of each of their claims. (*Id.* at 19–28). Finally, Plaintiffs urge the Court to "not strike the allegations concerning identity theft, but instead [to] leave the sufficiency of the allegations for determination on the merits." (*Id.* at 28).

### A. STANDING

To bring a lawsuit in federal court, a plaintiff must have standing. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 295–96, 142 S.Ct. 1638, 1646, 212 L.Ed.2d 654 (2022). This is a non-waivable, jurisdictional requirement. *La. Landmarks Soc., Inc. v. New Orleans*, 85 F.3d 1119, 1122 n.3 (5th Cir. 1996). To meet Article III's standing requirements, a plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). "A plaintiff 'bears the burden of establishing these elements.' " *Daves v. Dallas Cnty.*, 22 F.4th 522, 542 (5th Cir. 2022) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

To satisfy the first element, injury in fact, a plaintiff must show a harm suffered that is concrete and actual or imminent, not conjectural or hypothetical. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). To satisfy the second element, causation, the plaintiff must establish "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id.* at 103, 118 S.Ct. at 1016–17. And to satisfy the third and final element, redressability, there must be "a likelihood that the requested relief will redress the alleged injury." *Id.* at 103, 118 S.Ct. at 1017.

Marker Group disputes whether Plaintiffs Logan and Baxter have properly alleged an injury and challenge their ability to assert standing to seek monetary damages under four theories

App. 074

2024 WL 3489208

—actual and concrete injury, imminent risk of future injury, injury as a result of mitigation efforts, and injury resulting from diminution in value of their personal information. (Dkt. No. 25-1 at 13–17). Finally, Marker Group attacks the ability of all Plaintiffs to seek injunctive relief because "no Plaintiff has identified any 'forward-looking' relief that would potentially alleviate any purported risk." (*Id.* at 17–18).

### 1. Actual and Concrete Injury

**\*5** Marker Group argues that Logan and Baxter have not alleged a concrete injury because neither were truly "victims of identity theft, financial fraud, or any other harm." (*Id.* at 13). The text messages received by Logan, it argues, did not "result[ ] in any harm," and the transmission of unrelated information could have been the result of a "clerical error[.]" (*Id.*). As to Baxter's alleged injury, Marker Group argues that "numerous spam calls and unsolicited loan offers" are simply a fact of modern life and do not "plausibly suggest" misuse of his personal information as a result of the breach. (*Id.*). In response, Plaintiffs maintain that their allegations sufficiently allege that Logan and Baxter "were victims of actual identity theft and fraud," but offer no new rationale to rebut Marker Group's arguments. (Dkt. No. 28 at 11–12). In reply, Marker Group emphasizes that Plaintiffs can neither explain how "these situations constitute identity theft or fraud," and objects to Plaintiffs' attempt to "simply state, with no factual basis whatsoever, that any minor, unrelated inconvenience that [they] experienced after the Marker Group data security incident constituted identity theft." (Dkt. No. 29 at 3). The Court agrees with Marker Group.

Plaintiffs provide no authority supporting their claim that these occurrences constitute an Article III injury. On the contrary, courts have found that similar occurrences, such as "the receipt of phishing emails, while perhaps 'consistent with' data misuse, does not 'plausibly suggest' that any actual misuse of Plaintiff's personal identifying information has occurred." 🚩 *Legg v. Leaders Life Ins. Co.*, 574 F.Supp.3d 985, 993 (W.D. Okla. 2021) (quoting 🚩 *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966). Conclusory statements alleging actual incidents of identity theft are insufficient to establish an injury in fact because such injuries require a showing that "the information accessed was actually misused or that there has even been an attempt to use it." 🚩 *Green v. eBay Inc.*, No. 2:14-CV-01688, 2015 WL 2066531, at \*4 (E.D. La. May 4, 2015). For example, one recent court inferred

identify theft when a plaintiff's information was stolen and used "to fraudulently open credit cards in their names." 🚩 *McFarlane v. Altice USA, Inc.*, 524 F.Supp.3d 264, 270 (S.D.N.Y. 2021); *see also* 🚩 *Strautins v. Trustwave Holdings, Inc.*, 27 F.Supp.3d 871, 876 (N.D. Ill. 2014) (finding that whether a data breach results in identity theft "depends on a number of variables, such as whether their data was actually taken during the breach, whether it was subsequently sold or otherwise transferred, whether anyone who obtained the data attempted to use it, and whether or not they succeeded").

Moreover, even if Logan and Baxter's alleged occurrences could constitute a sufficient injury-in-fact, they would still "fail to meet the causation and redressability elements of the standing test." *See* 🚩 *Peters v. St. Joseph Servs. Corp.*, 74 F.Supp.3d 847, 857 (S.D. Tex. 2015). Courts in the Fifth Circuit have held that attempted credit card charges, phone solicitations, spam emails, and receipt of materials targeting one's specific medical conditions perpetrated "by *unknown third parties* ... fail[ ] to account for the sufficient break in causation caused by opportunistic third parties." *Id.* (emphasis in original); *see also* 🚩 *Almon v. Conduent Bus. Servs., LLC*, No. 5:19-CV-01075, 2022 WL 902992, at \*23 (W.D. Tex. Mar. 25, 2022) ("Because Plaintiffs cannot establish a causal connection between their injuries and the alleged data breach, they lack standing to assert claims arising out of the alleged data breach.") (citing 🚩 *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136). As Marker Group points out, the texts received by Logan could have resulted from a clerical error and the phone calls received by Baxter are not unusual in modern life. Thus, the claimed injuries are not cognizable under Article III for standing purposes. *Peters*, 74 F.Supp.3d at 857. Moreover, "to the extent that [such injuries] meet the first prong" of the standing test, without "any quantifiable damage or loss" alleged, a favorable decision from this Court could not redress the injuries. *Id.* Thus, the Court finds that Logan and Baxter lack Article III standing as victims of actual identity theft.

### 2. Imminent Risk of Future Injury

**\*6** Marker Group additionally argues that Logan and Baxter have "failed to allege any risk of future harm that can confer standing" because they do not claim to be victims of actual identity theft, and the risk they face of future identity theft is highly speculative. (Dkt. No. 25-1 at 13–16). In response, Plaintiffs assert that they "*do* allege that they were victims of

Logan v. Marker Group, Inc., Slip Copy (2024)

2024 WL 3489208

actual identity theft and fraud," and, in addition to that harm, "they now face a lifetime of heightened risk of identity theft and fraud" as a result of the data breach, which is sufficient to confer standing under Article III. (Dkt. No. 28 at 11) (emphasis in original). The Court agrees with Marker Group.

Generally, in a suit for damages, "the risk of future harm on its own does not support Article III standing[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441, 141 S.Ct. 2190, 2213, 210 L.Ed.2d 568 (2021). In fact, Plaintiffs' exact theory has been rejected by courts in the Fifth Circuit on several occasions.

*See, e.g., Peters*, 74 F.Supp.3d at 849; *Green*, 2015 WL 2066531, at *4; *Kostka v. Dickey's Barbeque Rests., Inc.*, No. 3:20-CV-03424, 2022 WL 16821685, at *4 (N.D. Tex. Oct. 14, 2022), *report and recommendation adopted*, No. 3:20-CV-03424, 2022 WL 16821685 (N.D. Tex. Nov. 8, 2022).

Two courts in this Circuit have directly examined "whether the heightened risk of future identity theft/fraud posed by a data security breach confers Article III standing on persons whose information may have been accessed[,]" and both found "that the answer is no." *Peters*, 74 F.Supp.3d at 849; *see also Green*, 2015 WL 2066531, at *4 (finding that even when Social Security numbers were stolen as a result of a data breach, "courts nonetheless have found that the mere risk of identity theft is insufficient to confer standing, even in cases where there were actual attempts to use the stolen information"). While more recent cases have asked similar questions in a different context, the rule remains that "the risk of future harm on its own does not support Article III standing" because "the mere risk of future harm, standing alone, cannot qualify as a concrete harm[.]" *Kostka*, 2022 WL 16821685, at *4 (quoting *TransUnion*, 594 U.S. at 436, 141 S.Ct. 2210–11). Thus, Logan and Baxter have failed to establish standing on a speculative risk of identity theft at some unknown point in the future.

### 3. Mitigation Efforts

Marker Group argues that Plaintiffs cannot establish standing by claiming that "they were forced to spend time and money on mitigation efforts related to the risk of identity theft." (Dkt. No. 25-1 at 16). Doing so, according to Marker Group, would allow Plaintiffs to "manufacture standing by incurring self-imposed costs." (*Id.*). Plaintiffs' response is premised on their argument that the risk of future harm is, itself, an Article III

injury. (Dkt. No. 28 at 16–18). They claim that "[b]ecause Plaintiffs have demonstrated that their risk of identity theft resulting from the data breach is a concrete harm, the time, money, and effort spent mitigating that risk are separate, concrete injuries that confer standing in this case as well as cognizable damages." (*Id.* at 17). The Court agrees with Marker Group.

Under Article III, parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416, 133 S.Ct. 1138, 1151, 185 L.Ed.2d 264 (2013). Since the Court has already determined that the risk of future identity theft based on the data breach is not a concrete injury sufficient to confer standing, Plaintiffs' attempt to conjure harms based on fear of that hypothetical future harm is also insufficient to establish standing. *See Green*, 2015 WL 2066531, at *5 n.59 (finding that "because there have been no reported incidences of actual identity theft or identity fraud as a result of the Data Breach ... there is no reason to believe such mitigation costs are necessary").

### 4. Diminution in Value

**\*7** Lastly, Marker Group argues Plaintiffs have not offered any factual support for the claim that they have suffered injuries in the form of diminution of value with respect to their personally identifiable information. (Dkt. No. 25-1 at 17). Plaintiffs respond that they have sufficiently alleged losses and "are not required to allege that [someone] attempted to sell their [information.]" (Dkt. No. 28 at 18).

"[D]istrict courts have been reluctant to find standing based *solely* on a theory that the value of a plaintiff's [personal information] has been diminished." *In re Google Android Consumer Priv. Litig.*, No. 4:11-CV-02264, 2013 WL 1283236, at *4 (N.D. Cal. Mar. 26, 2013) (emphasis in original) (collecting cases). When courts have adopted a theory of injury based on diminution in value, the cases "involved circumstances where the defendants collected information that was itself monetized and used for commercial purposes." *In re Am. Med. Collection Agency, Inc. Consumer Data Sec. Breach Litig.*, No. 2:19-CV-02904, 2021 WL 5937742, at *10 (D.N.J. Dec. 16, 2021). Because personal information "does not have an inherent

monetary value[,]" *Willingham v. Glob. Payments, Inc.*, No. 1:12-CV-01157, 2013 WL 440702, at *7 (N.D. Ga. Feb. 5, 2013), "collection of personal information does not create an economic loss." *Low v. LinkedIn Corp.*, No. 5:11-CV-01468, 2011 WL 5509848, at *4 (N.D. Cal. Nov. 11, 2011).

Moreover, "Plaintiffs do not explain how they were 'deprived' of the economic value of their personal information simply because their unspecified personal information was purportedly collected by a third party." *LaCourt v. Specific Media, Inc.*, No. 2:10-CV-01256, 2011 WL 1661532, at *5 (C.D. Cal. Apr. 28, 2011). An issue that has yet to be addressed in the Fifth Circuit, the court in *Green* noted that "[e]ven if the Court were to find that personal information has an inherent value and the deprivation of such value is an injury sufficient to confer standing, Plaintiff has failed to allege facts indicating how the value of his personal information has decreased as a result of the Data Breach." *Green*, 2015 WL 2066531, at *5 n.59. The same is true here. Because Plaintiffs' claims are "dependent on entirely speculative, future actions of an unknown third-party[,]" they are insufficient to confer Article III standing. *Browne v. US Fertility, LLC*, No. 2:21-CV-00367, 2021 WL 2550643, at *3 (E.D. Pa. June 22, 2021). Thus, Logan and Baxter cannot establish standing on this basis.

## 5. Injunctive Relief

Finding that Plaintiffs Logan and Baxter failed to establish standing to bring any monetary claims, the Court will now consider whether Harris, the sole remaining Plaintiff, has standing to maintain a claim for injunctive relief. Marker Group argues that injunctive relief is inappropriate in this case because the data breach occurred more than one year ago and "the Amended Complaint does not specifically identify any 'forward-looking' injunctive relief that could possibly prevent any potential future harm stemming from the incident from occurring." (Dkt. No. 25-1 at 18). In response, Plaintiffs argue that because Marker Group still possesses Plaintiffs' personal information, Plaintiffs seek injunctive relief requiring Marker Group to "implement and maintain reasonable security measures moving forward[.]" (Dkt. No. 28 at 19). In reply, Marker Group asserts that the claimed relief cannot prevent any potential future injuries resulting from *this* data breach, and is, therefore, inappropriate. (Dkt. No. 29 at 9). Marker Group is correct.

**\*8** "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435, 141 S.Ct. at 2210. The Court has already determined that the risk of future identity theft resulting from this data breach is insufficient to establish standing, and the Court also finds that Plaintiffs have not adequately pleaded facts to allege an imminent and substantial harm that another data breach will occur in the future. *See I.C. v. Zynga, Inc.*, 600 F.Supp.3d 1034, 1055 (N.D. Cal. 2022) (finding that plaintiffs did not have standing to seek injunctive relief because they could not "show any imminent risk of future harm from *this* data breach" (emphasis in original)). Thus, no Plaintiff has standing to seek injunctive relief.

## B. FAILURE TO STATE A CLAIM

Having determined that the Court lacks subject matter jurisdiction over Logan's and Baxter's claims—only Harris's claim remain. Marker Group moves to dismiss for failure to state a claim on Counts 2 through 6 of the Amended Complaint.[5] (Dkt. No. 25-1 at 24–28). Plaintiffs assert these claims are adequately pled. (Dkt. No. 28 at 19–28). The Court addresses whether Harris pled a viable cause of action claim-by-claim.

## 1. Breach of Implied Contract

Marker Group moves to dismiss Harris's breach-of-implied-contract claim because "[t]here was no meeting of the minds here[.]" (Dkt. No. 25-1 at 25). Marker Group asserts that "[Harris] never entered into an implied contract with Marker Group," and, moreover, Marker Group never "made any particular representations about data security" or "indicated an intention to be contractually bound in any other way" to Harris. (Dkt. No. 25-1 at 25). Harris responds that "[a] meeting of the minds occurred insofar as both parties understood that Defendant would use reasonable, industry standard measures to protect their [personal information]." (Dkt. No. 28 at 23). In addition, via Marker Group's website, Harris "identified concrete promises to protect [personal information] made by Defendant," not merely implied promises. (*Id.*).

Logan v. Marker Group, Inc., Slip Copy (2024)

2024 WL 3489208

Under Texas law, the elements of a breach of contract claim are "(1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach." *Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 834 (Tex. App.—Dallas 2009, no pet.). A binding contract, whether express or implied in fact, requires "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, [and] (4) each party's consent to the terms[.]"

*Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ). When alleging an implied contract, "the element of mutual assent can be inferred from the circumstances of the transaction." *Id.* (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972)). "Mutual assent can arise from the parties' acts and conduct from which one party can 'reasonably draw the inference of a promise.' " *Id.* (quoting *Haws & Garrett*, 480 S.W.2d at 609–10).

"Many federal courts have held that an implied contract to safeguard customers' sensitive data could reasonably be found to exist in transactions where consumers are solicited or invited to provide personal information in exchange for a good or service." *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F.Supp.3d 1183, 1221 (S.D. Fla. 2022); *see also In re Marriott Int'l, Inc., Consumer Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 486 (D. Md. 2020) (collecting cases). Even in those circumstances, however, the plaintiffs alleging existence of an implied contract must provide some "evidence from which one could plausibly infer that defendant intended to contractually bind itself to a general standard of reasonable care or any particular cybersecurity standard or protocol by accepting" receipt of plaintiff's personal information. *Lovell v. P.F. Chang's China Bistro, Inc.*, No. 2:14-CV-01152, 2015 WL 4940371, at *3 (W.D. Wash. Mar. 27, 2015).

**\*9** Despite Harris's assertion that it has identified evidence establishing that Marker Group promised to protect their personal information, (Dkt. No. 28 at 23), Marker Group did not solicit or invite Harris to provide such information in exchange for their services. This case resembles *In re Mednax* where the plaintiffs only "provided their personal information as required to receive healthcare services from Defendants— not data security services beyond the privacy requirements already imposed on Defendants by federal law." 603

F.Supp.3d at 1221. Just like the plaintiffs in *In Re Mednax*, Harris "allege[s] no invitation or solicitation by Defendants indicating that Defendants implicitly assented to secure [his] personal information] in exchange for remuneration." *Id.*

Moreover, the court in *In Re Mednax* emphasized that a "privacy notice is of no consequence because such notices are not contractual in nature." *Id.* Documents that inform patients, or in this case MDL participants, of their rights under federal law "cannot create contractual obligations" when defendants "are required by law to adhere to [federal law] without receiving any consideration from Plaintiffs or any other patient[.]" *Id.* at 1222. Thus, not only did Harris fail to allege that Marker Group solicited receipt of their personal information in exchange for data security services, he also failed to explain why Marker Group's representation that "it is fully compliant with the HIPAA Standards for Privacy, Electronic Transactions and Security ... to ensure compliance with federal and state information security laws" is contractual in nature. (Dkt. No. 28 at 23). Accordingly, Harris has not pled a viable breach-of-implied contract claim in Count 2 of the Amended Complaint, and it is therefore dismissed.

### 2. Invasion of Privacy

Marker Group next moves the Court to dismiss Harris's invasion of privacy claim, arguing that Harris failed to plead "any facts showing that Marker Group intentionally allowed an unauthorized third party to access [his] information." (Dkt. No. 25-1 at 25–26). The Court agrees with Marker Group.

To survive dismissal, Harris must plead facts alleging that "(1) the defendant intentionally intruded on the plaintiff's solitude, seclusion, or private affairs; and (2) the intrusion would be highly offensive to a reasonable person." *Beaumont v. Basham*, 205 S.W.3d 608, 614 (Tex. App.—Waco 2006, pet. denied) (citing *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993)). He fails on the first element.

Harris pleads, in a conclusory manner, that Marker Group "acted with an intentional state of mind when it permitted the Data Breach to occur because it acted with actual knowledge that its information security practices were inadequate and insufficient." (Dkt. No. 23 at 40). He claims that it can be "inferred" from the data breach that Marker Group's security practices were inadequate and insufficient. (*Id.* at 17).

2024 WL 3489208

However, Harris provides no facts explaining how Marker Group supposedly knew of the alleged inadequacies and insufficiencies of its security practices. Because invasion of privacy is an intentional tort, a theory based on "negligent failure to safeguard and protect" personal information is "insufficient to state a claim" for invasion of privacy. *In re Mednax*, 603 F.Supp.3d at 1226 (cleaned up).

Additionally, because Harris voluntarily gave his information to Marker Group, he cannot now allege that Marker Group intruded on his solitude. When confronted with invasion-of-privacy claims in the data breach context, courts have similarly noted that a plaintiff's voluntary disclosure of their personal information "dooms their claim." *In re Arthur J. Gallagher Data Breach Litig.*, 631 F.Supp.3d 573, 598 (N.D. Ill. 2022) (cleaned up). In that case, the plaintiffs "disclosed their [personal information] to Defendants as part of their relationships with Defendants." *Id.* (quotation omitted). The same is true here. Harris, in order to participate in the MDL, freely disclosed his personal information to Marker Group whose role was "to manage medical records, plaintiff fact sheets, and other discovery materials" in a central location where it can be "housed for continued access by the parties." (Dkt. No. 23 at 7). Accordingly, Harris has not pled a viable invasion-of-privacy claim in Count 3 of the Amended Complaint, and it is therefore dismissed.

### 3. **Unjust Enrichment**

**\*10** Marker Group argues that Harris failed to adequately plead an unjust enrichment claim because he "did not confer any benefit on Marker Group." (Dkt. No. 25-1 at 26). Harris responds that he conferred a benefit to Marker Group because they profited from receiving his personal information "through its contracts with its customers[.]" (Dkt. No. 28 at 27).

In Texas, "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). "Unjust enrichment is an equitable theory of recovery that is based on an implied agreement to pay for benefits received." *Jupiter Enters., Inc. v. Harrison*, No. 05-00-01914-CV, 2002 WL 318305, at \*3 (Tex. App.—Dallas Mar. 1, 2002, no pet.) (citing *Vortt Exploration Co., Inc.*

*v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)). In the absence of an express contract, a party can bring a claim for unjust enrichment by alleging that "(1) that valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by that person; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Id.* (citing *Vortt*, 787 S.W.2d at 944). Here, Harris cannot prove the first element of unjust enrichment—that he conferred any benefit or valuable services or materials to Marker Group.

As Harris points out, several courts across the country have allowed unjust enrichment claims to survive at the Rule 12 stage in the data-breach context. (Dkt. No. 28 at 26) (collecting cases). However, in each of Harris's cited cases, the plaintiffs allege that their data was given to the defendant *along with* something else of value—usually money. For example, in *In re Target Corp. Customer Data Security Breach Litig.*, the plaintiffs' theorized that they would not have given money to Target if they had been warned of Target's allegedly faulty data security. 66 F.Supp.3d 1154, 1177-78 (D. Minn. 2014). And in *Baldwin v. National Western Life Insurance Company*, the plaintiff's theory was also premised on an actual benefit to the defendant other than solely personal information. No. 2:21-CV-04066, 2021 WL 4206736, at \*8 (W.D. Mo. Sept. 15, 2021). Namely, the *Baldwin* plaintiff argued that she benefitted the defendant by "pa[ying] for life insurance and that part of those payments were for data security." *Id.* Thus, in both cases, the defendant was unjustly enriched by taking the plaintiff's data *and* their money, and then failing to protect the data. *Id.*; *In Re Target Corp.*, 66 F.Supp.3d. at 1177–78.

This case more closely resembles a 2021 case out of South Carolina, *In re Blackbaud, Inc., Customer Data Breach Litigation*, 567 F.Supp.3d 667 (D.S.C. 2021). In *Blackbaud*, a group of plaintiffs sued Blackbaud, a data storage company, after its servers were breached and the plaintiffs' data was accessed. *Id.* at 672. The plaintiffs alleged, among other things, that Blackbaud was unjustly enriched by receiving payment to store the plaintiffs' data, and then failing to protect it. *Id.* at 687. The court dismissed the claim at the Rule 12 stage, reasoning that unlike the other data breach cases

with successful unjust enrichment claims, the plaintiffs did not actually pay Blackbaud to store their data and therefore conferred no benefit. 🚩 *Id.* at 687–88. Instead, the *Blackbaud* plaintiffs had given their information to various companies "who in turn sought out, paid for, and utilized Blackbaud's services." 🚩 *Id.* at 688.

**\*11** This case presents the same issue discussed in *Blackbaud.* Here, the only thing Harris gave to Marker Group was his personal information. With nothing else to serve as consideration for the safe keeping of such information, Harris conferred no benefit on Marker Group. Again, personal information "does not have an inherent monetary value," 🚩 *Willingham,* 2013 WL 440702, at \*7, and "collection of personal information does not create an economic loss." 🚩 *Low,* 2011 WL 5509848, at \*4. The only benefit conferred to Marker Group was the money paid by a third-party, not Harris, who contracted and paid for Marker Group's services. (Dkt. No. 23 at 41). Thus, Harris cannot plead the first element of an unjust enrichment claim in Count 4 of the Amended Complaint, i.e., that *he* conferred a benefit. It is therefore dismissed.

### 4. Breach of Confidence

Marker Group asserts that Harris's breach of confidence claim also warrants dismissal because it is not a cause of action recognized by Texas law. (Dkt. No. 25-1 at 27). The Court agrees.

A court in the Eastern District of Virginia recently noted that it was "not aware of any decision under [Texas] law that has recognized a tort for the breach of confidence[.]" 🚩 *In re Capital One Consumer Data Sec. Breach Litig.,* 488 F.Supp.3d 374, 409 n.21 (E.D. Va. 2020). Harris did not provide this Court with any case law establishing the existence of a breach of confidence claim in Texas, and the Court is unaware of any such authority. Accordingly, Harris has not pled a viable breach of confidence claim in Count 5 of the Amended Complaint, and it is therefore dismissed.

### 5. Declaratory Relief

Lastly, Marker Group contends Harris is not entitled to declaratory relief. (Dkt. No. 25-1 at 27–28). Harris requests

"a declaration that (1) each of Defendant's existing security measures do not comply with their explicit or implicit contractual obligations and duties of care," and (2) a declaration requiring Marker Group "to comply with their explicit or implicit contractual obligations and duties of care," including the implementation and maintenance of reasonable security measures, of which Plaintiff list eight examples. (Dkt. No. 23 at 45–46). Harris asserts that a declaratory judgment is proper because Marker Group "has not provided any reassurance to [him] that it has taken steps to prevent another Data Breach from occurring in the future." (Dkt. No. 28 at 27). Emphasizing that Harris lacks standing for this relief, Marker Group argues that Harris's request is injunctive in nature and should be dismissed. (Dkt. No. 25-1 at 27–28). Finding that only the first of Harris's two requests for declaratory judgment is proper, the Court agrees in part with Harris and in part with Marker Group.

To state a claim under the Declaratory Judgment Act, 28 U.S.C. § 🚩 28 U.S.C. §§ 2201–02, a plaintiff must allege the existence of a dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests," and that the dispute be "real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." 🚩 *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007) (cleaned up). "Further necessary or proper relief based on a declaratory judgment or decree may be granted, *after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.*" 28 U.S.C. § 2202 (emphasis added).

"Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 🚩 *MedImmune, Inc.,* 549 U.S. at 127, 127 S.Ct. at 771. Because the "Declaratory Judgment Act is 'an authorization, not a command' ... federal courts have wide discretion to grant or deny declaratory judgment." *Aguiluz v. Citibank, N.A.,* No. 2:18-CV-05126, 2018 WL 5773302, at \*5 (E.D. La. Nov. 2, 2018) (quoting *Pub. Affs. Assocs., Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962)).

**\*12** The court in *In re Capital One* reviewed a similar claim at the motion to dismiss stage and ruled against dismissal.

Logan v. Marker Group, Inc., Slip Copy (2024)

2024 WL 3489208

488 F.Supp.3d at 414–15. In that case, the court explained that "Plaintiffs have adequately alleged the existence of an actionable dispute for purposes of the Declaratory Judgment Act" because "there remains a dispute over the security of Plaintiff's [personal information], which continues to be stored on [defendant's] servers and remain subjected to a heightened risk of access and misuse by hackers." *Id.* at 414. While the defendants in that case argued that they "had corrected the very vulnerability in [the] system," the plaintiffs had "plausibly alleged the continued inadequacy of Defendant's security measures." *Id.* at 414–15. Finding that the dispute concerned the defendant's "current security practices and their continued storage of Plaintiffs' [personal information], not a hypothetical likely set of acts or omissions regarding a speculatively likely data breach scenario," the court in *In re Capital One* allowed the claim to proceed. *Id.* at 415.

Similarly, in this case, Harris has alleged that Marker Group "does not specify in its Notice of Data Breach letter what steps they have taken to prevent this from occurring again," and that, as a result, he is "at risk of harm due to the exposure of [his personal information] and Defendant's failure to address the security failings that lead to such exposure." (Dkt. No. 23 at 45). As was the case in *In re Capital One*, this case involves an ongoing dispute as to "the adequacy of any remedial measures undertaken to ensure a breach does not occur again," which, according to Harris, has "not been transparently shared with regulators or Plaintiffs[,] who retain a vested interest in ensuring that their information remains protected." (*Id.* at 9).

Marker Group points to *Khuns v. Scottrade, Inc.*, another data breach case in which the Eighth Circuit affirmed the dismissal of a "bare bones claim for declaratory relief" as "virtually unintelligible." 868 F.3d 711, 718 (8th Cir. 2017). In that case, the plaintiff focused on past conduct, not the defendant's "current practices," in requesting that the court order the defendant to obey the contract at issue. *Id.* The court concluded that it did not have this authority in the context of a contractual dispute. *Id.*

Here, Harris properly requests declaratory judgment as to whether Marker Group's security measures are in compliance with its obligations, but improperly requests that the Court effectively issue an injunction by ordering Marker Group to revise its policies. Not only does Harris lack the requisite

standing, but such relief would be premature at this stage. *See* 28 U.S.C. § 2202. Accordingly, Harris's first request as to the propriety of Marker Group's current security measures remains, while his second request for the Court to order Marker Group to change its security measures is dismissed for failing to state a claim upon which relief can be granted.

**C. REQUEST TO STRIKE ALLEGATIONS**

Marker Group requests that the Court "limit the Amended Complaint to the Marker Group data security incident and their individual experiences" by striking paragraphs 46-50 and 59-66 of the Amended Complaint, which contain "extraneous material concerning the actions of identity thieves and statistics about cybercrime." (Dkt. No 25-1 at 29). Harris responds that because "the risk of future identity theft is at the heart of the controversy in this case," striking under Rule 12(f) is inappropriate and the Court "should leave the sufficiency of the allegations for determination on the merits." (Dkt. No. 28 at 28). The Court agrees with Harris.

Under Rule 12(f) of the Federal Rules of Civil Procedure, a district court has discretion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). However, a court should only strike material from a pleading that bears "no possible relation to the controversy." *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962) (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953))). "Both because striking a portion of a pleading is a drastic remedy, and because it often is sought by the movant simply as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *FDIC*, 821 F.Supp. at 449 (citing *Augustus*, 306 F.2d at 868).

**\*13** For example, in *Fortman v. Nissan Motor Co., Ltd.*, the court denied a motion to strike because "[t]he challenged allegations regarding crashworthiness and industry safety and manufacturing standards cannot be said to have 'no possible relation' to these claims." No. 1:21-CV-00660, 2022 WL 2761372, at \*3 (W.D. Tex. Mar. 31, 2022) (quoting *Coney*, 689 F.3d at 379). In the same way, the material included in the Amended Complaint, though extraneous, cannot be said to have no possible relation to the claims at issue. In addition, as in *Fortman*, Marker Group has failed to show that

App. 081

"the presence of the challenged allegations in the pleading throughout the proceeding will be prejudicial." *Id.* (cleaned up). Although Marker Group claims that the material is "designed to improperly inflame the issues and lend weight to the alleged risk of future identity theft," (Dkt. No. 25-1 at 29), Marker Group "offer[s] nothing but vague and conclusory statements with no showing of how and to what degree [it] will be prejudiced by the inclusion of these allegations." *Fortman*, 2022 WL 2761372, at *3. Thus, the Court denies Marker Group's 12(f) request.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Marker Group's Partial Motion to Dismiss Plaintiffs' Amended Class Action Complaint. (Dkt. No. 25).

All claims brought on behalf of Plaintiffs Logan and Baxter, including Baxter's CMIA claim, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction. Harris is the sole remaining Plaintiff.

As to Harris, his negligence claim remains. However, Harris's breach of implied contract, invasion of privacy, unjust enrichment, and breach of confidence claims are **DISMISSED WITHOUT PREJUDICE** in their entirety for failure to state a claim. Harris's first request for declaratory judgment remains, but the second request is **DISMISSED WITHOUT PREJUDICE**.

Harris is **ORDERED** to file a Second Amended Complaint in conformity with this Memorandum Opinion and Order within 14 calendar days of the date of this Order.

It is SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 3489208

---

## Footnotes

1   Despite the caption, Plaintiffs have not moved to certify a class under Rule 23.

2   Also contained in the Motion is a request to strike under Federal Rule of Civil Procedure 12(f). (Dkt. No. 25 at 1).

3   For purposes of addressing this Motion, the Court accepts all factual allegations in the Complaint as true and views them in the light most favorable to the nonmovants. See *White v. U.S. Corrections, L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021).

4   "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014) (quoting 🚩*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 2219, 135 L.Ed.2d 659 (1996)). The Parties agree that the claims in this case, save the CMIA claim, are governed by Texas law. (*See* Dkt. No. 25-1 at 19–20); (Dkt. No. 28 at 21–23). Accordingly, the Court will apply Texas law to those. See 🚩*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 68 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or acts of Congress, the law to be applied in any case is the law of the state.").

5   Marker Group did not move to dismiss Harris's claim for negligence in Count 1.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4028050
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Richard SMITH and Shae Loftice, on behalf of
themselves and all others similarly situated, Plaintiffs,

v.

AMERICAN PAIN AND
WELLNESS, PLLC, Defendant.

Civil Action No. 4:23-CV-295
|
Signed September 3, 2024

**Attorneys and Law Firms**

Raina C. Borrelli, Pro Hac Vice, Brittany N. Resch, Pro Hac
Vice, Strauss Borrelli PLLC, Chicago, IL, Elton Joe Kendall,
Kendall Law Group, Dallas, TX, for Plaintiffs.

Barrett Chistopher Lesher, Hallett & Perrin PC, Dallas, TX,
Condred Curtis Roberts III, Figari & Davenport, LLP, Dallas,
TX, for Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

AMOS L. MAZZANT, UNITED STATES DISTRICT
JUDGE

**\*1** Pending before the Court is Defendant's Rule 12(b)(1)
and (6) Motion to Dismiss (Dkt. #8). Having considered the
motion and the relevant pleadings, the Court finds that the
motion should be **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

Defendant American Pain and Wellness, PLLC ("American
Pain") is a healthcare provider (Dkt. #4 at p. 3). As part
of its operations, American Pain collects and maintains
personal identifiable information ("PII") and protected health
information ("PHI") (collectively, "PII/PHI") about current
and former patients seen at its facilities (Dkt. #4 at p. 3).
American Pain is alleged to have "agreed it would safeguard
the data in accordance with its internal policies, state law, and
federal law" (Dkt. #4 at p. 3).

On November 10, 2022, cybercriminals are alleged to have
breached American Pain's systems and gained access to
patient PII/PHI (the "Data Breach") (Dkt. #4 at p. 4).
However, "Defendant has been unable to determine precisely
what information was stolen and when" (Dkt. 34 at p. 6).
Plaintiff Richard Smith ("Smith") and Plaintiff Shae Loftice
("Loftice") (collectively, "Named Plaintiffs") allege that their
PII/PHI was accessed as a result of the Data Breach (Dkt.
#4 at p. 2). American Pain notified Named Plaintiffs of
the Data Breach on March 24, 2023 (Dkt. #4 at p. 5).
In a letter notifying Named Plaintiffs of the Data Breach,
American Pain encouraged Named Plaintiffs to "remain
vigilant for incidents of fraud and identity theft by reviewing
account statements and monitoring free credit reports;"
"place a fraud alert and security freeze on one's credit
file;" "contact the Federal Trade Commission, their state
Attorney General, and law enforcement to report attempted or
actual identity theft and fraud;" "educate yourself regarding
identity theft, fraud alerts, credit freezes, and the steps
you can take to protect your personal information by
contacting the consumer reporting bureaus, the Federal
Trade Commission, or your state Attorney General" (Dkt.
#4 at p. 5) (citing *Data Breach Notifications*, MAINE
ATTY GEN., https://apps.web.maine.gov/online/aeviewer/
ME/40/5f0af895-9bce-434f-86f0-20256aa4d93c.shtml (last
visited Mar. 31, 2023)).

Smith alleges that his "[ ] name; [ ] home address; [ ] date
of birth; [ ] Social Security number; [ ] medical history; [ ]
health insurance information; and [ ] treating physician; and [ ]
diagnosis information" was compromised" (Dkt. #4 at p. 7).
Smith further alleges that he has and will continue to spend
time and effort monitoring his account to protect himself from
identity theft (Dkt. #4 at pp. 7–8). As a result of the Data
Breach, Smith alleges that he has suffered from "anxiety,
sleep disruption, stress, fear, and frustration" (Dkt. #4 at p.
8). And Smith alleges he has suffered from the diminution in
the value of his PII/PHI and an increased risk of identity theft
(Dkt. #4 at p. 8)

Loftice alleges that her "[ ] name; [ ] home address; [ ] date
of birth; [ ] medical history; [ ] health insurance information;
[ ] treating physician; and [ ] diagnosis information" was
compromised" (Dkt. #4 at p. 9). Loftice further alleges that
she has spent at least 20 hours on the Data Breach and will
continue to spend time and effort monitoring her account to
protect himself from identity theft (Dkt. #4 at p. 9). As a result
of the Data Breach, Loftice alleges that she has suffered from
"anxiety, sleep disruption, stress, fear, and frustration" (Dkt.

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

#4 at p. 10). And Loftice alleges she has suffered from the diminution in the value of her PII/PHI and an increased risk of identity theft (Dkt. #4 at p. 9)

**\*2** Loftice further alleges that, "following the Data Breach, in March 2023, [she] was notified by Credit Wise, a credit and identity protection service, of a fraudulent attempt to open a credit line with JP Morgan Chase & Co." (Dkt. #4 at p. 10). And she has "experienced an increase in spam texts and phone calls since the Data Breach" (Dkt. #4 at p. 10).

Named Plaintiffs bring this class action on behalf of themselves and all others allegedly harmed by American Pain's conduct and the resulting Data Breach (Dkt. #4 at p. 2). Smith is a citizen of Texas, residing in Tarrant County, Texas (Dkt. #4 at p. 2). Loftice is a citizen of Texas, residing in Grayson County, Texas (Dkt. #4 at p. 2). American Pain is a professional limited liability company headquartered in and doing business in Texas (Dkt. #4 at pp. 2–3).

## LEGAL STANDARD

### I. 12(b)(1) Motion to Dismiss
Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges

jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

### II. 12(b)(6) Motion to Dismiss
The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement ... showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

**\*3** In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

"not entitled to the assumption of truth." *Iqbal, 556 U.S. at 664.* Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.' "

*Morgan v. Hubert, 335 F. App'x 466, 470 (5th Cir. 2009)* (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679.*

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id. at 678* (quoting *Twombly, 550 U.S. at 570*).

### ANALYSIS

#### I. American Pain's 12(b)(1) Motion to Dismiss

American Pain argues that Named Plaintiff's claims should be dismissed under *Rule 12(b)(1)* for lack of subject matter jurisdiction because: 1) there is no diversity jurisdiction; 2) there is no federal question jurisdiction; and 3) Plaintiffs lack Article III standing (*see* Dkt. #8). The Court considers each argument in turn.

#### A. The Court has diversity jurisdiction over the parties under *28 U.S.C. § 1332(d)(2).*

American Pain first contends that the Court does not have subject matter jurisdiction over this suit because there is no diversity between the parties. Because it is undisputed that the Named Plaintiffs are citizens of Texas and American Pain is located in Texas, American Pain argues that the requirements under *28 U.S.C. § 1332(d)(2)* have not been met. Moreover, American Pain argues that the Named Plaintiffs did not adequately allege the amount in controversy under the Class Action Fairness Act ("CAFA").

#### i. There is diversity between parties.

According to American Pain, the Court must only look to the *named* plaintiffs when analyzing whether diversity exists in a class action (Dkt. #8 at p. 5) (emphasis added). In response, Named Plaintiffs argue that, under CAFA, diversity can exist between *any* plaintiff class member and any defendant (Dkt. #12 at p. 8) (emphasis added). The Court agrees with Named Plaintiffs.

"CAFA does not replace the basic diversity requirements; it supplements them. That means that a class action case not arising under federal law can be lodged in federal court if it meets either the basic diversity requirements or CAFA's requirements." *2 W. Rubenstein, Newberg on Class Actions § 6:6 (5th ed.)* (emphasis in original). Federal district courts have jurisdiction over cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties. *28 U.S.C. § 1332(a).* Alternatively, "CAFA provides district courts with jurisdiction over 'class action[s]' in which the matter in controversy exceeds $5,000,000 and at least one class member is a citizen of a State different from the defendant." *Home Depot U.S.A., Inc. v. Jackson, 587 U.S. 435, (2019)* (citing *§ 1332(d)(2)(A)*).

The Fifth Circuit has clarified that CAFA is referring to the citizenship of "any class member and any defendant." *In re Katrina Canal Litig. Breaches, 524 F.3d 700 (5th Cir. 2008).* In other words, "CAFA, in expanding federal jurisdiction over certain class actions filed in state court, escaped the rule that citizenship of the named representative is controlling." *Id.*; *see also Hart v. FedEx Ground Package Sys. Inc., 457 F.3d 675, 676-77 (7th Cir. 2006)* ("Because [the class representative] too is a citizen of Pennsylvania, *in the absence of CAFA* nothing would support federal subject-matter jurisdiction over these claims. That is because *§ 1332* requires 'complete diversity,' meaning that no plaintiff may be from the same state as any defendant, and in class actions only the citizenship of the named plaintiff counts." (emphasis added)).

**\*4** Even so, CAFA seeks to "draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state." *Hollinger, 654 F.3d at 570* (citing *Hart, 457 F.3d at 682*). "Therefore, [CAFA] provides a number of scenarios in which federal courts must abstain from exercising jurisdiction." *Madison v. ADT, L.L.C., 11 F.4th 325, 327 (5th*

App. 085

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

Cir. 2021) (citing 🚩 *Hollinger*, 654 F.3d at 570). One such scenario is the "home state" exception, "whereby the court must abstain if 'two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.' " *Id.* (citing 🚩 *Hollinger*, 654 F.3d at 570; 🚩 28 U.S.C. § 1332(d)(4)(B)).

In its Motion, American Pain does not make any argument regarding exceptions to CAFA (*see* Dkt. #8). However, at a teleconference hearing for a discovery dispute between the parties, counsel for American Pain raised additional arguments related to the home state exception. Because there is nothing in the record supporting those arguments, the Court declines to consider them at this time. [1]

It is undisputed that American Pain is considered a citizen of Texas. And Named Plaintiffs have alleged that "many members of the proposed class are from different states than [American Pain]" (Dkt. #4 at p. 3). Accordingly, based on the current record, diversity of citizenship exists between the parties under CAFA.

### ii. Named Plaintiffs sufficiently allege the amount in controversy.

In their Complaint, Named Plaintiffs allege that "the amount in controversy exceeds $5 million, exclusive of interest and costs" (Dkt. #4 at p. 3). American Pain argues that Named Plaintiffs' allegation is "unsupported" and "runs afoul of *Iqbal*'s pleading requirements" (Dkt. #8 at p. 6). *See* 🚩 *Iqbal*, 556 U.S. at 678.

Under CAFA, the aggregate amount in controversy for class or mass actions must exceed $5 million. 🚩 *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 166 (2014). The plaintiff's burden to demonstrate the amount in controversy is "[n]ormally ... satisfied if the plaintiff claims a sum greater than the jurisdictional requirement." 🚩 *White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003) (citations omitted). "The required demonstration concerns what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether the plaintiff is likely to win or be awarded everything he seeks." *Robertson v. Exxon Mobil Corp.*, 814 F.3d 236, 240 (5th Cir. 2015) (citations omitted).

"A claim for damages made in apparent good faith controls the jurisdictional question ...." *Jouett Investments Inc. v. Intuit Inc.*, No. 3:14–CV–1803–L, 2015 WL 3770715, at *7 (N.D. Tex. June 15, 2015). And the Court can apply common sense when evaluating the amount in controversy claimed. *Robertson*, 814 F.3d at 240.

Given that Named Plaintiffs have brought this action on behalf of approximately 7,457 persons who were allegedly harmed as a result of the Data Breach (*see* Dkt. #12 at p. 8), the Court finds that Named Plaintiffs have met their burden to demonstrate that the amount in controversy exceeds $5 million as required under CAFA. [2]

### B. Plaintiffs have standing.

**\*5** American Pain additionally argues that Named Plaintiffs have failed to allege injuries sufficient to confer Article III standing (Dkt. #8 at p. 8). In response, Named Plaintiffs argue that they have standing to sue based on the following alleged injuries: 1) American Pain disclosed Named Plaintiffs' private information; 2) American Pain injured Named Plaintiff's rights under contract; 3) Named Plaintiffs are now exposed to an increased risk for identity theft; 4) Plaintiff Loftice suffered fraud; 5) Named Plaintiffs have spent time and resources mitigating their chances of suffering harm; and 6) Named Plaintiffs fear for their financial security (Dkt. #12 at p. 7).

A federal court lacks jurisdiction over a claim if it does not allege an actual case or controversy. *See Attala Cnty. v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022) ("It is axiomatic that a plaintiff seeking redress in federal court must meet the initial 'requirement imposed by Article III of the Constitution by alleging an actual case or controversy.' " (citation omitted)). An actual case or controversy requires that a plaintiff have standing to sue. *Id.* To establish standing, the plaintiff must demonstrate that an injury is "[(1)] concrete, particularized, and actual or imminent; [(2)] fairly traceable to the challenged action; and [(3)] redressable by a favorable ruling." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted). "[S]tanding is

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The proposed class representatives must have Article III standing. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Green v. eBay Inc.*, No. CIV.A. 14-1688, 2015 WL 2066531, at *3 (E.D. La. May 4, 2015) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). "After all, if the class representative lacks standing, then there is no Article III suit to begin with —class certification or otherwise." *Flecha*, 946 F.3d at 769.

The Fifth Circuit has not addressed standing in the data breach context.

### i. Named Plaintiffs' injury is concrete and imminent.

The Supreme Court recently addressed standing in a similar, but distinct context. *See TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). The U. S. Treasury Department's Office of Foreign Assets Control ("OFAC") "maintains a list of 'specially designated nationals' who threaten America's national security." *TransUnion*, 594 U.S. at 419. These individuals are generally "terrorists, drug traffickers, or other serious criminals." *Id.* In *TransUnion*, a class of 8,185 plaintiffs filed suit after there were inaccurate OFAC alerts in their credit files. 1,853 of the class members (including the named plaintiff) had their credit reports containing inaccurate OFAC alerts disseminated to third parties during the period specified in the class definition. *Id.* at 421. The internal credit files of the remaining 6,332 class members were not provided to third parties during the relevant time period. *Id.*

**\*6** When evaluating whether the plaintiffs had Article III standing, the Supreme Court focused its analysis on whether the plaintiffs had suffered a "concrete harm." *Id.* at 417. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit ...." *Id.* (citing

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Supreme Court recognized that various intangible harms can be concrete. *Id.* at 425. "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425.

The Supreme Court had "no trouble concluding" that those 1,853 class members whose misleading credit reports were provided to third parties "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation such that they had Article III standing." *Id.* at 432.

However, the Supreme Court held that the remaining plaintiffs did not have standing because they did not suffer a concrete harm. In a suit for damages, the mere exposure to a risk of future harm alone is insufficient to constitute a concrete injury, unless that exposure caused an independent harm. *Id.* at 436. The risk of future harm on its own is not enough to support Article III standing. *Id.* Rather, a plaintiff must "demonstrate that the risk of future harm materialized," or a plaintiff must "factually establish a sufficient risk of future harm to support Article III standing." *Id.* at 437–38. Because the misleading OFAC alerts were never provided to third parties, nor was there a factually established risk that the credit reports would be provided to third-party businesses, the remaining plaintiffs did not have Article III standing. *Id.*

The Supreme Court went on to note that, had there been evidence that the plaintiffs "suffered some other injury[,] such as emotional injury[,] from the mere risk that their credit reports would be provided to third-party businesses" the plaintiffs could have had Article III standing. *Id.* at 437.

Following *TransUnion*, several circuit courts have spoken on the issue of standing in the data breach context. *See, e.g.,* *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146 (3d Cir. 2022); *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023).

In *Bohnak*, the Second Circuit had "no trouble concluding" that exposure of private PII to unauthorized third parties is "sufficiently concrete" to support a claim for damages. *Bohnak*, 79 F.4th at 285. To be sure, the Second Circuit held that the plaintiff's exposure "bears some relationship to a well-established common-law analog: public disclosure of

App. 087

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

private facts." *Id.* (citing Restatement (Second) Torts § 652D ("One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of ... privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.")).

In *Bohnak*, the Second Circuit further underscored that the Supreme Court in TransUnion specifically recognized that "disclosure of private information" was an intangible harm "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 286 (citing *TransUnion*, 594 U.S. at 417). Thus, an injury arising from such a disclosure is concrete for purposes of Article III standing. *Id.* Moreover, the Second Circuit held that the plaintiff's allegations established a concrete injury for a second reason—she suffered concrete harms "as a result of the risk of future harm occasioned by the exposure of her PII." *Id.* Specifically, she alleged that she incurred "out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft" and "lost time" and other "opportunity costs" associated with attempting to mitigate the consequences of the data breach. *Id.* Thus, the Second Circuit held that "[t]hese separate and concrete harms foreseeably arising from the exposure of [the plaintiff's] PII to a malign outside actor, giving rise to a material risk of future harm, independently support standing." *Id.*

**\*7** In support, in *Bohnak*, the Second Circuit cited to similar holdings from the First and Third Circuits. *Id.* at 286–87. In *Webb*, the plaintiffs brought suit against a pharmacy after their PII was allegedly exposed in a data breach. 72 F.4th at 369. One of the plaintiffs alleged actual misuse of her PII. *Id.* Another plaintiff alleged that, based on the allegations of actual misuse, there is a material risk of future misuse. *Id.* at 375. The First Circuit held that both plaintiffs plausibly alleged a concrete harm "based on an imminent and substantial risk of future harm as well as a present and concrete harm resulting from the exposure to this risk." *Id.* at 369.

The Third Circuit in *Clemens* similarly concluded:

> Following *TransUnion*'s guidance, we hold that in the data breach context, where the asserted theory of injury is

a substantial risk of identity theft or fraud, a plaintiff suing for damages can satisfy concreteness as long as [the plaintiff] alleges that the exposure to that substantial risk caused additional, currently felt concrete harms. For example, if the plaintiff's knowledge of the substantial risk of identity theft causes [the plaintiff] to presently experience emotional distress or spend money on mitigation measures like credit monitoring services, the plaintiff has alleged a concrete injury.

*Clemens*, 48 F.4th at 155-56.

The Court finds these holdings in *Bohnak, Webb,* and *Clemens* persuasive. Here, Named Plaintiffs assert six causes of action, each of which encompass at least one of the harms that satisfies Article III standing. Named Plaintiffs allege that their PII/PHI was exposed to a third party. This exposure bears some relationship to a well-established common-law analog: public disclosure of private facts. And the Supreme Court in *TransUnion* found that the disclosure of private information was an intangible harm traditionally recognized as providing a basis for suit. *TransUnion*, 594 U.S. at 425. Accordingly, Named Plaintiffs sufficiently allege a concrete injury for standing purposes under Article III.

Further, Named Plaintiffs allege that they spent time and money mitigating their risks of identity theft. In *Bohnak*, the Second Circuit held that the plaintiff alleged concrete harms when she alleged that she incurred "out of pocket expenses associated with the prevention, detection, and recover from identity theft" and "lost time" as well as "opportunity costs" associated with mitigating the data breach's impact. *Bohnak*, 79 F.4th 286. In this case, American Pain encouraged Named Plaintiffs to take precautions due to the Data Breach (Dkt. #4 at p. 5), and Named Plaintiffs allege they expended time and money to protect themselves against identity theft. Named Plaintiffs could have expended their time and money on other things; however, the Data Breach forced them to take precautions they otherwise would not have taken. *See Webb*, 72 F.4th at 377 ("[T]ime spent responding to a data breach can constitute a concrete injury sufficient to confer standing, at least when that time would otherwise have been put to profitable use.") As such, Named Plaintiffs sufficiently

App. 088

2024 WL 4028050

allege a concrete injury for standing purposes under Article III.

Named Plaintiffs also allege they suffer from emotional distress because of the Data Breach. Relying on *TransUnion*, the Third Circuit in *Clemens* recognized that "if the plaintiff's knowledge of the substantial risk of identity theft causes [the plaintiff] to presently experience emotion distress ... the plaintiff has alleged a sufficiently concrete injury." *Clemens*, 48 F.4th at 156. Here, Named Plaintiffs allege the exposure of their PII/PHI caused them emotional distress—namely anxiety, sleep disruption, stress, fear, and frustration (Dkt. #4 at pp. 8-10). Accordingly, Named Plaintiffs sufficiently allege a concrete injury for standing purposes.

**\*8** Thus, Named Plaintiffs' sufficiently allege concrete and particularized injuries for standing purposes under Article III.

For Article III standing, an injury in fact must also be "actual or imminent, not conjectural or hypothetical." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019). "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Id.* Here, American Pain advised Named Plaintiffs to, among other things, "remain vigilant for incidents of fraud and identity theft," to place fraud alerts and credit freezes on their reports, as well as report suspicious activity to the appropriate law enforcement agencies (*See* Dkt. #4 at p. 5). The suggested precautions are telling. American Pain realized Named Plaintiffs faced an actual or imminent harm from the Data Breach since third parties may use the PII/PHI for nefarious purposes. Notably, Loftice alleges that following the Data Breach she was notified "of a fraudulent attempt to open a credit line with JP Morgan Chase & Co." (Dkt. #4 at p. 10). Thus, the Court is satisfied that there is a substantial risk that the Named Plaintiffs will suffer identity theft as a result of the Data Breach.

In conclusion, Named Plaintiffs sufficiently allege concrete and particularized injuries that are imminent or actual.

### ii. Named Plaintiffs' injury is traceable to the Data Breach and their injury is redressable.

American Pain focuses solely on the argument that Named Plaintiffs have not alleged a concrete and particularized injury to satisfy Article III standing (Dkt. #8 at p. 7). Therefore, the Court will just briefly address the additional requirements for standing—traceability and redressability.

A plaintiff's alleged injury must be "fairly traceable to the defendant's allegedly unlawful conduct." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007). And "Article III standing requires identification of a remedy that will redress the individual plaintiffs' injuries." *California v. Texas*, 593 U.S. 659, 660 (2021).

Here, Named Plaintiff's alleges that American Pain's actions led to the disclosure of their private information. Thus, the Court is satisfied that Named Plaintiff's injury is fairly traceable to American Pain's alleged conduct at this stage. And Named Plaintiffs have alleged that monetary relief would compensate them, which renders their injury redressable.

### II. American Pain's 12(b)(6) Motion to Dismiss

American Pain argues that Named Plaintiff's claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim (Dkt. #8 at p. 11). Having considered the motion and the relevant pleadings, the Court finds that Named Plaintiffs have stated plausible claims for purposes of defeating a Rule 12(b)(6) motion for the following claims: 1) negligence; 2) breach of contract; 3) breach of fiduciary duty; 4) intrusion upon seclusion; and 5) unjust enrichment. However, Named Plaintiffs do not state a plausible claim for negligence per se.

Named Plaintiffs allege a claim for negligence per se, arguing that American Pain "violated [the Health Insurance Portability and Accountability Act ("HIPAA")] by failing to comply with mandated safeguards and Section 5 of the [Federal Trade Commission Act ("FTC Act")] by failing to provide fair, reasonable or adequate computer systems and data security practices to safeguard PII/PHI" (Dkt. #12 at p. 21). American Pain moves to dismiss Named Plaintiff's claim for negligence per se under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim (Dkt. #8 at p. 13). In support, American Pain argues that there is no private right of action under the FTC Act or HIPAA, so "it would be inconsistent with the legislative intent to impose private civil liability for a violation thereof" (Dkt. #8 at p. 13).

**\*9** "Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent

Smith v. American Pain and Wellness, PLLC, Slip Copy (2024)

2024 WL 4028050

person test used in pure negligence claims." *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). "Under Texas law, when a legislative body declines to provide for an individual private right of action in a statute and instead provides a comprehensive regulatory scheme with limited private remedies, that statute will not be an appropriate basis for a negligence per se claim." *Armstrong v. Sw. Airlines Co.*, No. 3:20-CV-3610-BT, 2021 WL 4391247, at *3 (N.D. Tex. Sept. 24, 2021) (citing *Smith*, 940 S.W.2d at 607–08; *Reeder v. Daniel*, 61 S.W.3d 359, 362–63 (Tex. 2001)). When "determine[ing] whether a given statute may be the basis for a negligence per se claim, Texas courts must 'consider whether recognizing such an accompanying civil action would be inconsistent with legislative intent.' " *Id.* (quoting *Reeder*, 61 S.W.3d at 362). "Texas courts 'will not disturb the Legislature's regulatory scheme by judicially recognizing a cause of action' not contemplated in the statute." *Id.* (quoting *Reeder*, 61 S.W.3d at 364).

The FTC Act does not create a private cause of action. *Thomas v. Culpepper*, No. 4:18-CV-814-ALM-CAN, 2019 WL 6037992 (E.D. Tex. July 29, 2019), *report and recommendation adopted*, No. 4:18-CV-814, 2019 WL 4564837 (E.D. Tex. Sept. 20, 2019) (citing *Fulton v. Hecht*, 580 F.2d 1243, 1248 n.2 (5th Cir. 1978)). Likewise, "there is no private cause of action under HIPAA." *Acara v. Banks*, 470 F.3d 569, 572 (5th Cir. 2006). Other Texas state courts and federal courts applying Texas law have declined to recognize negligence per se claims based upon statutes that do not create a private right of action. *See, e.g.,* *Smith*, 940 S.W.2d at 607 (holding that violating section 106.06 of the Texas Alcohol Beverage Code "does not create a negligence per se cause of action" because "[t]o hold otherwise would ignore the intent and policies of the Legislature."); *Baker v. Smith & Nephew Richards, Inc.*, No. 95-58737, 1999 WL 811334, at *18 (152nd Dist. Ct., Harris County, Tex.

June 7, 1999), *aff'd sub nom. McMahon v. Smith & Nephew Richards, Inc.*, No. 14-99-00616-CV, 2000 WL 991697 (Tex. App.—Houston [14th Dist.] July 20, 2000, no pet.) (mem. op., not designated for publication) (holding where there is "Congressional prohibition of private rights of action" under a statute, allowing negligence per se claims based upon that statute would be "both legally improper and ill-advised"); *Armstrong*, 2021 WL 4391247, at *4 (holding the Air Carrier Access Act that "precludes a private right of action ... is not a proper basis for a negligence per se claim under Texas law"); *Walters v. Blue Cross & Blue Shield of Texas, Inc.*, No. 3:21-CV-981-L, 2022 WL 902735, at *6 (N.D. Tex. Mar. 28, 2022) (holding that HIPAA is not a proper basis for a negligence per se claim under Texas law because the statute does not contain a private right of action). Given these prior rulings, the Court finds that neither the FTC Act nor HIPAA is an appropriate basis for a negligence per se claim. Named Plaintiffs' negligence per se claims should be dismissed.

## CONCLUSION

For the foregoing reason, Defendant's Rule 12(b)(1) and (6) Motion to Dismiss (Dkt. #8) is hereby **GRANTED in part** and **DENIED in part.**

Specifically, it is **ORDERED** that Plaintiffs Richard Smith's and Shae Loftice's claims for negligence per se are **DISMISSED with prejudice.**

It is further **ORDERED** that Defendant American Pain and Wellness, PLLC's Rule 12(b)(1) and (6) Motion to Dismiss is **DENIED** in all other respects.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2024 WL 4028050

## Footnotes

1    The Court will consider additional arguments related to jurisdiction in the event that they are properly presented.

2    Because Named Plaintiffs are not claiming that federal question jurisdiction exists, (*see* Dkt. #4 at p. 3), and there is currently a basis for diversity jurisdiction (*see supra*), the Court declines to consider whether it has federal question jurisdiction at this time.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Blue Flag – Appeal Notification

Appeal Filed by   Williams v. Bienville Orthopaedic,   5th Cir.,   July 19, 2024

2024 WL 3387169
Only the Westlaw citation is currently available.
United States District Court, S.D.
Mississippi, Southern Division.

Charles WILLIAMS, Amber Cochran, Casey Crosby,
Robert Fendley, Guy Schenck, Debbie Slusser,
Robert Harris, and Richard Rose, individually and
behalf of all others similarly situated, Plaintiffs
v.
BIENVILLE ORTHOPAEDIC
SPECIALISTS, LLC, Defendant

Cause No. 1:23CV232-LG-MTP
|
Signed June 18, 2024

**Synopsis**
**Background:** Patients brought putative class action against
healthcare provider alleging negligence, unjust enrichment,
breach of implied contract, breach of fiduciary duty, and
invasion of privacy arising from data breach of provider's
computer network, which purportedly leaked patients'
personally identifiable information (PII) and protected
health information (PHI), including names, Social Security
numbers, dates of birth, medical information, health insurance
information, usernames and passwords, financial account
information, and driver's license numbers. Patients sought
declaratory and injunctive relief, monetary damages, pre-
and post-judgment interest, attorneys' fees, and expenses.
Provider moved to dismiss for lack of standing and for failure
to state a claim.

**Holdings:** The District Court, Louis Guirola, Jr., J., held that:

[1] patients who alleged that they had already experienced
actual fraud and data misuse following breach suffered
concrete injuries sufficient for federal standing to seek
monetary damages;

[2] patient who claimed he experienced influx of spam phone
calls after data breach did not suffer concrete injuries-in-fact
for standing purposes;

[3] patients who did not allege misuse or actual access of their
private information did not suffer concrete injuries-in-fact for
standing purposes;

[4] patients' claims that they suffered injuries-in-fact
sufficient for federal standing based on lack of benefit-of-
the-bargain and diminished value of their private information,
were not well-taken;

[5] alleged misuse of patients' PII was not an injury that was
fairly traceable to data breach, as required for patients' federal
standing to seek monetary damages; and

[6] patients lacked federal standing to seek injunctive or
declaratory relief.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Lack of
Standing; Motion to Dismiss for Failure to State a Claim.

West Headnotes (32)

**[1]**   **Constitutional Law** 🔑 Nature and scope in
general
**Federal Courts** 🔑 Case or Controversy
Requirement

In order to preserve the separation of powers,
Article III of the United States Constitution
limits judicial power to cases and controversies.
U.S. Const. art. 3, § 2, cl. 1.

**[2]**   **Federal Civil Procedure** 🔑 In general;
injury or interest
**Federal Courts** 🔑 Case or Controversy
Requirement

For there to be a case or controversy under
Article III, the plaintiff must have a personal
stake in the case, in other words, federal standing
to sue. U.S. Const. art. 3, § 2, cl. 1.

**[3]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

Williams v. Bienville Orthopaedic Specialists, LLC, --- F.Supp.3d ---- (2024)

2024 WL 3387169

**Federal Civil Procedure** 🔑 Causation; redressability

In order to establish federal standing, a plaintiff must show: (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. U.S. Const. art. 3, § 2, cl. 1.

**[4]** **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

**Federal Courts** 🔑 Case or Controversy Requirement

If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve, as required for federal standing. U.S. Const. art. 3, § 2, cl. 1.

**[5]** **Federal Civil Procedure** 🔑 Representation of class; typicality; standing in general

Every member of a class action must have federal standing in order to recover individual damages. U.S. Const. art. 3, § 2, cl. 1.

**[6]** **Federal Courts** 🔑 Pleadings and motions

Where the movant mounts a facial attack on jurisdiction on federal standing grounds based only on the allegations in the complaint, the court simply considers the sufficiency of the allegations in the complaint because they are presumed to be true. U.S. Const. art. 3, § 2, cl. 1.

**[7]** **Federal Courts** 🔑 Pleadings and motions

In order to survive a facial attack on jurisdiction, the plaintiff must clearly allege facts demonstrating each element of federal standing. U.S. Const. art. 3, § 2, cl. 1.

**[8]** **Federal Civil Procedure** 🔑 In general; injury or interest

If a plaintiff fails to establish federal standing, the plaintiff's claim must be dismissed for lack of jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[9]** **Federal Civil Procedure** 🔑 Representation of class; typicality; standing in general

In a class action, to establish federal standing, the named plaintiffs representing a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they purport to represent. U.S. Const. art. 3, § 2, cl. 1.

**[10]** **Constitutional Law** 🔑 Requirement that complainant be injured

**Federal Civil Procedure** 🔑 In general; injury or interest

"Concrete injuries," as required for federal standing, include constitutional harms, traditional tangible harms such as physical and monetary harms, and various intangible harms, including injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. U.S. Const. art. 3, § 2, cl. 1.

**[11]** **Federal Civil Procedure** 🔑 In general; injury or interest

A "concrete injury," as required for federal standing, must be de facto, that is, it must actually exist; it must be real, and not abstract. U.S. Const. art. 3, § 2, cl. 1.

**[12]** **Federal Civil Procedure** 🔑 In general; injury or interest

The term concrete is not necessarily synonymous with "tangible," for purposes of federal

Case 4:24-cv-03300 Document 17-3 Filed on 10/29/24 in TXSD Page 96 of 107
Williams v. Bienville Orthopaedic Specialists, LLC, --- F.Supp.3d ---- (2024)

2024 WL 3387169

standing's concrete injury requirement. U.S. Const. art. 3, § 2, cl. 1.

**[13]  Federal Civil Procedure** ⬥ In general; injury or interest

When analyzing whether an intangible harm is a concrete injury, as required for federal standing, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. U.S. Const. art. 3, § 2, cl. 1.

**[14]  Finance, Banking, and Credit** ⬥ Credit reporting

The presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm, as required for federal standing; therefore, the risk of future harm arising from inaccurate credit reporting is not a concrete injury in fact. U.S. Const. art. 3, § 2, cl. 1.

**[15]  Telecommunications** ⬥ Persons entitled to sue, standing, and parties

Evidence of a mere data breach does not, standing alone, satisfy the concrete injury in fact requirements of federal standing. U.S. Const. art. 3, § 2, cl. 1.

**[16]  Health** ⬥ Parties

Patients who alleged that they had already experienced actual fraud and data misuse following data breach, including nonconsensual posting of their private information on the dark web, asserted concrete injuries sufficient to establish federal standing to seek monetary damages from healthcare provider arising from purported leak of patients' personally identifiable information (PII) and protected health information (PHI) via data breach; patients alleged unauthorized charges on credit account and notification of multiple fraudulently-opened accounts at credit union,

which took time and money to address, as well as anxiety, sleep disruption, stress, fear, and frustration, and patients claimed that credit monitoring companies notified them that their private information was on dark web. U.S. Const. art. 3, § 2, cl. 1.

**[17]  Health** ⬥ Parties

Patient who claimed he had experienced actual data misuse following data breach via influx of spam phone calls did not suffer concrete injury sufficient to seek monetary damages from healthcare provider arising from breach, where patient alleged that in one call, a person posing as a Medicare representative had patient's name, date of birth, and Medicare number, and that patient spent several hours investigating data breach, replacing his insurance card, obtaining a new Medicare number, and taking other actions in an attempt to mitigate his damages. U.S. Const. art. 3, § 2, cl. 1.

**[18]  Health** ⬥ Parties

Patients who did not allege misuse or actual access of their private information did not suffer concrete injuries sufficient for federal standing to seek monetary damages from healthcare provider arising from data breach; patients merely contended that they expended money to mitigate their damages, and suffered anxiety, sleeplessness, and other forms of emotional distress. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

**[19]  Health** ⬥ Parties

Patients' claims, in putative class action against healthcare provider seeking monetary damages arising from data breach, that they suffered injuries-in-fact sufficient for federal standing based on lack of benefit-of-the-bargain and diminished value of their private information, were not well-taken by the District Court at motion to dismiss stage; there was no allegation that any of the patients paid a certain amount of money to healthcare provider in exchange for

protection of their private information or that they intended to sell their private information. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

**[20]   Federal Civil Procedure**  👈 Causation; redressability

Where a causal relation between injury and challenged action depends upon the decision of an independent third party, federal standing is not precluded, but it is ordinarily substantially more difficult to establish; to meet their burden, plaintiffs must show at the least that third parties will likely react in predictable ways. U.S. Const. art. 3, § 2, cl. 1.

**[21]   Federal Civil Procedure**  👈 Causation; redressability

Tracing a concrete injury for purposes of determining federal standing is not the same as seeking its proximate cause. U.S. Const. art. 3, § 2, cl. 1.

**[22]   Federal Civil Procedure**  👈 Causation; redressability

A plaintiff cannot establish that an injury is fairly traceable, for purposes of federal standing, by proposing a speculative chain of possibilities. U.S. Const. art. 3, § 2, cl. 1.

**[23]   Health**  👈 Parties

Alleged misuse of patients' personally identifiable information (PII) was not an injury that was fairly traceable to healthcare provider's data breach, as required for federal standing of patients to seek monetary damages from provider arising from breach; such information was so commonly stolen in a myriad of ways, often without victims' knowledge, that it was seemingly impossible to trace the misuse of personal information to one particular breach, and patients merely alleged that they experienced misuse of their PII or learned that some of their

PII had been stolen during healthcare provider's data breach. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

**[24]   Federal Civil Procedure**  👈 Pleading

Plaintiffs generally have the burden of stating a plausible set of facts establishing jurisdiction to maintain federal standing at motion to dismiss stage. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[25]   Federal Civil Procedure**  👈 Pleading

Plausibility standard applicable to motions to dismiss for lack of federal standing is derived from the standards used for resolving motions to dismiss for failure to state a claim, under which detailed factual allegations are not required, but unadorned, the-defendant-unlawfully-harmed-me accusations are insufficient, and factual allegations must support claims to relief that are facially plausible, not merely speculative. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**[26]   Federal Courts**  👈 Dismissal or other disposition

A motion to dismiss for lack of federal standing should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[27]   Federal Civil Procedure**  👈 Information and belief

"Information and belief" pleadings are generally deemed permissible, especially in cases in which the information is more accessible to the defendant.

**[28]   Declaratory Judgment**  👈 Subjects of relief in general

Patients failed to allege facts tending to show that a second data breach was currently impending or that there was a substantial risk that one would occur, and thus lacked federal standing to seek declaratory or injunctive relief arising from data breach of healthcare provider's system; patients argued that provider's actions had been and continued to be inadequate and unreasonable, and that they therefore continued to suffer injury from the ongoing threat of fraud and identity theft. U.S. Const. art. 3, § 2, cl. 1.

**[29]  Declaratory Judgment** 🔑 Proper Parties

Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements for federal standing. U.S. Const. art. 3, § 2, cl. 1.

**[30]  Declaratory Judgment** 🔑 Proper Parties

Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement of federal standing only by demonstrating a continuing injury or threatened future injury; that continuing or threatened future injury, like all injuries supporting federal standing, must be an injury in fact. U.S. Const. art. 3, § 2, cl. 1.

**[31]  Injunction** 🔑 Persons entitled to apply; standing

To have federal standing, a plaintiff seeking injunctive relief must show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact and demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. U.S. Const. art. 3, § 2, cl. 1.

**[32]  Injunction** 🔑 Persons entitled to apply; standing

The pertinent inquiry in assessing federal standing to seek injunctive relief is whether the future risk of harm is sufficiently imminent and substantial. U.S. Const. art. 3, § 2, cl. 1.

### Attorneys and Law Firms

Jonathan Matthew Eichelberger, Eichelberger Law Firm, PLLC, Jackson, MS, Danielle L. Perry, Pro Hac Vice, Lisa A. White, Pro Hac Vice, Mason LLP, Washington, DC, Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Raina C. Borrelli, Pro Hac Vice, Strauss Borrelli PLLC, Chicago, IL, for Plaintiff Charles Williams.

Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Lisa A. White, Pro Hac Vice, Mason, LLP, Washington, DC, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, for Plaintiffs Amber Cochran, Casey Crosby.

Robert G. Germany, Germany Law Firm, PLLC, Madison, MS, Daniel Srourian, Pro Hac Vice, Srourian Law Firm, PC, Los Angeles, CA, Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Lisa A. White, Pro Hac Vice, Mason, LLP, Washington, DC, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, for Plaintiff Robert Fendley.

Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Danielle L. Perry, Lisa A. White, Pro Hac Vice, Mason LLP, Washington, DC, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, for Plaintiff Guy Schenck.

Jonathan Matthew Eichelberger, Eichelberger Law Firm, PLLC, Jackson, MS, Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Gary M. Klinger, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman, PLLC, Chicago, IL, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, Justin C. Walker, Pro Hac Vice, Markovits, Stock & De Marco, LLC, Cincinnati, OH, Lisa A. White, Pro Hac Vice, Mason, LLP, Washington, DC, for Plaintiff Debbie Slusser.

Justin G. Witkin, Aylstock, Witkin, Kreis & Overholtz, PLLC, Pensacola, FL, Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Jeff Ostrow, Pro Hac Vice, Steven Patrick Sukert, Pro Hac Vice, Kopelowitz Ostrow P.A., Fort Lauderdale, FL, Lisa A. White, Pro Hac Vice, Mason, LLP, Washington, DC, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, William Peerce Howard, Pro Hac Vice, The Consumer Protection Firm, PLLC, Tampa, FL, for Plaintiff Robert Harris.

Case 4:24-cv-03300   Document 17-3   Filed on 10/29/24 in TXSD   Page 99 of 107
Williams v. Bienville Orthopaedic Specialists, LLC, --- F.Supp.3d ---- (2024)

2024 WL 3387169

Jonathan Matthew Eichelberger, Eichelberger Law Firm, PLLC, Jackson, MS, Erik S. Heninger, Heninger Garrison Davis, LLC, Birmingham, AL, Lisa A. White, Pro Hac Vice, Mason, LLP, Washington, DC, Raina C. Borrelli, Strauss Borrelli PLLC, Chicago, IL, for Plaintiff Richard Rose.

Jeffrey S. Moore, Andrew W. Coffman, Phelps Dunbar, LLP, Tupelo, MS, Alfred Paul LeBlanc, Jr., Pro Hac Vice, James Walter Green, Pro Hac Vice, Phelps Dunbar, LLP, Baton Rouge, LA, for Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

LOUIS GUIROLA, JR., UNITED STATES DISTRICT JUDGE

**\*1  BEFORE THE COURT** is the [28] Motion to Dismiss filed by Defendant Bienville Orthopaedic Specialists, LLC, in this consolidated, [1] putative class action that arose out of a data breach of Bienville's computer network. Plaintiffs, who are current and former patients of Bienville, have filed a response in opposition to the Motion, and Bienville has filed a reply. After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that Bienville's Motion to Dismiss should be granted because Plaintiffs have not alleged sufficient facts to demonstrate standing to pursue this lawsuit.

## BACKGROUND

Bienville provides orthopedic healthcare to patients at five clinics located on the Mississippi Gulf Coast. (Compl. at 6, ECF No. 27). Plaintiffs are patients who provided personal information to Bienville in order to receive medical care. (*Id.* at 33-50).

On September 1, 2023, Bienville issued a notice that cybercriminals had accessed files in its network that contained the "personally identifiable information" ("PII") and "protected health information" ("PHI") of Plaintiffs and members of the proposed class. The PII and PHI included in the accessed files included patients' names, Social Security numbers, dates of birth, medical information, health insurance information, usernames and passwords, financial account information, and driver's license numbers. (*Id.* at 2, 9). Plaintiffs attempt to assert the following claims

against Bienville, individually and on behalf of all others similarly situated: negligence, unjust enrichment, breach of implied contract, breach of fiduciary duty, and invasion of privacy. They seek declaratory and injunctive relief, monetary damages, pre- and post-judgment interest, attorneys' fees, and expenses. Bienville seeks dismissal of Plaintiffs' Complaint for lack of standing and failure to state a plausible claim for relief.

## DISCUSSION

### I. ARTICLE III STANDING

**[1]**   **[2]**   **[3]**   **[4]** In order to preserve the separation of powers, Article III of the United States Constitution limits judicial power to cases and controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341-42, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *see also* U.S. CONST. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake in the case — in other words, standing.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (internal quotation marks omitted). In order to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423, 141 S.Ct. 2190. In other words, "[i]f the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.*

**\*2  [5]**   **[6]**   **[7]**   **[8]**   **[9]** "Every class member must have Article III standing in order to recover individual damages." *Id.* at 431, 141 S.Ct. 2190. "Where, as here, the movant mounts a facial attack on jurisdiction based only on the allegations in the complaint, the court simply considers the sufficiency of the allegations in the complaint because they are presumed to be true." *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (internal quotation marks omitted). In order to survive a facial attack, the plaintiff must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (alterations omitted). If the plaintiff fails to establish standing, the plaintiff's claim must

Williams v. Bienville Orthopaedic Specialists, LLC, --- F.Supp.3d ---- (2024)

2024 WL 3387169

be dismissed for lack of jurisdiction pursuant to *Fed. R. Civ. P.* 12(b)(1). *Lewis v. Knutson,* 699 F.2d 230, 237 (5th Cir. 1983). In a class action, the named plaintiffs representing a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n,* 70 F.4th 914, 924 n.12 (5th Cir. 2023). Because Bienville only challenges the concrete injury in fact and causation elements of standing, the Court limits its analysis to those two standing elements.

## A. PLAINTIFFS' CLAIMS FOR MONETARY RELIEF

### 1. WHETHER PLAINTIFFS HAVE ALLEGED A CONCRETE INJURY-IN-FACT

**[10]** Bienville first argues that Plaintiffs have failed allege a concrete injury-in-fact. "Concrete injuries include constitutional harms, traditional tangible harms such as 'physical' and 'monetary' harms, and 'various intangible harms,' including 'injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.' " *Lutostanski v. Brown,* 88 F.4th 582, 586 (5th Cir. 2023) (quoting *TransUnion,* 594 U.S. at 424, 141 S.Ct. 2190).

The Fifth Circuit has not yet had the opportunity to address the issue of Article III standing in the context of a data breach case, but other circuits have looked to a series of Supreme Court cases concerning intangible injuries for guidance: (1) *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013); (2) *Spokeo, Inc. v. Robins,* 578 U.S. 330, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016); and (3) *TransUnion LLC v. Ramirez,* 594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). In *Clapper,* the plaintiffs filed a lawsuit seeking a declaration that an amendment to the Foreign Intelligence Surveillance Act was unconstitutional as well as an injunction prohibiting surveillance under that amendment. *568 U.S. at 401, 133 S.Ct. 1138.* The plaintiffs claimed that their work "require[d] them to engage in sensitive international communications with individuals who they believe[d] [were] likely targets of surveillance." *Id.* The plaintiffs argued that they had standing to challenge the amendment because there was an "objectively reasonable likelihood" that their communications with these foreign contacts would be intercepted due to the amendment. *Id. at 410, 133 S.Ct. 1138.* The Supreme Court rejected this argument because the plaintiffs did not allege an imminent injury that was fairly traceable to the statutory amendment; rather, they submitted a "speculative chain of possibilities" that they would be injured if their foreign contacts were subjected to future surveillance. *Id. at 414, 133 S.Ct. 1138.* The Supreme Court also rejected the plaintiffs' assertion that they had undertaken "costly and burdensome" measures to avoid surveillance authorized by the FISA amendment. *Id. at 415, 133 S.Ct. 1138.* It explained that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id. at 416, 133 S.Ct. 1138.*

**[11]** **[12]** **[13]** In *Spokeo, Inc. v. Robins,* the plaintiff claimed that Spokeo's "people search engine" disseminated incorrect information about him. *578 U.S. at 333, 136 S.Ct. 1540.* The Supreme Court stated, "A 'concrete' injury must be 'de facto'; that is, it must actually exist.... When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.' " *Id. at 340, 136 S.Ct. 1540.* Nevertheless, " '[c]oncrete' is not ... necessarily synonymous with 'tangible.' " *Id.* When analyzing whether an intangible harm is concrete, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id. at 341, 136 S.Ct. 1540.* After noting that inaccurate information does not necessarily "cause harm or present any material risk of harm," the Supreme Court remanded the case to the Ninth Circuit for a determination of whether the plaintiff had alleged a concrete injury. *Id. at 342-43, 136 S.Ct. 1540.*

**\*3** In the wake of *Spokeo* and *Clapper,* an apparent circuit split developed concerning whether plaintiffs claiming injury from a data breach had alleged an injury in fact. *See, e.g., Remijas v. Neiman Marcus Grp., LLC,* 794 F.3d 688, 691-95 (7th Cir. 2015) (explaining that "customers

App. 098

should not have to wait until hackers commit identity theft or credit-card fraud in order to give the class standing, because there is an 'objectively reasonable likelihood' that such an injury will occur"); *but see* 🚩*In re SuperValu, Inc.*, 870 F.3d 763, 769-70 (8th Cir. 2017) (plaintiffs lacked standing because they did not allege that their personal information was misused). Meanwhile, the Eleventh Circuit recognized that some data "breaches may present greater risk of identity theft than others," but it held that the plaintiffs' alleged harms of substantial future risk of identity theft, proactive mitigation costs, and conclusory allegations of unauthorized charges failed to confer standing. 🚩*Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1340-44 (11th Cir. 2021).

**[14]** The Supreme Court brought more clarity to the issue in 🚩*TransUnion*, which concerned violations of the Fair Credit Reporting Act. In 🚩*TransUnion*, the court determined that plaintiffs who claimed that a credit reporting agency had provided incorrect credit reports to third-party businesses "had demonstrated "concrete reputational harm and thus [had] standing to sue ...." 🚩594 U.S. at 417, 141 S.Ct. 2190. However, plaintiffs whose credit files were not provided to third-party businesses did not have standing to sue. 🚩*Id.* The Court explained that the "presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." 🚩*Id.* at 434, 141 S.Ct. 2190. Therefore, "the mere risk of future harm" is not a concrete injury in fact. 🚩*Id.* at 436-37, 141 S.Ct. 2190.

Since the 🚩*TransUnion* decision was issued, only a few circuit courts have considered standing in data breach cases. In a Third Circuit case, a plaintiff filed a putative class action after hackers accessed her former employer's servers through a phishing attack. 🚩*Clemens v. Execupharm, Inc.*, 48 F.4th 146, 150 (3d Cir. 2022). After learning of the attack, the plaintiff took several measures to protect her financial accounts, including subscribing to credit monitoring services. 🚩*Id.* at 151. She sued her former employer and alleged that she had standing due to these mitigation measures as well as the risk of future identity theft and fraud. 🚩*Id.* The Third Circuit explained:

[A]llegations of future injury suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur. A substantial risk means a realistic danger of sustaining a direct injury. While plaintiffs are not required to demonstrate that it is literally certain that the harms they identify will come about, a possible future injury — even one with an objectively reasonable likelihood of occurring — is not sufficient.

🚩*Id.* at 152-53. The 🚩*Clemens* court further held that, pursuant to 🚩*TransUnion*, "a plaintiff suing for damages can satisfy concreteness as long as he alleges that the exposure to that substantial risk caused additional, currently felt concrete harms." 🚩*Id.* at 155-56. "For example, if the plaintiff's knowledge of the substantial risk of identity theft causes him to presently experience emotional distress or spend money on mitigation measures like credit monitoring services, the plaintiff has alleged a concrete injury." 🚩*Id.* Based on these considerations, the Third Circuit held that the plaintiff had standing to assert contract, tort, and breach of fiduciary duty claims. 🚩*Id.* at 156.

The First Circuit considered the 🚩*TransUnion* decision in the context of a data breach in 🚩*Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023). In that case, two plaintiffs — Webb and Charley — brought a putative class action against a home-delivery pharmacy service that experienced a data breach that enabled hackers to gain access to their PII. The plaintiffs claimed that they had spent "considerable time and effort" monitoring their accounts and had experienced emotional distress including stress, fear, and sleep disruption. 🚩*Id.* at 370. The First Circuit held that Webb had alleged a concrete injury in fact "based on the plausible pleading that the data breach resulted in the misuse of her PII by an unauthorized third party ... to file a fraudulent tax return." 🚩*Id.* at 373. Furthermore, the misuse of Webb's PII to file a fraudulent tax return assisted Charley

in demonstrating standing even though her PII had not been misused." *Id.* at 374.

**\*4** The Second Circuit addressed the effect of *TransUnion* on data breach claims in *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276 (2d Cir. 2023). In that case, a plaintiff filed a putative class action alleging that her former employer failed to adequately secure her PII, which was accessed by an "unauthorized actor" who "leveraged a vulnerability in a third party's software." 79 F.4th at 281. Relying on the holding in *TransUnion*, the court determined that the plaintiff had alleged a concrete injury that was actual or imminent. *Id.* at 283. The court found that the "exposure of Bohnak's PII to unauthorized third parties—bears some relationship to a well-established common-law analog: public disclosure of private facts." *Id.* at 285. The plaintiff had suffered separate concrete harms as a result of the risk of future harm in the form of "out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and lost time and other opportunity costs associated with attempting to mitigate the consequences of the data breach." *Id.* at 285 (internal quotation marks omitted).

**[15]** In *Green-Cooper v. Brinker Int'l, Inc.*, the Eleventh Circuit explained, "We typically require misuse of the data cybercriminals acquire from a data breach because such misuse constitutes both a 'present' injury and a 'substantial risk' of harm in the future." 73 F.4th 883, 889 (11th Cir. 2023), *cert. denied sub nom. Brinker Int'l, Inc. v. Steinmetz,* ⸺ U.S. ⸺, 144 S.Ct. 1457, 218 L.Ed.2d 689 (2024) (citing *Tsao, 986 F.3d at 1343–44*). The plaintiffs' allegations that hackers took credit card data and other personal data from the Chili's restaurant systems and "affirmatively posted that information for sale" on an online marketplace for stolen payment data, constituted misuse. *Id.* at 886, 889-90. This misuse constituted both a present injury and a substantial risk of future injury, thus satisfying the concrete injury requirement of Article III standing." *Id.* at 890. The Eleventh Circuit noted that its prior decision in *Tsao* was consistent with *TransUnion*. *Id.* at 890 n.9. As a result, *Tsao*'s holding that "[e]vidence of a mere data breach does not, standing alone, satisfy the requirements of

Article III standing" has not been overturned. *Tsao, 986 F.3d at 1344.*

**[16]**   In the present case, Plaintiffs allege that cybercriminals had access to their PII and PHI between at least February 3, 2023, and March 5, 2023, when Bienville "detected" the breach. (Compl. at 99, ECF No. 27). Their complaint states, "Given the sensitivity of the [p]rivate [i]nformation involved in this Data Breach, Plaintiffs and Class Members have all suffered damages and will face a substantial risk of additional injuries for the rest of their lives." (*Id.* at 29). It further asserts:

> Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:
>
> a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;
>
> b. Purchasing credit monitoring and identity theft prevention services;
>
> c. Placing "freezes" and "alerts" with reporting agencies;
>
> d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;
>
> e. Contacting financial institutions and closing or modifying financial accounts; and
>
> f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for the rest of their lives.

(*Id.* at 32). They state that they have also "suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm for the rest of their lives." (*Id.* at 33).

They further claim that their PII and PHI are now "in the hands of cybercriminals" due to the breach and that their private information now has less value as a result of the breach. (*Id.* at 29-31). According to Plaintiffs, they were also damaged in that they did not receive the "benefit-of-

App. 100

the-bargain" because they "overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not." (*Id.* at 31).

**\*5** Plaintiff Charles Williams alleges that he "has already experienced actual fraud and data misuse following the Data Breach." (*Id.* at 34). Several unauthorized charges totaling around $17,000 were made on his credit union account in late February 2023. (*Id.*). "Shortly thereafter, [he] was notified of multiple accounts fraudulently opened in his name with the same credit union." (*Id.*). According to the Complaint,

> [a]ll these actions have taken several hours away from Plaintiff Williams' valuable time that he otherwise would have spent on other activities and opportunities. Moreover, Plaintiff Williams has had to expend his own money in an attempt to address the harms of the Data Breach, including money he spent for gas to travel to and from the bank when he was working to resolve the fraudulent transactions and fraudulently opened accounts.

(*Id.* at 34-35). The breach has allegedly resulted in "anxiety, sleep disruption, stress, fear, and frustration." (*Id.* at 35).

Plaintiff Robert Fendley claims that "he has already experienced actual data misuse following the Data Breach" because he "began experiencing an influx of spam phone calls" in July or August 2023. (*Id.* at 37). In one of these calls, a person posing as a Medicare representative had Fendley's name, date of birth, and Medicare number. (*Id.*). Fendley spent several hours investigating the data breach, replacing his insurance card, obtaining a new Medicare number, and taking other actions in an attempt to mitigate his damages. (*Id.*). Plaintiffs Guy Schenck and Richard Rose claim that the date breach caused them injury because credit monitoring companies notified them that their private information had been posted on the dark web. [2] (*Id.* at 39, 49).

**[17]** The Court finds that Williams, Schenck, and Rose have alleged a concrete injury sufficient to establish Article III standing to seek monetary damages. *See* Green-Cooper, 73 F.4th at 889 (holding that allegations that personal

information was exposed for theft and sale on the dark web is sufficient to establish an injury in fact). However, Fendley's allegation of an increase in spam phone calls is insufficient to establish an injury in fact. *See McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023) ("Spam calls ... have become very common in this digitized world, and a number of courts have declined to confer standing when considering an increase in spam communications."); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1052 (N.D. Cal. 2022) (allegations of "various forms of spam ... fall short of actual identity theft," particularly where there are no allegations that these attempts were successful); *Cooper v. Bonobos, Inc.*, No. 21-CV-854 (JMF), 2022 WL 170622, at \*5 (S.D.N.Y. Jan. 19, 2022) (noting that "[c]ourts have generally rejected the theory that unsolicited calls or emails constitute an injury in fact").

**[18]** Slusser, [3] Crosby, Cochran, and Harris also have not alleged an injury-in-fact because they have not alleged misuse or actual access of their private information. *See Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 824 (5th Cir. 2022) ("[I]f a risk hasn't materialized, the plaintiff hasn't yet been injured."); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621-22 (4th Cir. 2018) (noting that "a mere compromise of personal information, without more, fails to satisfy the injury-in-fact element in the absence of an identity theft"). The Court further finds that these plaintiffs' claimed mitigation expenses, anxiety, sleeplessness, and other forms of emotional distress are insufficient to establish standing in the absence of allegations of misuse or actual theft of the data. *See* Tsao, 986 F.3d at 1345 (explaining that a plaintiff "cannot conjure standing ... by inflicting injuries on himself to avoid an insubstantial, non-imminent risk of identity theft"); *Baron v. Syniverse Corp.*, No. 8:21-CV-2349-SCB-SPF, 2022 WL 6162696, at \*7 (M.D. Fla. Oct. 7, 2022) ("Absent a showing that the [data breach] is an intangible harm sufficiently concrete to confer standing, Plaintiffs' allegation of emotional harm resulting from the same also fails to confer standing.").

**\*6** **[19]** Finally, the named plaintiffs' claims of injury-in-fact based on lack of benefit-of-the-bargain and diminished value of private information are not well-taken. *See C.C. v. Med-Data Inc.*, No. 21-2301-DDC-GEB, 2022 WL 970862, at \*\*6-11 (D. Kan. Mar. 31, 2022); *Legg v. Leaders Life Ins. Co.*, 574 F. Supp. 3d 985, 993 (W.D. Okla. 2021). There is no allegation that any of the plaintiffs paid a certain amount

of money to Bienville in exchange for protection of their private information or that they intend to sell their private information.

## 2. WHETHER PLAINTIFFS' ALLEGED INJURIES ARE FAIRLY TRACEABLE TO THE DATA BREACH

Article III standing analysis does not end with a finding that a plaintiff has suffered an injury in fact. Plaintiffs must also plead sufficient facts to establish that the misuse of their private information was fairly traceable to the Bienville data breach. *See* ⚠️ *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). Since the Court has previously found that only Williams, Schenck, and Rose have asserted an injury-in-fact for Article III purposes, it is only necessary to determine whether these plaintiffs' alleged injuries are fairly traceable to the data breach.

[20]   [21]   [22]   The Fifth Circuit has explained:

> Tracing an injury is not the same as seeking its proximate cause. Where, as here, a causal relation between injury and challenged action depends upon the decision of an independent third party[,] standing is not precluded, but it is ordinarily substantially more difficult to establish. To meet [their] burden, Plaintiffs must show at the least that third parties will likely react in predictable ways.

*Book People, Inc. v. Wong*, 91 F.4th 318, 332 (5th Cir. 2024) (cleaned up); *Clapper*, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (refusing "to abandon [the Court's] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). A plaintiff cannot establish that an injury is "fairly traceable" by proposing a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414, 133 S.Ct. 1138.

[23]   Bienville argues that the plaintiffs have not satisfied the causation requirement of standing because "[t]he Complaint and relevant jurisprudence establish that data breaches are an every-day occurrence, and thus the private information of virtually every American has been at least exposed to misappropriation or misuse by cyber-criminals." (Def.'s Mem. at 11-12, ECF No. 29). Bienville also alleges that the plaintiffs' "failure to provide any allegation that specific information placed at risk in this particular data breach has been taken or misused is fatal to their Article III standing." (Def.'s Mem. at 21, ECF No. 29). It claims that Williams should have alleged facts linking the unauthorized charges on his credit union account to the private information exposed in the Bienville data breach, and that Schenck and Rose should have provided the date(s) on which their information was posted and/or stated that the information posted was involved in the Bienville data breach. Plaintiffs counter that Bienville's argument is "procedurally premature" because Bienville is attempting "to insert an evidentiary standard at the pleading stage." (Pls.' Resp. at 22, ECF No. 32).

[24]   [25]   [26]   Therefore, the parties' arguments turn on the allegations necessary to withstand a Rule 12(b)(1) standing challenge. Generally, plaintiffs have the burden of stating "a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). This plausibility standard is derived from the standards used for resolving Rule 12(b)(6) motions. *See* *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015); *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *White v. Texas*, No. 4:23-CV-0925-P, 2023 WL 6578481, at *1 (N.D. Tex. Oct. 10, 2023). "[D]etailed factual allegations" are not required, but an "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plaintiff's factual allegations must support a claim to relief that is plausible on its face and rises above mere speculation." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). However, a motion to dismiss under Rule 12(b)(1) "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Williams v. Certain Underwriters at Lloyd's of London*, 398 F. App'x 44, 46 (5th Cir. 2010) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

App. 102

**\*7**  In a data breach case, the District of Minnesota has held that the following allegations were sufficient to satisfy the causation requirement of standing: (1) the defendant failed to secure his private information; (2) its network was subsequently hacked; (3) the plaintiff's private information was stolen by hackers, and (4) the plaintiff became the victim of a bank scam after the data breach. *Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 753 (D. Minn. 2023). This finding was not altered by the defendant's argument that the plaintiff's bank account information was not stolen in the breach because the plaintiff's burden is "relatively modest" at the pleading stage of the litigation. *Id.*

In addition, the United States District Court for the Eastern District of Louisiana has explained:

> Plaintiff has alleged that he does not recall receiving any other notices of data breach, and that his PII was compromised because defendant failed to implement minimum safeguards in contravention of its legal obligation to do so. At this stage, nothing further is required to establish traceability for constitutional purposes.

*Merrell*, 2023 WL 6316257, at \*4 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.")). Other courts have similarly found a defendant's argument that the plaintiff's data may have been stolen in a separate data breach to be "less about standing and more about the merits of causation and damages." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1029 (9th Cir. 2018); *see also Merrell v. 1st Lake Props., Inc.*, No. CV 23-1450, 2023 WL 6316257, at \*4 (E.D. La. Sept. 28, 2023) (rejecting the assertion that a data breach plaintiff's injury is not traceable to the defendant's negligence "because [the] plaintiff's information may have been compromised in another data breach"). These courts reason that the possibility of another breach "does nothing to negate the plaintiffs'

standing to sue for the breach in question." *Zappos*, 888 F.3d at 1029 (quoting *Remijas*, 794 F.3d at 696).

The United States District Court for the District of Kansas came to the opposite conclusion in a case where "[t]he only link between the data breach and the claimed misuse [was] that the misuse came after the data breach." *Masterson v. IMA Fin. Grp., Inc.*, No. 2:23cv2223-HLT-ADM, 2023 WL 8647157, at \*4 (D. Kan. Dec. 14, 2023); *see also Blood v. Labette Cnty. Med. Ctr.*, No. 5:22cv4036, 2022 WL 11745549, at \*5 (D. Kan. 2022) ("noting that the plaintiffs, who did not know what personal information, if any, was stolen, [did] not plead any facts suggesting how the mere possession of their Social Security numbers and names would enable someone to make unauthorized charges on an existing account (instead of, for example, opening a new account)");

*but see Hutton*, 892 F.3d at 623 (holding plaintiffs satisfied the causation requirement of standing with allegations that the defendant organization was the only common source that collected and continued to store the personal information at issue during the relevant time periods).

**[27]**  Plaintiffs allege that cybercriminals had access to their private information in Bienville's network between at least February 3, 2023, and March 5, 2023. (Compl. at 99, ECF No. 27). Williams, Schenck, and Rose assert that they are "very careful about sharing [their] sensitive information." (*Id.* at 34, 39, 49). Williams and Schenck further state that, "to their knowledge," their private information "has never been exposed in any other data breach." (*Id.* at 34, 39). "Upon information and belief, Plaintiff Williams attributes [the fraudulent] charges and fraudulent accounts [at his credit union] to the [Bienville] Data Breach." (*Id.* at 34). The fraudulent charges were made on his credit union account in late February 2023, and additional accounts were opened "shortly thereafter." (*Id.*) The Court recognizes that " 'information and belief' pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531 (5th Cir. 2004) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (2d ed. 1990)). But here, there is no indication that the circumstances concerning the fraudulent charges and accounts at Williams' credit union are in Bienville's possession; the details are more likely to be in Williams' possession, or at least more accessible to Williams.

**\*8** As for the other named plaintiffs, Experian notified Schenck "[s]ince the Data Breach" that his private information was posted on the dark web, and (2) Rose was notified by his credit monitoring service that his private information was posted on the dark web in October 2023. (*Id.* at 39, 49). The Complaint provides no information linking the dark web posts with the Bienville data breach. For example, "Was the PII on the dark web before the breach[,] and were [Plaintiffs] only notified later? And what PII was 'found'? Does it match the PII stolen in the data breach? And is Defendant's database the only place this information was available?" *See Blood*, 2022 WL 11745549, at \*8.

In today's society, an individual's PII and PHI can be stolen in myriad ways, often without the individual's knowledge. Data breaches and other forms of data theft are so prevalent that it is seemingly impossible to trace the misuse of personal information to one particular breach. The mere fact that Williams, Schenck, and Rose experienced misuse of their PII or learned that some of their PII had been stolen after the data breach is insufficient to show that the misuse of their PII is fairly traceable to the Bienville data breach. *See Masterson*, 2023 WL 8647157, at \*4 (the timing of the misuse of PII is insufficient to satisfy the fairly traceable standard).

### B. PLAINTIFFS' REQUESTS FOR DECLARATORY AND INJUNCTIVE RELIEF

**[28]** The Court must separately address whether Plaintiffs have standing to seek declaratory [4] and injunctive relief. *See Town of Chester v. Laroe Ests. Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017) ("[S]tanding is not dispensed in gross, a plaintiff must demonstrate standing for each claim she seeks to press and for each form of relief that is sought."); *see also TransUnion*, 594 U.S. at 437, 141 S.Ct. 2190 ("[A] plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages."). Plaintiffs' Complaint states, "On information and belief, Plaintiffs allege that Defendant's actions were—and still are—inadequate and unreasonable." (Compl. at 67, ECF No. 27). Plaintiffs claim they therefore "continue to suffer injury from the ongoing threat of fraud and identity theft." (*Id.* at 68). Plaintiffs ask the Court to enter judgment declaring that:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

(*Id.* at 67-68).

Plaintiffs also seek "injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it." (*Id.* at 68). They claim they will suffer irreparable injury and lack an adequate legal remedy if Bienville experiences a second data breach "because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct," and "[a]n injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large." (*Id.*).

**\*9** **[29]** **[30]** **[31]** **[32]** The Fifth Circuit has explained:

> Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements.... Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact.

*Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019) (internal quotation marks omitted). In particular, a plaintiff seeking injunctive relief must "show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact" and "demonstrate either continuing harm or a

App. 104

**Williams v. Bienville Orthopaedic Specialists, LLC, --- F.Supp.3d ---- (2024)**

2024 WL 3387169

real and immediate threat of repeated injury in the future." *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 901-02 (5th Cir. 2023). Therefore, the pertinent inquiry is whether the future risk of harm is "sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435, 141 S.Ct. 2190 (citing *Clapper*, 568 U. S. at 414, n.5, 133 S.Ct. 1138).

In the present case, Plaintiffs do not have standing to seek declaratory or injunctive relief because they have failed to allege facts "tending to show that a second data breach is currently impending or there is a substantial risk that one will occur." *See Hummel v. Teijin Auto. Techs., Inc.*, No. 2023 WL 6149059, at *14 (E.D. Mich. Sept. 20, 2023); *see also Beck v. McDonald*, 848 F.3d 262, 277-78 (4th Cir. 2017) ("[T]he most that can be reasonably inferred from the Plaintiffs' allegations regarding the likelihood of another data breach ... is that the Plaintiffs could be victimized by a future data breach. That alone is not enough."); *Brooks v. Peoples Bank*, No. 2:23-CV-3043, — F.Supp.3d —, ——, 2024 WL 2314538, at *5 (S.D. Ohio May 6, 2024) ("Plaintiffs have not pleaded facts from which the Court could find that the risk of a second data breach is substantial and imminent.").

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [28] Motion to Dismiss filed by Defendant Bienville Orthopaedic Specialists, LLC, is **GRANTED**. This lawsuit is hereby **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Clerk of Court shall file this Memorandum Opinion and Order in each of the following member cases: 1:23cv234-LG-MTP, 1:23cv237-LG-MTP, 1:23cv238-LG-MTP, 1:23cv243-LG-MTP, 1:23cv248-LG-MTP, and 1:23cv253-LG-MTP.

**SO ORDERED AND ADJUDGED** this the 18th day of June, 2024.

**All Citations**

--- F.Supp.3d ----, 2024 WL 3387169

---

## Footnotes

1   The cause numbers assigned to the member cases are 1:23cv234-LG-MTP, 1:23cv237-LG-MTP, 1:23cv238-LG-MTP, 1:23cv243-LG-MTP, 1:23cv248-LG-MTP, and 1:23cv253-LG-MTP.

2   "The dark web is an area of the internet accessible only by using an encryption tool. It provides anonymity and privacy online, and perhaps consequently, frequently attracts those with criminal intentions." *United States v. Schultz*, 88 F.4th 1141, 1143 (5th Cir. 2023) (citing Gareth Owen & Nick Savage, *The Tor Dark Net*, Global Commission on Internet Governance, Paper Series No. 20, 1 (2015)).

3   This plaintiff's last name is sometimes spelled "Sulsser" in the Complaint.

4   The Declaratory Judgment Act permits the judiciary to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.